IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 8:20CR104 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **BRIEF IN SUPPORT OF MOTION** |
| | ) | **TO SUPPRESS STATEMENTS** |
| | ) | |
| JONATHAN ROONEY, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the Defendant, Johnathan Rooney, by and through his attorney, Kelly M. Steenbock, and moves this court to exclude from trial custodial statements made to law enforcement in violation of the law. Initially, Mr. Rooney was twice interrogated without benefit of required *Miranda* warnings. Then, after Mr. Rooney invoked his right to have an attorney present, officers initiated a subsequent interrogation. This brief is in support of Mr. Rooney's previously filed motion to suppress statements.

**Factual Background**

About a half mile from an asphalt road in Winnebago, Nebraska, Jonathan Rooney and Kozee Decorah's vehicle became lodged in an embankment on the side of the road while driving to retrieve pre-chopped wood. Although it was not raining at the time, wet weather throughout the week created slippery, muddy roads. As the couple crept into the hills outlying the city, their truck became stuck in the first upward bend of Honey Creek Road. After unsuccessful attempts to get the truck out of the rut, Ms. Decorah called an aunt, Pam Mahkuk. She told Ms. Mahkuk they needed her help because they were stuck with their baby and that they had to walk quite a ways before they could get a cellular phone signal. Right after she got off the call with Ms.

Decorah, a little before 8:00 p.m. on May 16, 2020, Ms. Mahkuk reported to police that the couple were stuck down on Honey Creek Road and needed assistance.

The first responder was Peter Snowball, a Wildlife Conservation Officer, who is intimately familiar with his forested jurisdiction. As soon as Snowball got the call, he started out to the area where the couple's truck was reportedly lodged. Snowball approached the area from the west side and wound downhill until he saw the unoccupied vehicle that appeared to be stuck on the bank of the northwest side of the road. At 8:34 p.m., Snowball radioed dispatch to find out if the subjects had been located walking, but other officers had not yet had contact with the couple. While trying to leave the area, Snowball also got his vehicle stuck so he walked the short distance to the asphalt roadway to the east.

By time Snowball was picked up, and the search party reconvened, it was 9:50 p.m. At that point, Winnebago Police and Winnebago Fire personnel joined Conservation Officers in the search. Snowball suggested checking the cabins located on private property about a quarter mile south of the road where the vehicle was stuck in the road. Fire Captain Grant and Fireman Urbanec met Snowball at the entrance of the private property. At 11:50 p.m., the foot canvas began at the driveway of the private property with Snowball and Urbanec hiking up the hill to the first of the two cabins. Once atop the hill at the first cabin, Snowball observed a red glow on the east hilltop. Urbanec and Snowball called out, with no response. They then hiked through the overgrown valley to the east cabin and observed a cabin with black boots located outside. Upon entering the cabin, Snowball found the Defendant, Jonathan Rooney, and a small infant sleeping on a mattress inside.

The first things Rooney asked were, "where is she?" and "are you the rescue party?" Snowball told Mr. Rooney, yes, he is the rescue party and where did she [Ms. Decorah] go?

Rooney responded, "she went outside to get cell service." While searching the area for Ms. Decorah, Snowball located a fire around 5-7 yards from the cabin and observed that an outhouse and a large tree branch were on fire. As Snowball and SAFC Grant observed the outhouse footprint, they observed what appeared to be a bone and a skull. Urbanec agreed it appeared to be a skull and observed a "funky" smell that in both the firefighters and conservation officer agreed was not consistent with the smell of wood burning.

Rooney's clothes, which he reported were hanging up to dry, could not be found. Therefore, officers wrapped him in a blanket and placed him and the baby into a fire department vehicle. At the direction of BIA Officer Walker, Grant transported Rooney to Winnebago in his Fire chief issued vehicle. Snowball advised Grant to keep the dispatch radio off during the transportation and have Rooney delivered to the parking lot of the Winnebago Fire Department. While Rooney was en route, scene officers advised BIAO Walker that the fire site contained, in their opinion, human remains.

