IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 8:20CR104 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANT'S REPLY BRIEF** |
| | ) | |
| | ) | |
| JONATHAN ROONEY, | ) | |
| | ) | |
| Defendant. | ) | |

The government, having filed their brief on the issues raised in Defendant's Motion to Suppress Statements, concedes some of the issues raised and has thus limited the scope of the dispute. In the first instance, the government concedes both BIA Officer Walker and SA Roberts unlawfully questioned Rooney without having first advised him of his rights as required per *Miranda.* As such, those statements are inadmissible, as a matter of well-established law, and should be suppressed. "[W]herever an accused has been taken into "custody" and subjected to "interrogation" without warnings, the Court has consistently prohibited the use of his responses for prosecutorial purposes at trial". See, e.g., *Estelle v. Smith*, 451 U.S. 454 (1981). The "meaning of *Miranda* has become reasonably clear and law enforcement practices have adjusted to its strictures." *Rhode Island v. Innis*, 446 U.S. 291, 304, (1980) (BURGER, C.J., concurring), *New York v. Quarles*, 467 U.S. 649, 663 (1984) and see also, *Dickerson v. U.S*, 530 U.S. 428 (2000).

The government also concedes the second time BIAO Walker interviewed Rooney he had already invoked his right to have an attorney. Regardless of what Walker knew, Rooney had in fact invoked counsel, and Walker was prohibited by law from initiating a subsequent interrogation. In *Edwards,* the Court set forth a "bright-line rule" that all questioning must cease

after an accused requests counsel. *Solem v. Stumes,* 465 U.S. 638, 646 (1984), *Smith v. Illinois*, 469 U.S. 91, 98 (1984). The government's concession to forgo use of the statement at trial does not render the matter moot. As such, regardless of the government's intent for use of the statement, the Court should suppress and exclude it from use at trial.

The remaining issues include: 1) admissibility of the second statement given to SA Roberts and, 2) admissibility of the second statement given to BIAO Walker as impeachment evidence in the event the Defendant decides to testify at the time of trial.

## Argument

**A.     *Miranda* warnings, given after Rooney was already intentionally and unlawfully interrogated, were ineffective. Rooney's statements to SA Roberts are inadmissible at trial.**

As an initial matter, how very interesting for SA Roberts to recover audio from the first interview after he previously claimed he did not record it and did not write a report. The clearly established actions of a seasoned FBI agent certainly effect the motivations this Court should afford his conduct. SA Roberts should not be given the benefit of the doubt that his strategy was not "designed, deliberate, intentional or calculated" when he was unwilling to even disclose, from audio or from memory, the content of the first interrogation.

The facts, as we now know them, are that Roberts initially asked Rooney questions designed to elicit an incriminating response while Rooney was naked and handcuffed in the back of a police cruiser. If that doesn't spark an instinct to provide *Miranda* warnings, I don't know what possibly does. Additionally, if Roberts' own declarations are to be believed, he is very experienced with investigating high level felony investigations, such as when people "blow shit up." (Roberts 2nd interview audio 4:35). The questions were purposeful and not designed to find out the identity of the human remains in the rubble of the outhouse fire, as may be reasonable if the officers indeed did not already believe the identity of the remains. The inquiry was designed

to elicit incriminating information from Rooney about his relationship with Ms. Decorah that would later be used to establish the very strategy SA Roberts used when he interrogated Rooney the second time.

When we get to the subsequent interrogation, Roberts had no interest in establishing a coherent understanding of the events that lead the couple being at the cabin.  He was primarily interested exploring the facets of Rooney's relationship that fit his narrative- that there was a domestic fight and that Rooney killed Decorah.  He first revealed his intent in the un-*Mirandized* statement he acquired the first time when he asked Rooney, "do you ever put your hands on her?" (Roberts 1st audio 4:35).   Roberts assured him, "it happens."  (4:50).   One only needs to listen to the audio of the subsequent interrogation to see the ways inculpatory statements from the first interrogation set the stage for interrogation tactic used in the subsequent interrogation.  Roberts' conduct reveals the "question-first" object, which is to "render *Miranda* warnings ineffective by waiting to give them until after the suspect has already confessed."  The threshold question in this situation is whether it would be reasonable to find that the warnings could function "effectively" as *Miranda* requires.  *Missouri v. Seibert*, 542 U.S. 600 (2004).   How could later warnings be effective when Rooney already confessed that he did, sometimes, hit Decorah.  Once Rooney answered that question, how did he have a choice?