At about 1:14 a.m., Rooney arrived at the fire department and was intercepted by Winnebago Tribal Police Officer Trudell. WPTO Trudell was under direction from Walker to detain Rooney until further notice. Trudell retrieved Rooney out of the fire department vehicle and told him he was not under arrest but that he was being detained. WPTO Trudell placed Rooney in handcuffs and secured him into his police cruiser, locking the door. At 1:25 a.m., BIAO Walker called Chief of Police Lawrence who instructed Walker to call the on-duty agent at the FBI. After talking to Lawrence, BIAO Walker approached Rooney to ask questions about what happened and where Kozee was located. At no time did BIAO Walker advise Rooney of his rights per *Miranda*. At 2:10 a.m. Walker called on-duty FBI agent Roberts.

Special Agent Roberts arrived at the Winnebago Police Station parking lot at 3:08 a.m. where he was updated on the status of the investigation. SA Roberts made contact with Rooney wherein he asked questions designed to incriminate Rooney in the investigation of the suspected human remains. This interview was not audio or video recorded. Further, as of today's date, SA Roberts did not complete a FD-302 form used by the FBI to memorialize interviews and comply with this Court's Order on Discovery pursuant to Federal Rule of Criminal Procedure 16(a)(1)(A). (doc #22). After interaction with Rooney, SA Roberts and BIAO Walker along with Firefighters Grant and Urbanec headed out to the scene of the fire.

At 5:23 a.m., upon return to Winnebago, SA Roberts commenced a second interview with Rooney, who was still handcuffed and locked in WTPO Trudell's cruiser. SA Roberts gave Rooney a rights advisory consistent with the requirements of *Miranda* and proceeded to interrogate Rooney for approximately 30 minutes. Almost immediately, Roberts referenced the earlier questioning by stating, "I know you told me your story earlier, we talked a couple hours ago." (audio at 2:08). Roberts then started in with an interrogation that included several well-known tactics including suggestions and deception. Once it became clear that Roberts would not accept his explanations, Rooney asked for a lawyer (31:28). After one more run at it, Roberts accepted Rooney's second request for a lawyer and terminated the interview (33:05).

After Roberts gave up, BIA Officer Walker decided to give another try. At 6:18 a.m. Walker re-initiated contact with Rooney, who was still apparently handcuffed and seated in the back of Trudell's cruiser. Walker started by asking, "FBI talked to you already?" Rooney answered, "yeah." (audio at :53). Walker then read the right's advisory to Rooney and, with the final question, asked if he wanted to talk. After a long pause, Rooney replied, "I don't know, I tried talking to that guy." (1:57). Walker responded, "He's with FBI, I'm BIA, so." (2:03). Both

BIAO Walker and Rooney are Native American. In Winnebago, amongst Native Americans from the same community, the statement, "I'm BIA" has meaning other than the agency where he works. It is, of course, a reference to their common heritage as Native men and as Winnebago. It is also a reference to their common religion and religious practices as practicing men of the Native American Church (2:55). With that explanation, Rooney quickly relented and agreed to talk to Walker (2:05).

## Argument

**1. Jonathan Rooney's initial statements, in response to questioning without benefit of *Miranda*, to both BIA Office Walker and Special Agents Roberts were obtained in violation of well-established principles and should be suppressed and excluded from use at the time of trial.**

Custodial interrogations, by their nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. 436, 464 (1966). To combat this natural pressure, *Miranda* demands that individuals subjected to custodial interrogation be advised of their right to remain silent and to have counsel present. *Id*. at 468-70.

It should be undisputed that, for the duration of each of the four interactions with law enforcement, Rooney was in custody. Though Rooney was told he was not under arrest, he was, by no stretch, free to leave. The question of whether a suspect was "in custody" for *Miranda* purposes does not turn on the presence or absence of formal arrest. See *Miranda*, 384 U.S. at 444. The ultimate question is whether, "under the totality of the circumstances he faced at the time of his questioning, a reasonable person in [the defendant's position] would have felt free to end the interrogation and leave." *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir.2009). Once in Winnebago, Tribal Police Office Trudell, at the direction of BIA Officer Walker, placed Rooney in handcuffs and locked him into the backseat of his patrol unit. No person in Rooney's

positon would have felt at liberty to leave because he was, in fact, not able to leave the confines of the handcuffs nor imprisonment of a police cruiser.