For example, after Roberts told Rooney there was blood in the cabin, Rooney expressed surprise.  Rooney reminded him that he was asleep but that often Decorah would cut herself on the arm when she was upset at Rooney or when he did not come home.  SA Roberts told Rooney, "That's not what the blood in cabin looks like, man.  Doesn't look like some girl nicked herself up." (Roberts 2nd audio 9:03)  "I talk to a lot of shitheads, I specialize in shitheads; I can tell right now you're not… you're not a fuckin' loser" (9:22) "You're not a shithead, you're not a turd…I

know that…there's a lot of shit that doesn't make sense...fucking blood in that fucking cabin. Where the fuck are your fucking clothes?" (12:15) Roberts goes on to say, "Shit happens. I told you, I've been there too, I've been boxed in a corner. And, hey, I'm a man and I'm going to make decisions and I deserve my own freedom and sometime you have to take it, maybe that happened, maybe that happened. That doesn't make you a bad guy." (17:54)

This situation is more consistent with the facts presented in *Seibert*, where the officer chose intentionally to withhold warnings. In this case, SA Roberts withheld warnings, despite being seasoned and experienced in these serious felony matters. What he learned was his inroad and his way of fake relating to Rooney's experience. Complete with a made-up girlfriend who also had Roberts "cornered." This strategy makes the intervening *Miranda* warning meaningless, especially when Rooney is immediately on-guard about the nature of his relationship, whether they fight, what her mental health status is or is not. This Court should not allow such strategy as it is inconsistent with the goal to provide warnings that give a meaningful choice to the accused. As such, Rooney's statement to Roberts should be suppressed and excluded from use at trial.

**B. After having invoked his right to an attorney, BIA Walker initiated a second subsequent interview of Rooney. Statements made by Rooney were involuntarily given and should be excluded even as impeachment evidence at the time of trial.**

It is not clear from BIA Officer Walker's report what he knew about the reason the interview with SA Roberts terminated. Officer Trudell's report, however, clarifies, "Where once again FBI agent Roberts went to question Jonathan. During this round of questioning Jonathan did decide to remain silent. After FBI agent Roberts and I came back inside the police department, Officer Walker went to advise Jonathan he was being placed under arrest and to question Jonathan prior to being transported to corrections. I went back out with Officer Walker,

where Jonathan was read his Miranda Rights and stated he understood his rights. I signed off as a witness for the Miranda Warning and Waiver form. Officer Walker then started questioning." In this circumstance, it is reasonable to conclude that the officers, since they were together, had a similar understanding- that Rooney (for whatever reason) had decided to remain silent and that Walker questioned him anyway.

"Once the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Edwards v. Arizona*, supra, 451 U.S., at 485, 486. The statement is clearly inadmissible in the government's case-in-chief and it seems the government concedes as much.

The first thing Rooney told Walker, after *Miranda*, was "I don't know, I tried talking to that guy." (Walker audio at 1:57). Walker's response was not to clarify the reason Rooney terminated the FBI interview, likely because he already knew. Walker did not seek to clarify Rooney's frustration with Roberts but instead replied, "He's with FBI, I'm BIA, so." (2:03).

When the defendant's statements are involuntary, they must be excluded for all purposes. See, *New Jersey V. Portash,* 440 U.S. 450, 459(1979) and *Mincey v. Arizona*, 437 U.S. 385, 389 (1978). Rooney, by the time Walker approached him, had been naked and handcuffed in the back of a cruiser for several hours. The government, in their brief, claim Winnebago officers checked on him every ½ hour or so but there is no evidence he was provided clothing, water, a restroom break or food. He was handcuffed in the back of a cruiser- with no space between his kneecaps and the front seat. The only fresh air he got was when officers opened the door to interrogate him.

Defendant acknowledges cases in which a defendant can make a colorable argument that self-incriminating statements were compelled—despite warnings and a waiver of them—are rare. "Absent evidence that [the defendant's will] was overborne and his capacity for self-determination critically impaired because of coercive police conduct," the statements he made will be considered voluntary. *Colorado v. Spring*, 479 U.S. 564, 574 (1987). This case however, demonstrates a cluster of factors that weigh against his second subsequent statement being voluntary. Walker, by implicating their common heritage and church membership at Native American men, the physical discomforts and deprivation of dignity Rooney had suffered for hours, and the series of questioning itself are sufficient to overcome any believe that Rooney's second subsequent statement was voluntarily given. The government should not be allowed to use the statement for any purpose.

## Conclusion

Law enforcement should not be allowed to disregard or cleverly circumvent well-established principles governing custodial statements. As such, the Defendant respectfully requests this Court to suppress from use at trial both of the first unwarned statements. He also requests the first subsequent statement and the second subsequent statement be excluded from the government's case-in-chief and that the second subsequent statement not be allowed to be used as impeachment evidence, in the event the Defendant elects to testify.

JONATHAN ROONEY, Defendant,

By: s/ Kelly M. Steenbock
**KELLY M. STEENBOCK**
**Assistant Federal Public Defender**
222 South 15th Street, Suite 300N
Omaha, NE 68102
(402) 221-7896
Fax: (402) 221-7884

email: kelly_steenbock@fd.org