"Failure to give Miranda warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 601 (2004). In this case, there is no dispute that the Defendant was in custody. As such, the statements made to BIA Walker and, separately, to SA Roberts should be suppressed and excluded from use by the government at the time of trial. See, *Wong Sun v. United States*, 371 U.S. 471 (1963).

**2.** *Miranda* **warnings administered in Robert's successive interrogation were ineffective in advising Rooney that he had any real choice about giving an additional statement.**

By about 1:25 a.m., Jonathan Rooney was detained and in custody of the Winnebago Police Department in the backseat of a police cruiser. BIA Officer Walker had contact with Rooney and asked him some questions about what happened and told Rooney he will remain detained until Kozee was located. Walker's report reflects SA Roberts arrived at Winnebago Police station at 3:08 a.m. and that he also had contact with Rooney. WTPO Trudell's report reflects he unlocked his cruiser to allow Roberts access to Rooney but that Trudell was out of earshot and could not hear what was said between the two. At 3:23 a.m., Roberts and Walker responded to the intersection of the asphalt road and Honey Creek Road, transferred vehicles and headed to the scene.

Without notice of the actual content of the statement allegedly provided by Rooney, it is impossible to know whether the "question first" tactic used effects the function of later *Miranda* warnings as presenting an actual choice to Rooney. What we do know raises constitutional concerns: SA Robert's second interaction with Rooney started with; "I know you told me your story earlier, we talked a couple hours ago." (audio at 2:08). Certainly, the manner in which the

successive interrogation started gives the distinct impression that Rooney, for having talked to Roberts and/or Walker earlier, had no real choice about continuing the conversation and blurred any distinction between the first and second interrogations. The statement itself attaches the two interrogations and demands, as a starting point, further explanation by Rooney of his first statement.

The Supreme Court settled this circumstance when it decided *Seibert*. "Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Missouri v. Seibert*, 542 U.S. 600, 613 (2004). "It would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because Miranda warnings formally punctuate them in the middle." *Seibert,* 542 U.S. at 614 (2004).

Omission of *Miranda* as "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will" is one circumstance but not the only scenario with "ask first warn later." See, *Oregon v Elstad,* 470 U.S. 298, 309 (1985). By the time Roberts had his first contact with Rooney, he had already been handcuffed and confined in the backseat of a police cruiser for over 2 hours. Then, between the first set of interrogations and the second interrogation, Rooney was left handcuffed and confined for another 2 hours. There is no evidence, that for over 4 hours, he was given a break from the cramped quarters, offered water, or a restroom break.

If in *Elstad*, the Court thought any causal connection between the first and second responses to the police was "speculative and attenuated," that is not so here. *Id*., at 313. In this

case, Roberts connected the two interrogations with his first sentence. Roberts did nothing to alleviate the conclusion that Rooney's earlier statement could not be used or that he would be given an opportunity to stop talking about matters previously discussed. As in *Seibert* where the Officer created a link between the first and second interrogations so did Roberts in this case:

> "Officer Hanrahan set the scene by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Seibert* at 616–17.

As such, because the facts cannot support confidence by this Court that *Miranda* warnings could have served their purpose, Rooney's post-warned statements should also be excluded as evidence.

**3. Having already unequivocally expressed his desire to deal with law enforcement only through counsel, Rooney's subsequent waiver and statement to BIA Officer Walker is the product of coercion and should be suppressed and excluded from use at the time of trial.**

Application of two on-point Supreme Court cases resolves this issue squarely in favor of Rooney's motion to suppress. First, in *Edwards*, the Supreme Court determined that the traditional standard for waiver was not sufficient to protect a suspect's right to have counsel with him during an interrogation if he had previously requested counsel; "additional safeguards" were needed. *Edwards v. Arizona*, 451 U.S. 477 (1981). The Court therefore superimposed a "second layer of prophylaxis." *Edwards*, 484. Thus, when the suspect has invoked his right to have counsel present during custodial interrogation, he does not waive that right by merely responding to further police-initiated interrogation after being advised of his *Miranda* rights. *Id*. Having expressed his desire to deal with the police only through counsel, the suspect may not be

interrogated by the police until counsel has been made available to him, unless he "initiates further communication, exchanges or conversations with the police." *Id.*

Second, in *Minnick*, the suspect requested an attorney during an interview with the FBI, the interview ceased and an appointed attorney met with the suspect on two or three occasions. Three days later, county sheriffs questioned the suspect without his attorney present. The Supreme Court held that the involvement of separate law enforcement officials did not circumvent the suspect's right to counsel. See, *Minnick v. Mississippi*, 498 U.S. 146 (1990). The Court stated that "when counsel is requested; interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not [the suspect] has consulted with his attorney." *Minnick* at 153.

Here, Winnebago Tribal Officer Trudell noted in his report that after Rooney talked to SA Roberts: "Where once again FBI agent Roberts went to question Jonathan. During this round of questioning Jonathan did decide to remain silent." Both Trudell and Walker knew full well that Rooney had been interrogated and that Rooney had either decided to remain silent or to discontinue the interview for some other reason. Rooney told Walker as much at the start of the subsequent interview. Even though Rooney was re-administered *Miranda* warnings and waived them, Rooney did not initiate contact with Walker. As such, and in consideration of the earlier statement, ALL statements to BIA Officer Walker should be suppressed and excluded from use at the time of trial.

**4. Rooney's successive interrogation and statements to BIA Officer Walker were not voluntarily given and should be excluded from use even as impeachment evidence.**

Although rare, this Court has the authority to exclude statements for use as impeachment if the Court finds the Defendant's "will overborne and his capacity for self-determination critically impaired because of coercive police conduct." See, *Colorado v. Spring*, 479 U.S. 564,

574 (1987). After sitting handcuffed for over 4 hours, the combination of threats to keep Rooney handcuffed in the police cruiser until Kozee was found, along with the threats by Roberts to use the FBI to somehow make Rooney's situation worse is powerful incentive to talk. Once SA Roberts started talking about murder charges, Rooney asked to have a lawyer (audio with Roberts at 31:26). After more attempts from Roberts to manipulate Rooney and after Roberts told Rooney the scene looked like murder, Rooney once again asked for a lawyer- this time his request was honored. (audio at 33:05).

      BIA Office Walker decided to take another crack at Rooney. Finally, Rooney sees someone who knows who him as a Native American man, a Winnebago man. A person who is part of the Native American Church, a church that the two share as a cultural background. Rooney sees an ally not just from the community but as a person who is also Winnebago who he can talk to in a way that he could not with SA Roberts, a self-described big deal from D.C. who worked "counter terrorism" who is "used to dealing with people who blow shit up." (audio 4:38).

      The distinction between Walker and Roberts created a crisis within Rooney that overcame his reasoned choice. The comment, "he's FBI, I'm BIA" means so much more in the context of history, community and religion. Walker monopolized upon that connection for his own investigative pursuits and coerced Rooney into making inculpatory statements. Both statements to BIA Office Walker should be suppressed and excluded - not just in the government's case in chief but also as impeachment evidence if the Defendant elects to testify in his own defense at the time of trial.

**Conclusion**

This Court should sustain Mr. Rooney's motion to suppress statements.  Initially, he was twice interrogated without benefit of *Miranda* warnings as required by law.  Secondly, law enforcement from the FBI engaged Mr. Rooney in an unlawful successive interrogation in an effort to cure the prior illegally obtained statements.  Then, after Mr. Rooney invoked his right to have an attorney present, a BIA officer initiated a second successive interrogation.  The statements to the BIA, during the second successive interrogation, should also be suppressed and excluded from use as impeachment evidence.

JONATHAN ROONEY, Defendant,

By:   s/ Kelly M. Steenbock
**KELLY M. STEENBOCK**
**Assistant Federal Public Defender**
222 South 15th Street, Suite 300N
Omaha, NE 68102
(402) 221-7896
Fax: (402) 221-7884
email: kelly_steenbock@fd.org