```
 1                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF NEBRASKA
 2

 3     UNITED STATES OF AMERICA,      )     Case No. 8:20CR104
                                      )
 4                 Plaintiff,         )
                                      )
 5     vs.                            )
                                      )
 6     JONATHAN DANIEL ROONEY,        )
                                      )     Omaha, Nebraska
 7                 Defendant.         )     December 15 and 18, 2020

 8

 9
                           TRANSCRIPT OF PROCEEDINGS
10              BEFORE THE HONORABLE MICHAEL D. NELSON
                    UNITED STATES MAGISTRATE JUDGE
11

12                      A-P-P-E-A-R-A-N-C-E-S

13     FOR THE PLAINTIFF:           Ms. Lecia E. Wright
                                    Mr. Sean P. Lynch
14                                  U.S. Attorney's Office
                                    1620 Dodge Street
15                                  Suite 1400
                                    Omaha, NE 68102-1506
16

17     FOR THE DEFENDANT:           Ms. Kelly M. Steenbock
                                    Federal Public Defender's Office
18                                  222 South 15th Street
                                    Suite 300N
19                                  Omaha, NE 68102

20

21     TRANSCRIBER:                 Ms. Lisa Grimminger, RDR, CRR, CRC
                                    100 Centennial Mall North
21                                  Room 587
                                    Lincoln, NE 68508
22                                  (402) 437-1908

23

24

25     Proceedings recorded by electronic sound recording, transcript
       produced with computer.
```

```
 1              (At 9:33 a.m. on December 15, 2020; with counsel and the

 2     defendant present:)

 3              THE COURT:  ...of America versus Jonathan Rooney.

 4     The case number is 8:20CR104.

 5         Counsel for the government, please enter your appearance.

 6              MS. WRIGHT:  Good morning, Your Honor.  Seated here

 7     at the government's table, Lecia Wright for the United States

 8     along with Sean Lynch.  Behind us is FBI Special Agent Sam

 9     Roberts.

10              THE COURT:  Good morning to each of you.

11         For the defendant.

12              MS. STEENBOCK:  Good morning, Judge.  Kelly

13     Steenbock, Assistant Public Defender, on behalf of Mr. Rooney,

14     who's seated at counsel table with me this morning.

15              THE COURT:  Good morning to each of you.

16         Mr. Rooney, are you feeling all right?

17              MS. STEENBOCK:  You gotta answer.

18              THE DEFENDANT:  Yeah.

19              THE COURT:  Okay.  We're here today, sir, because

20     your attorney has filed a motion to suppress.  That motion was

21     at filing number 41.  The aim of the motion is to contest the

22     admission of statements that you made while in custody.  The

23     motion's supported by a brief at filing number 42.  It's

24     opposed by the government at filing number 45, and the

25     defendant filed a reply brief at the Court's direction at
```

1      filing number 48.  We're here for the evidentiary hearing.

2          As I understand it, Ms. Wright, you don't intend to put on

3      all your evidence today because of witness availability?

4              MS. WRIGHT:  Yes, Your Honor, that's correct.  One of

5      the government's witnesses, Officer Walker, is in quarantine in

6      Winnebago until tomorrow and is able to travel to court on

7      Friday, and so the intent is to proceed with Agent Roberts this

8      morning and then conclude on Friday.

9              THE COURT:  Okay.  So you're going to have two

10     witnesses total?

11             MS. WRIGHT:  Yes, Your Honor.

12             THE COURT:  And Ms. Steenbock, you don't have to make

13     this decision final now, but do you intend to be putting on any

14     evidence?

15             MS. STEENBOCK:  I -- I have no intention to unless

16     something unexpected occurs.

17             THE COURT:  Okay.  As far as exhibits, I'm assuming

18     that the government has some exhibits?

19             MS. WRIGHT:  I do, Your Honor.  I have a disk that

20     has three separate interviews on them, and that disk Your Honor

21     has already received, and I think you'd noticed that it's

22     labeled inside of the disk.  It's Exhibit 1, 2 and 3.

23             THE COURT:  Okay.  I will say that the disk I got had

24     two interviews.  They are the Roberts interviews.  It did not

25     have the Walker interview.

```
 1            MS. WRIGHT:  Okay.

 2            THE COURT:  So I -- because you had provided it to

 3    defense counsel and I anticipated defense was not going to have

 4    an objection to me listening to that, I did listen to those two

 5    interviews --

 6            MS. WRIGHT:  Okay.

 7            THE COURT:  -- more than -- more than once, but I

 8    haven't heard the Walker interview yet.  So the disk is

 9    Exhibits 1, 2 and 3, three different interviews.

10            MS. WRIGHT:  Yes, that's correct, Your Honor.  I

11    apologize that the Walker one was not on the copy you received.

12    It should have been.  It is on the copy I have here in court.

13    My intent was to wait and offer it on Friday.

14            THE COURT:  Okay.

15            MS. WRIGHT:  But if -- if Ms. Steenbock doesn't have

16    an objection, I might offer it today if there are no foundation

17    issues, and that way Your Honor has an opportunity to listen to

18    it prior to Officer Walker's testimony on Friday.

19            THE COURT:  And then do you have one paper --

20            MS. WRIGHT:  And that's --

21            THE COURT:  -- exhibit?

22            MS. WRIGHT:  Correct, Your Honor.  So Government

23    Exhibit 4 would be the FD-395.

24            THE COURT:  Okay.  The rights advisory?

25            MS. WRIGHT:  Yes, Your Honor.
```

1           THE COURT:  What I typically do, Ms. Steenbock, is

2     have the government offer those exhibits if there's not going

3     to be an objection now and just receive them so that they're

4     available as testimony comes in.

5           The government is offering Exhibits 1 through 4?

6           MS. WRIGHT:  Yes, Your Honor.

7           THE COURT:  Would there be an objection?

8           MS. STEENBOCK:  No objection, Judge.

9           THE COURT:  Okay.  I'll go ahead and receive them.

10          And then as far as opening statements, I don't think it's

11    necessary.  The parties have done an excellent job with their

12    briefing.  I did have some clarifications that I did want to

13    ask you first, Ms. Wright.  And if you want to make an

14    argument, you certainly can, as Ms. Steenbock will be allowed

15    to.  Certainly when we get done on Friday, we'll allow you to

16    make closing arguments.

17          With regard to statements, as I understand it, there were

18    essentially four encounters that resulted in statements from

19    the defendant.  The first one was with Officer Walker, but

20    that's not recorded.

21          Is that correct?

22          MS. WRIGHT:  Correct.

23          THE COURT:  And then there were -- there was the

24    initial one with Agent Roberts that Officer Walker may have

25    been present but didn't do the interview?

```
 1              MS. WRIGHT:  Officer Walker was not present during

 2      that interview.  It was only Agent Roberts.

 3              THE COURT:  Okay.  That one's recorded?

 4              MS. WRIGHT:  Yes.

 5              THE COURT:  And that's about 3:30 in the morning or

 6      something like that?

 7              MS. WRIGHT:  Approximately three -- 3:23.

 8              THE COURT:  Okay.  And what date is this?

 9              MS. WRIGHT:  May 17th.

10              THE COURT:  Okay.  And then the second interview is

11      again with Agent Roberts, and that's a couple hours later?

12              MS. WRIGHT:  At 5:35, yes, Your Honor.

13              THE COURT:  Okay.  And that one's recorded?

14              MS. WRIGHT:  Yes.

15              THE COURT:  So those are Exhibits 1 and 2.

16              MS. WRIGHT:  Yes, Your Honor.

17              THE COURT:  And then later there is this interview

18      with Officer Walker later.

19              MS. WRIGHT:  That's correct.

20              THE COURT:  What time was that?

21              MS. WRIGHT:  6:18.

22              THE COURT:  All on the same day?

23              MS. WRIGHT:  Yes.

24              THE COURT:  Now, as I understand it, the government

25      is not offering any statements that were made by the defendant
```

1      with regard to the first Officer Walker interview.

2          Is that correct?

3              MS. WRIGHT:  Correct, Your Honor.

4              THE COURT:  The one that's not recorded.

5              MS. WRIGHT:  Correct.

6              THE COURT:  And the -- the fourth interview, so to

7      speak, the last one with Officer Walker, the government is not

8      going to be offering any statements that were made by the

9      defendant in its case in chief but wishes to be able to use

10     those statements for impeachment in the event that Defendant

11     Rooney testifies at trial.

12             MS. WRIGHT:  Yes, Your Honor.  Correct.

13             THE COURT:  With regard to the two interviews that

14     were done by Officer Roberts, the first one the government is

15     not intending to offer for any purpose?

16             MS. WRIGHT:  Well, I suppose it would still be

17     available for impeachment as well -- I had not addressed that

18     in the brief, Your Honor -- but not in its case in chief.

19             THE COURT:  Okay.  And then the third interview,

20     second one with Agent Roberts, the government intends to offer

21     any statements that are made by the defendant during that

22     interview?

23             MS. WRIGHT:  Yes, Your Honor.

24             THE COURT:  Okay.

25             MS. WRIGHT:  But when I say intends to, I don't want

1    to necessarily say that I'm -- I plan to in my case in chief,

2    but it's our position that it is admissible in our case in

3    chief.

4            THE COURT:  Thank you.  So that's -- that's

5    essentially where you're coming from in your briefs, and that

6    would be essentially your opening statement?

7            MS. WRIGHT:  I would agree, Your Honor.

8            THE COURT:  Okay.  Ms. Steenbock, you take the

9    position that none of the statements are admissible for the

10   reasons that you stated in your brief, including impeachment?

11           MS. STEENBOCK:  Yes, Your Honor, for different

12   reasons for each of them.  And I guess at this point, given the

13   government's position this morning and in her briefing, I would

14   ask the Court to just enter an order before we even begin the

15   hearing finding that statements one, two and four are

16   inadmissible in the government's case in chief.  That would, of

17   course, narrow our issues to statement number three's

18   admissibility and then statement number four's admissibility as

19   impeachment evidence should Mr. Rooney elect to testify.

20           THE COURT:  Well, I think those issues are moot.  The

21   government's indicated that they're not offering statements

22   one, two and four in their case in chief, and they reserve

23   the -- they wish to reserve the right to -- to utilize

24   statements made during interviews two and four for impeachment.

25   I think the record's clear on that.

1          MS. STEENBOCK:  Well, whether or not if they think

2     it's moot based on their decision currently, I still think it's

3     a violation of his constitutional rights and there should be an

4     order stating that.

5          THE COURT:  What's the position of the government on

6     that?

7          MS. WRIGHT:  The -- our position is consistent with

8     what Your Honor just stated, that they -- the issue is -- is a

9     moot issue because we don't intend to offer that evidence.

10         THE COURT:  Okay.  Okay.  Well, why don't we go

11    ahead, then, and have you call your first witness?

12         MS. WRIGHT:  At this time, then, the government calls

13    Special Agent Samuel Roberts to the stand.

14         THE COURT:  Special Agent Roberts, if you would

15    please come up to the stand.

16       You can go ahead and take a seat in the chair here, and

17    then we'll have you sworn in.

18         COURTROOM DEPUTY:  Please state your full name for

19    the record and spell your last name.

20         THE WITNESS:  Samuel Roberts.  Samuel David Roberts,

21    R-O-B-E-R-T-S.

22         COURTROOM DEPUTY:  Please stand and raise your right

23    hand.

24          SAMUEL ROBERTS, PLAINTIFF'S WITNESS, SWORN

25         THE COURT:  You may proceed when you're ready.

Roberts - Direct                                                    10

```
 1              MS. WRIGHT:  Thank you, Your Honor.
 2                       DIRECT EXAMINATION
 3   BY MS. WRIGHT:
 4   Q.   Agent Roberts, before we begin, I've noticed that you do
 5   have a tendency to speak rather quickly, and although we don't
 6   have a court reporter here, because we're all masked up, I
 7   would ask that you, as much as you can, try to be aware and
 8   talk a little slower for purposes of this hearing.
 9        Will you please identify yourself for the record, your
10   name and how you are employed?
11   A.   My name is Samuel Roberts.  I'm a special agent with the
12   FBI.
13   Q.   How long have you been in that position?
14   A.   Almost two years.
15   Q.   What sort of training did you have to become an FBI agent?
16   A.   I went through the basic field training officer course at
17   Quantico, Virginia.
18   Q.   Prior to working for the FBI, what did you do?
19   A.   I was a federal air marshal.
20   Q.   Where?
21   A.   In Washington, D.C.
22   Q.   And what sort of training did you have for that position?
23   A.   Tactical training on the aircraft and firearms training.
24   Q.   What are your current duties and responsibilities with the
25   FBI?
```

Roberts - Direct                                                    11

1    A.    I work major crimes and violent crimes on the Native

2    American reservations in Nebraska.

3    Q.    As a part of those duties and responsibilities, did you

4    become involved in the investigation of the discovery of human

5    remains at a cabin in a remote location on the Winnebago Indian

6    Reservation?

7    A.    Yes, ma'am, I did.

8    Q.    When was this?

9    A.    May 17th.

10   Q.    Of 2020?

11   A.    Of 2020.

12   Q.    How did you become involved?

13   A.    I was the duty agent for Sioux City Resident Agency.  I

14   received the call approximately 2:30 a.m. saying they'd found

15   human remains in a burn pit.

16   Q.    The phone call that you received, was that from FBI, or

17   was that from someone else?

18   A.    It was from Winnebago Police Department.

19   Q.    All right.  And other than being told there were human

20   remains, were you told anything else at that time?

21   A.    Not to my recollection, ma'am.

22   Q.    Were you told anything about a potential suspect or a

23   potential victim?

24   A.    Yes, ma'am.  I was told that it was a potential female

25   victim and they had a potential suspect in custody.

Roberts - Direct                                              12

1    Q.    Once you learned that information, what did you do?

2    A.    I got dressed and left my house and headed to Winnebago.

3    Q.    All right.  And on the way to the Winnebago Police

4    Department, did you have any conversations or make any

5    notifications to anyone else about your starting this

6    investigation?

7    A.    Not to my memory, ma'am.

8    Q.    All right.  What time did you arrive at the Winnebago

9    Police Department?

10   A.    Approximately 3:08 a.m. on May 17th.

11   Q.    What did you do when you arrived?

12   A.    I went into the PD and made contact with Officer Walker.

13   Q.    What did the two of you discuss, Officer Walker and you?

14   A.    Basically the nature of what had happened, what he had

15   seen.  He also informed that it was at a very remote location

16   on the reservation.

17   Q.    At the time that you spoke with Officer Walker, do you

18   know if he had himself been to what we're de- -- what we're

19   calling the scene?

20   A.    I believe he conveyed that to me, yes, ma'am.

21   Q.    Okay.  I want to make sure we're clear here.  Officer

22   Walker, when you spoke with him when you first arrived at the

23   police department, do you know whether or not he had been to

24   the -- the scene, meaning the cabin?

25   A.    Yes, ma'am.  He had been up there and come back.

Roberts - Direct                                                      13

1   Q.   That was your understanding?

2   A.   That was my understanding.

3   Q.   Okay.  Do you know if there were any other officers who

4   had been to the scene or the location?

5   A.   My understanding that there had been some conservation

6   officers that had been up there as well.

7   Q.   And when did you learn of the conservation officers?

8   A.   I believe that initial conversation that they had been out

9   there.

10  Q.   Okay.  Initial conversation with Officer Walker?

11  A.   Yes, ma'am.

12  Q.   And was that taking place inside of the Winnebago Police

13  Department?

14  A.   Yes, ma'am, it would have been.

15  Q.   When you arrived at the Winnebago Police Department, did

16  you see the defendant, Mr. Rooney?

17  A.   Not initially I did not.

18  Q.   All right.  And after your initial discussion with Officer

19  Walker when you described finding out the nature of what was

20  going on, did you and Officer Walker discuss any sort of

21  strategy with respect to how you would approach the defendant?

22  A.   No, ma'am, we did not.

23  Q.   What did you do?

24  A.   I did go out and interview the defendant.

25  Q.   All right.  Now, tell the judge a little bit about how it

1    came to be that you were speaking with Officer Walker and then

2    you left to interview the defendant.

3    A.    Officer Walker advised me that it would take a significant

4    amount of time to get up to the cabin just due to its rural

5    nature, and so what my fear was -- in addition to this I asked

6    what they would be doing with him.  They said they were likely

7    going to send him to Thurston County Corrections to be housed

8    there.  I was concerned that in moving him and then --

9           MS. STEENBOCK:  Objection, nonresponsive to the

10   question.

11          THE COURT:  Overruled.

12   BY MS. WRIGHT:

13   Q.    You can -- you can keep on going.

14   A.    That -- that once in process there they would wash him

15   down or allow him to clean himself and also just could

16   potentially destroy any evidence.  I also wanted to know if he

17   was intoxicated; so that initiated me to go out and interact

18   with him.

19   Q.    All right.  So at some point while you were talking with

20   Officer Walker, you did learn that Mr. Rooney was on property

21   at the Winnebago Police Department?

22   A.    Yes, ma'am, I was.

23   Q.    Okay.  And so did Walker tell you that he was outside?

24   A.    Yes, ma'am.  He said he was in the back of a unit.

25   Q.    Okay.

1    A.    Or a regular police officer's unit.

2    Q.    All right.  And can you describe for the judge -- I don't

3    know if he's familiar with what the Winnebago Police Department

4    looks like, but the parking lot and the building itself.

5    A.    It's a one-story building that's -- as you go into the

6    fire department, and it has no jail in it whatsoever.  It has a

7    bathroom, a break room, storage room, and then, like, a

8    dispatch room, and that's about it, and the parking lot is

9    where they park all their units and keep all their personal

10   vehicles as well.

11   Q.    Is the parking lot behind the building or in front of the

12   building?

13   A.    It's directly in front of the building.

14   Q.    All right.  When you arrived, did you park in that parking

15   lot?

16   A.    Yes, ma'am, I did.

17   Q.    Okay.  And so although you didn't know when you arrived,

18   the defendant was in a vehicle in the front of the building?

19   A.    Yes, ma'am.  The officers parked directly in front of the

20   main entrance.  I parked over on the fire department side as to

21   not impede their movement; so I would not have crossed directly

22   in the vehicle where I could have seen inside any of their

23   vehicles.

24   Q.    Okay.  But then you did learn that he was out there and --

25   A.    Yes, ma'am.

Roberts - Direct                                             16

1    Q.    What was the plan as you left the Winnebago Police

2    Department?

3    A.    After speaking with Mr. Rooney?  It was to go to the

4    crime --

5    Q.    No.  Sorry.  After speaking with Officer Walker, when you

6    exited the building, what was -- where were you going?

7    A.    To speak to Rooney.

8    Q.    Okay.  And were you also going to go to the -- what we're

9    describing as the scene?

10   A.    Yes, ma'am.

11   Q.    All right.  What time did you leave the building to speak

12   with the defendant?

13   A.    Approximately 3:23 a.m.

14   Q.    And was Officer Walker with you when you spoke with the

15   defendant?

16   A.    No, ma'am.

17   Q.    Prior to speaking with Mr. Rooney, did you advise him of

18   his Miranda rights?

19   A.    No, ma'am.

20   Q.    Were you aware at the time that you were speaking with him

21   that he was in custody?

22   A.    Yes, ma'am, I was.

23   Q.    Can you describe for the judge what you were wearing when

24   you went to speak with him?

25   A.    I believe I was wearing khaki pants, a pullover -- or a

Roberts - Direct                                                17

1    polo shirt, a blue jacket, and my typical agent gear, my

2    firearm and badge on my belt.

3    Q.   All right.  Do you know if your firearm and your badge

4    were visible to the defendant?

5    A.   I do not know.

6    Q.   When you approached the defendant, did you have to be let

7    into the vehicle?

8    A.   No, ma'am.  I believe the door was opened for me.

9    Q.   Okay.  Was it unlocked?

10   A.   I do not know.  I believe -- if I'm not mistaken, I

11   believe Officer Walker opened the door --

12   Q.   Okay.

13   A.   -- for me.

14   Q.   And then did you get into the vehicle with the defendant?

15   A.   No, ma'am, I did not.

16   Q.   Can you describe for the judge, then, how you approached

17   the defendant?

18   A.   I stood at the open door speaking to him through the cabin

19   of the vehicle.

20   Q.   All right.  And what kind of vehicle was this?

21   A.   An SUV.

22   Q.   Did you record your conversation with the defendant?

23   A.   Yes, ma'am, I did.

24   Q.   Prior to initiating your recording, did you have any

25   conversation with him?

1    A.    No, ma'am.

2    Q.    And did you eventually listen to that recording?

3    A.    Yes, ma'am.

4    Q.    When was the first time that you listened to that

5    recording?

6    A.    October 8th, 2020.

7    Q.    And the date that you spoke with him was on May 17th?

8    A.    Correct.

9    Q.    How did you -- what was the explanation for the delay in

10   you listening to that recording?

11   A.    I had received a new recorder, and I had recorded this on

12   my old recorder and had mislabeled it as a transportation

13   recording, and so when I went through it, I did not see it.  I

14   assumed I had not recorded the recording.  When going through

15   my old recorder, I did discover it.

16   Q.    Okay.  And when you discovered it, what did you do with

17   it?

18   A.    I immediately called you.

19   Q.    Okay.  And you --

20   A.    USA attorney.

21   Q.    -- provided that to me --

22   A.    Yes, ma'am.

23   Q.    -- on the same day that you discovered it?

24   A.    Yes, ma'am.

25   Q.    Okay.  And have you yourself gone back and listened to

Roberts - Direct                                                    19

1    that interview?

2    A.   Yes, ma'am.

3    Q.   Was it -- the recording a true and accurate -- did it

4    capture a true and accurate recitation of your conversation

5    with the defendant?

6    A.   Yes, ma'am, it did.

7    Q.   And I've already asked you this, but you did not advise

8    him of his Miranda rights; correct?

9    A.   No, ma'am, I did not.

10   Q.   Why did you not advise him of his rights when you knew

11   that he was in custody?

12   A.   It was not my intention to do any type of interrogation or

13   detailed conversation.  I mainly wanted to check if he had any

14   physical evidence on him and if he was intoxicated or not.

15   Q.   Okay.  And when you spoke to him, were you attempting at

16   that time to -- to find out what happened?

17   A.   And just generally, yes, ma'am, what -- what had occurred.

18   Q.   Okay.  And so you did in fact ask him some questions that

19   were eliciting an incriminating response?

20   A.   Yes, ma'am.

21   Q.   But if -- if I'm understanding, you weren't intending to

22   interrogate him?

23   A.   No, ma'am, no.

24   Q.   Would you say it's fair to summarize that although it

25   wasn't your intent, you did in fact cross that line into

Roberts - Direct                                                20

1  interrogation?

2  A.   Yes, ma'am, you could say that.

3  Q.   Okay.  And why was it that it wasn't your intent to

4  interrogate him?

5  A.   I -- I was skeptical of what had happened as well, and

6  before I began any type of investigative procedures, I wanted

7  to verify the crime scene and that it was in fact human remains

8  in the burn pit.

9  Q.   Okay.  And what about him being in custody?  Did that play

10  into your consideration at all?

11  A.   Yes, ma'am.  I was cognizant that he was in custody, and

12  as well as that I had not Mirandized him is why I spoke to my

13  questions as I did.

14  Q.   Now, how long did you speak with him?

15  A.   Approximately six and a half minutes.

16  Q.   Do you recall what the tone of your conversation was when

17  you spoke with him?

18  A.   It was conversational.  At no time did we raise our

19  voices.

20  Q.   And was he also conversational with you?

21  A.   Yes, ma'am.

22  Q.   And he did speak with you?

23  A.   Yes, ma'am.

24  Q.   During your conversation did you remain outside of the

25  vehicle the entire time?

Roberts - Direct                                                21

```
 1    A.    The entire time.

 2    Q.    And do you recall where Officer Walker was during that

 3    conversation?

 4    A.    He separated after opening the door, and I did not see him

 5    for the remainder of the interview.

 6    Q.    Was there anybody else around, any other law enforcement

 7    officers?

 8    A.    Not to my knowledge.

 9    Q.    And while you were speaking with the defendant, what was

10    he wearing?

11    A.    He was wearing a blanket across his lap, and that's all I

12    could observe.

13    Q.    Were you able to see his -- if he had a blanket, was there

14    anything else on him?

15    A.    He had restraints around his wrists.

16    Q.    All right.  And did he have a shirt on?

17    A.    No, ma'am.

18    Q.    Did you observe anything on his physical appearance as you

19    were speaking with him?

20    A.    I noticed some minor blemishes, but that's about it.

21    Q.    All right.  And this was at 3:23 in the morning,

22    approximately.  Was it dark outside?

23    A.    Yes, ma'am, it was.

24    Q.    Was it light inside of the vehicle?

25    A.    No, ma'am.
```

Roberts - Direct                                                          22

1   Q.   Did -- was there, like, a dome light that lit up inside of

2   the vehicle?

3   A.   I -- I do not recall if there was.

4   Q.   All right.  And what about the parking lot?  Did that have

5   lights?

6   A.   The parking lot is lit --

7   Q.   Okay.

8   A.   -- from the main building's floodlights.

9   Q.   So you were able to -- to see him enough that you could

10  see his face; correct?

11  A.   Correct.

12  Q.   And to make out some markings on his body?

13  A.   Correct.

14  Q.   Okay.  Now, I've asked you about whether prior to speaking

15  with Mr. Rooney that initial time if you and Officer Walker had

16  discussed any sort of strategy, but I want to know what about,

17  like, independently in your own mind.  Did you develop some

18  sort of strategy in how you were going to approach Mr. Rooney?

19  A.   At this initial --

20  Q.   Correct.

21  A.   Not really.  I'd ran out there, as I -- I said, to assess

22  his -- whether he was intoxicated and whether he had any

23  physical evidence on him, and I was cognizant he -- I had not

24  Mirandized him and he was in the back of a police unit, and so

25  I remember thinking, Don't -- don't get too in the weeds with

Roberts - Direct                                              23

1    this conversation.

2    Q.   All right.  Now, what did you do after you spoke with --

3    well, let me ask this first.  The recording is about six and a

4    half minutes, and it stops.  Did you have any conversation with

5    Mr. Rooney after turning off the recorder?

6    A.   No, ma'am.

7    Q.   What did you do after you finished your conversation with

8    him?

9    A.   Myself, Officer Walker and conservation officers and some

10   individuals with the fire department went up to the cabin.

11   Q.   All right.  At the cabin what did you observe?

12   A.   I observed human remains in a smoldering fire pit and also

13   a significant amount of blood found in the cabin.

14   Q.   All right.  And at some point did you return to the

15   Winnebago Police Department?

16   A.   Yes, ma'am, I did.

17   Q.   Prior to your return or on your way back to the Winnebago

18   Police Department, did you at any point have a discussion with

19   any of the officers about having another conversation with

20   Mr. Rooney?

21   A.   No, ma'am.

22   Q.   All right.  And what about in your own mind, did you at

23   any point develop a strategy after viewing the scene with

24   respect to how you would discuss anything further with

25   Mr. Rooney?

Roberts - Direct                                              24

1   A.   I believe that at that time he was likely a suspect in

2   what had happened, and I had decided that I should probably

3   have a more in-depth interview with him concerning the events

4   at the cabin.

5   Q.   All right.  Now, then, when you returned to the Winnebago

6   Police Department, what time was it?

7   A.   Approximately 5:23 a.m.

8   Q.   And was Mr. Rooney still there?

9   A.   Yes, ma'am.

10  Q.   When you got back, did you go into the police department

11  first, or did you make contact with Mr. Rooney?

12  A.   I went in the police department first.

13  Q.   What did you do inside the police department?

14  A.   Had a brief discussion about what we had found up on BIA

15  50, the cabin, and then I told him I was going to go interview

16  Mr. Rooney.

17  Q.   And who were you speaking with?

18  A.   Officer Walker.

19  Q.   Were any other officers present?

20  A.   I believe dispatch was there, but I don't believe I

21  engaged them.  I solely spoke to Officer Walker.

22  Q.   And was Mr. Rooney still in the vehicle, the same vehicle

23  as before?

24  A.   Yes, ma'am.

25  Q.   And so can you tell the judge about how you re-engaged

Roberts - Direct                                                25

1    with him at that point?

2    A.   I returned to the vehicle and Mirandized him and then

3    began conversation with him again.

4    Q.   When you went to the vehicle, do you recall on this second

5    interview that it happened a- -- was it at approximately 5:35?

6    A.   That is correct.

7    Q.   Did you open the door yourself, or did somebody let you

8    in?

9    A.   I believe I opened the door, to the best of my memory.

10   Q.   Okay.  And this conversation was also recorded; correct?

11   A.   Yes, ma'am.

12   Q.   And so if on that recording you can be heard -- your voice

13   can be heard at the very beginning saying, "Do you mind if I

14   talk to him real quick," who would you have been talking to?

15   A.   It was likely there was an officer standing out there

16   because there was an individual in the vehicle, just watching

17   the vehicle, and so it would have been someone just statically

18   standing off to the vehicle.

19   Q.   Okay.  You said "likely."  Do you have a recollection of

20   there being someone there?

21   A.   I remember there being someone out there, but I don't

22   remember which officer it was.

23   Q.   Okay.  Do you know who Officer Marcus Trudell is?

24   A.   I'm familiar with him, yes, ma'am.

25   Q.   Do you know if it was him?

Roberts - Direct                                                    26

 1   A.   It very likely could have been.  I knew he was out there
 2   that evening.
 3   Q.   Okay.  But you can't say for sure?
 4   A.   No, ma'am, I can't say for sure.
 5   Q.   Okay.  And then you believe you opened the door and then
 6   started speaking with him?
 7   A.   Yes, ma'am.
 8   Q.   Did you advise him of his rights at that time?
 9   A.   Yes, ma'am, I did.
10   Q.   And at that time why did you advise him of his rights?
11   A.   Because I was aware that he was in custody and I was going
12   to be asking interrogative questions.
13   Q.   Did he waive his rights?
14   A.   Yes, ma'am, he did.
15   Q.   And is there some sort of way that the FBI typically
16   advises a -- a suspect of their rights?
17   A.   Yes, ma'am.  We read a FD-395 form, and we have them read
18   us it and sign and date it.  Or I date it and he signs it.
19   Q.   And is that what you did in this case?
20   A.   Yes, ma'am.
21   Q.   And all of that was captured on a recording as well?
22   A.   Yes, ma'am.
23   Q.   Okay.  So Mr. Rooney did in fact talk to you at that
24   time --
25   A.   Yes, ma'am.

1    Q.    -- correct?

2          Okay.  How long did he speak with you for?

3    A.    Approximately 33 minutes.

4                THE COURT:  Excuse me.  I'm sorry.  How long?  I

5    didn't hear your answer.

6                THE WITNESS:  Oh, I'm sorry.  Approximately 33

7    minutes, Your Honor.

8                THE COURT:  Thank you.

9    BY MS. WRIGHT:

10   Q.    And how did that conversation come to an end?

11   A.    He asked me to speak to a lawyer.

12   Q.    And once he asked you that, what did you do?

13   A.    Terminated the interview.

14   Q.    The conversation you just described as being 33 minutes,

15   that was recorded, and --

16   A.    Yes, ma'am.

17   Q.    -- the judge has received that as an exhibit and has also

18   listened to it.  Were there any conversations, though, with the

19   defendant that were not captured on that recording?

20   A.    No, ma'am.

21   Q.    Okay.  So either prior to initiating the recording device

22   or after shutting it off, you didn't have any other

23   conversations with him?

24   A.    No, ma'am.

25   Q.    Okay.  And I'll ask you kind of the same question with

Roberts - Direct                                          28

 1   respect to your firearm and your -- and where you were located

 2   during this 33-minute conversation.  When you approached the

 3   defendant and you opened the door, did you get in the vehicle

 4   at that point?

 5   A.    No, ma'am, I didn't.

 6   Q.    So you remained outside?

 7   A.    Yes, ma'am.

 8   Q.    And would your firearm have been visible to him?

 9   A.    It potentially could have been with my jacket.

10   Q.    Okay.  But you did have a jacket on?

11   A.    Yes, ma'am.

12   Q.    And was your conversation at that time similar to your

13   first one in that it was conversational?

14   A.    Yes, ma'am.

15   Q.    After you finished speaking with Mr. Rooney at 5:35, what

16   did you do?

17   A.    I stayed in the parking lot for a brief moment.  About

18   that time I had contacted ERT, or evidence response team for

19   the FBI, and they had -- were recently getting there.

20   Somebody -- an assistant team leader was there, and we went up

21   and did another assessment of the site and began processing the

22   scene.

23   Q.    Okay.  When you were done speaking with the defendant, did

24   you go into the police station and have a conversation with

25   Officer Walker?

Roberts - Direct                                          29

1    A.    Yes, ma'am, I did.

2    Q.    Do you remember what you discussed with Officer Walker?

3    A.    No, ma'am, I do not.

4    Q.    Okay.  Now, do you -- sitting here today, do you know if

5    you told Officer Walker that Mr. Rooney had in fact invoked his

6    right to have an attorney?

7    A.    I -- I do not recall if I did or not.

8    Q.    But you did talk to Officer Walker?

9    A.    Yes, ma'am, I did.

10   Q.    Do you think -- I know you're not supposed to speculate,

11   but in -- to what capacity you can tell the judge, would you

12   have likely gone into the station and said, "I just finished

13   talking to him, and this is what he told me"?

14   A.    It's very likely that -- that I would do that, and then I

15   would discuss my findings with him as well as how the interview

16   had been terminated.

17   Q.    Okay.  But you don't have, like, an independent

18   recollection of that conversation?

19   A.    Unfortunately I do not.  I apologize.

20   Q.    All right.  Now, do you know what Officer Walker did after

21   you spoke with him?

22   A.    He went out and spoke to Mr. Rooney as well.

23   Q.    Okay.  And were you present for that conversation?

24   A.    No, ma'am, I was not.

25   Q.    After Officer Walker spoke with the defendant, did Officer

Roberts - Direct                                                    30

1    Walker talk to you again?

2    A.   Briefly, yes.

3    Q.   Okay.  And when did you go up to the -- the scene with

4    ERT?

5    A.   Shortly after that.

6         MS. WRIGHT:  Okay.  Your Honor, may I have just a

7    moment, please?

8         THE COURT:  Yes.  Take as long as you need.

9         MS. WRIGHT:  Thank you.

10   BY MS. WRIGHT:

11   Q.   You mentioned earlier that you had some skepticism about

12   what was going on and what was taking place.  Can you elaborate

13   on that a little bit?

14   A.   Yes, ma'am.  I work with other law enforcement's officers

15   and being in another law enforcement agency which I have

16   learned that it's not uncommon for animal remains to be

17   confused as human remains and reported as such; so I, initially

18   when I received the call, was skeptical enough to know to

19   approach this entire thing with a very critical thinking

20   standpoint and that I needed to see and verify for myself

21   that these were in fact human remains and then proceed from

22   there.

23   Q.   Okay.  And so after you went to the scene, were you

24   satisfied that what you saw was human remains?

25   A.   Yes, ma'am, I was.

Roberts - Direct                                                31

1    Q.   But you had been told, at least, prior to going up to the

2    scene that the conservation officers who had located

3    Mr. Rooney, that they thought what was in the -- the -- what

4    we're calling the burn pit was human remains?

5    A.   That -- that is correct.

6    Q.   Okay.  But you wanted to be satisfied for yourself of

7    that?

8    A.   Yes, ma'am.

9             MS. WRIGHT:  All right.  Your Honor, just to be sure,

10   I believe you did accept Government Exhibit 4, which would be

11   the FD-395.

12            THE COURT:  Yes.  It was offered and received without

13   objection.

14       Is that -- I'm correct about that, Ms. Steenbock?

15            MS. STEENBOCK:  I think so.  I think so, yeah.  No

16   objection.

17            THE COURT:  You don't object?

18            MS. STEENBOCK:  Oh, no.  No, no objection.

19            THE COURT:  Thank you.

20            MS. WRIGHT:  All right.  I have nothing further at

21   this time, Your Honor.

22            THE COURT:  Okay.  Ms. Steenbock, do you have

23   cross-examination?

24            MS. STEENBOCK:  Yes.  Thank you, Judge.

25            THE COURT:  You may proceed when you're ready.

CROSS-EXAMINATION

BY MS. STEENBOCK:

Q.   The first time that you approached Mr. Rooney you found him in the back seat of a cruiser; correct?

A.   It was -- yes, ma'am.

Q.   All right.  And the cruiser was locked, and you think Walker maybe unlocked the door for you to get into the cruiser?

A.   Yes, ma'am.

Q.   Okay.  And you found him to be naked save for a blanket over his lap; correct?

A.   That is correct.

Q.   And you found him to be handcuffed; correct?

A.   Correct.

Q.   And you testified in direct examination that your goal was to suss out whether or not he had physical evidence on his body; right?

A.   Correct.

Q.   Okay.  So did you bring a camera with you to memorialize what you saw on his body?

A.   No, ma'am.

Q.   All right.  Did you investigate through other officers who had already had contact with Mr. Rooney whether or not they observed injuries or physical evidence that you wanted to capture?

A.   I do not recall if I asked them that or not, ma'am.

Roberts - Cross                                                    33

1    Q.    And you also were interested in finding out if he was

2    under the influence or intoxicated; right?

3    A.    Correct.

4    Q.    All right.  So did you bring with you a device to measure

5    that?

6    A.    No, ma'am, but I knew the local -- state and locals had

7    that capability.

8    Q.    Okay.  And so did you find out if they had already PBTed

9    him?

10   A.    I found out later in the event that they had.

11   Q.    Okay.  So this was your main interest, but you didn't find

12   out beforehand who had already given him a PBT and what that

13   result was; correct?

14   A.    No, ma'am, I did not.

15   Q.    All right.  So your interests being this physical evidence

16   and his intoxication level, so the first thing you say to

17   Mr. Rooney is, "What's going on today?  Why are you in here?"

18   Correct?

19   A.    I don't remember if that was my exact words.

20   Q.    Well, did you listen to your recording to prepare for

21   today's hearing?

22   A.    Yes, ma'am, I did.

23   Q.    Okay.  So if I'm telling you the first thing out of your

24   mouth is, What's going on here, what -- why are you in here,

25   would you say that that's probably true, or do you think that

Roberts - Cross                                                    34

1    you have a dispute with that?

2    A.   No.   It's probably true, ma'am.

3    Q.   All right.  So you didn't first ask him, "Are you drunk,

4    Mr. Rooney?"  Correct?

5    A.   No, ma'am.

6    Q.   You didn't first ask him, "What drugs have you taken

7    today, Mr. Rooney," did you?

8    A.   No, ma'am.

9    Q.   All right.  You didn't ask him to show him your face -- or

10   to show you his face and take a flashlight to him, did you?

11   A.   No, ma'am.

12   Q.   All right.  Instead you engaged in the discussion with him

13   about what he had done that day; correct?

14   A.   Correct.

15   Q.   And then after he told you his situation, what he had

16   done, and his family, then you ask him, "Do you guys fight a

17   lot?  I mean, what's going on?"  Isn't it true you asked him

18   that question?

19   A.   Yes, ma'am, I did.

20   Q.   Okay.  And so in your mind, at this point you're not in

21   the weeds yet, and you haven't gotten to a point where you

22   should maybe put the brakes and advise my client of his rights?

23   A.   Ma'am, I don't understand your question.  I'm sorry.

24   Q.   You're aware, are you not, that in the middle of an

25   interrogation, if you find that you have crossed the line that

Roberts - Cross                                                    35

1    you can stop, take a break, and advise someone of their rights;

2    correct?

3    A.    Yes, ma'am.

4    Q.    You're also aware that you can tell someone, hey, don't go

5    any further 'cause you have the right to remain silent and I

6    need to tell you about your constitutional rights; correct?

7    A.    Correct.

8    Q.    But you instead solicited, "You guys fight a lot?  I mean,

9    what's going on?"  Correct?

10   A.    Yes, ma'am, I did.

11   Q.    Because at this point you might be suspicious, but you

12   certainly have been told that there are human remains at a

13   crime scene; correct?

14   A.    That's what I was told in the phone call, yes, ma'am.

15   Q.    Right?  You can be as suspicious as you like, but this is

16   what you have been told is that there's human remains; correct?

17   A.    Yes, ma'am.

18   Q.    And you're aware that Mr. Rooney is in custody upon

19   suspicion of his involvement with those human remains; correct?

20   A.    About Winnebago, yes, ma'am.

21   Q.    Okay.  Yes or no.  You were aware of that?

22   A.    Aware he was in custody, yes, ma'am.

23   Q.    Okay.  And you were also aware that there is a missing

24   female, specifically Mr. Rooney's significant other; correct?

25   A.    I don't believe I was advised she was missing.  I knew

1    they had said they had found remains.  I don't recall.

2    Q.    Okay.  So after -- when you went in and talked to BI Agent

3    Walker before you talked to Mr. Rooney, he did not tell you at

4    any point during that conversation that there is a missing

5    woman, specifically Mr. Rooney's significant other?

6    A.    I don't recall if I initially learned that she was missing

7    from either speaking with him or I'd learned that going in

8    there.  I don't recall.

9    Q.    Well, after you asked him, you know, "Why are you in this

10   cruiser," he told you, "I'm being detained because they haven't

11   found my wife."  Correct?

12   A.    Correct.

13   Q.    Okay.  So that's also some information that there's a

14   missing person; right?

15   A.    Yes, ma'am.

16   Q.    Okay.  Did you make any effort to get Mr. Rooney any

17   clothes?

18   A.    No, ma'am, I did not.

19   Q.    Okay.  Because you -- you didn't want them to wash him off

20   or -- or tamper with anything that might be on his body;

21   correct?

22   A.    Yes, ma'am.

23   Q.    And did you -- this is your crime scene once you arrive;

24   correct?  This is your investigation?

25   A.    Correct.

Roberts - Cross                                        37

1   Q.   Right?  This is an FBI case; right?

2   A.   Yes, ma'am, it is.

3   Q.   Okay, all right.  And this is your first homicide?

4   A.   Yes.  At that time it was.

5   Q.   Okay.  So I assume by human nature that you're trying to

6   be as careful and thorough as possible?

7   A.   Yes, ma'am, I was.

8   Q.   All right.  So did you issue a general order to the local

9   police to not tamper with him so that you could preserve any

10  evidence on his body?

11  A.   I believe I only advised them not to touch anything at the

12  actual crime scene.

13  Q.   Okay.  So in your mind when you walked away to the crime

14  scene, they could have took him and showered him up and given

15  him a cup of coffee, for all you know; right?

16  A.   Yeah, correct.

17  Q.   Okay.  You didn't do anything to prevent that process of

18  booking him in at Thurston County; correct?

19  A.   I did not impede, no, ma'am, if that's what you're asking.

20  Q.   I'm not asking whether you impeded it.  I'm asking, as far

21  as you knew, these cops could have done that.  That's what you

22  thought they were going to do with him; right?

23  A.   I was under the impression they were trying to take him to

24  Thurston County relatively soon.

25  Q.   Okay.  And you did not issue an order to prevent them from

Roberts - Cross                                                          38

1    doing that?

2    A.    No, ma'am.

3    Q.    All right.  When you were talking to Mr. Rooney the first

4    time, about halfway through the interrogation he told you, "I

5    didn't think I was in any trouble" in response to you asking

6    him if he'd ever been in trouble before; correct?

7    A.    Correct.

8    Q.    And then after that you proceeded to interrogate him about

9    a history of domestic violence; correct?

10   A.    I asked him that, yes, ma'am, I did.

11   Q.    So after that you go to the crime scene, and you come

12   back, and at that point you decide that you're going to talk to

13   him again; right?

14   A.    Yes, ma'am.

15   Q.    All right.  And did you use the same recording device as

16   you had used in the first interrogation?

17   A.    Yes, ma'am, I did.

18   Q.    Okay.  So how is it that you could find the second

19   recording and commemorate your conversation in a report and the

20   first recording is missing?

21   A.    Negligence, honestly, because my first one starts with me

22   Mirandizing, and the other one doesn't.

23   Q.    Okay.  So do you --

24   A.    And so when I listened to it, I didn't listen to it long

25   enough to get it to play into hearing us both speak, and so

Roberts - Cross                                                    39

1    when I listened to the initial part, I was, like, that's a

2    transport one, because I was in a hurry.

3    Q.   You're aware, certainly, if you talk to a prisoner during

4    transport that that's a custodial interrogation; right?

5    A.   Yes, ma'am.

6    Q.   Okay.  So you'd be required to turn it over even if it is

7    a transport conversation; right?

8    A.   Not to my knowledge, ma'am, no.

9    Q.   You're not aware of a conversation you have with someone

10   while they're in your custody that that is discoverable?

11   A.   I -- I often just turn my recorder on in general just when

12   I am transporting whether there's a conversation or not.

13   Q.   Okay.  You're aware of the general progression order in

14   this case, are you not, sir?

15   A.   Can -- can you explain that question, ma'am?

16   Q.   You're aware that this Court ordered the government and

17   its agents to produce discovery to include all of the

18   defendant's statements, written or oral or that you have record

19   of; correct?

20   A.   Yes, ma'am.

21   Q.   And you failed to comply with that court order; correct?

22   A.   I complied at the time to the best I knew.  I was unaware

23   I had it.

24   Q.   So I just referenced document number 22, which is part of

25   the court record.  The judge ordered on June 22nd that you

1    produce those things to me, and you failed to do so; correct?

2    A.   Yes, ma'am, yeah.

3    Q.   All right.  And you did that because you sped through the

4    first interrogation right to the second one and didn't think

5    the first one was important; right?

6    A.   I didn't know it was related to this case.

7    Q.   All right.  So when -- you didn't memorialize it by making

8    a police report either; correct?

9    A.   No.  No, ma'am, I did not.

10   Q.   Okay.  So you no doubt -- I'm not going to exhaust you

11   here, but you no doubt were trained the purpose of a 302 is to

12   memorialize as quickly as possible the things that occurred so

13   that you can use it to prepare for a trial so that the parties

14   can be aware of what happened; correct?

15   A.   Correct.

16   Q.   And you didn't do that in this instance even though after

17   you walked away and went home that night you knew you talked to

18   him twice; correct?

19   A.   Correct.

20   Q.   And you no doubt had conversations with the government's

21   attorney asking you for memorialization of the first

22   interrogation; correct?

23   A.   I don't recall if they asked or not.

24   Q.   She never asked you about the first statement?

25   A.   We had a verbal conversation about it, yes, ma'am.

1    Q.    And you told her that you didn't have any record of it and
2    that you weren't going to write a report?
3    A.    I do not recall if that's what was said.
4    Q.    Okay.  You didn't write a report?
5    A.    No, ma'am.
6    Q.    You never have written a report to this day.
7    A.    No, ma'am, I have not.
8    Q.    Okay.  So you have had a chance to look at other officers'
9    reports that were prepared for this case?
10   A.    Yes, ma'am.
11   Q.    Okay.  So you've reviewed Trudell's report and Walker's
12   reports?
13   A.    Yes, ma'am.
14   Q.    And you know that both those reports indicate that you
15   talked to Rooney twice?
16   A.    Yes, ma'am.
17   Q.    And when did you first become aware that that's what those
18   reports indicated?
19   A.    Whenever I initially read them.  I don't remember when
20   that was, though.
21   Q.    May, June, July?
22   A.    Yes, ma'am.  Probably around May or June-ish.
23   Q.    Okay.  So what efforts did you take to memorialize your
24   interview as it's becoming less and less fresh in your mind?
25   A.    None.

1   Q.   What efforts did you take to find or go back and find out

2   if there was a recording from that day?

3   A.   None after my initial look for it.

4   Q.   Okay.  So you found this recording after I filed my motion

5   to suppress and called you out for not doing it; right?

6   A.   No, ma'am.  I don't -- it wasn't intentional.

7   Q.   Literally within days.

8   A.   Say it again, ma'am.

9   Q.   Literally within days of my filing my motion to suppress,

10  you somehow unearth this magical recording.  That has nothing

11  to do with me calling you out for not doing your job?

12  A.   Oh, I -- no.  I'm not arguing that, ma'am.  Yes.  The

13  timeline, yeah.  I understand.

14  Q.   All right.  When you came back the second time, did you

15  advise Mr. Rooney that the conversation -- the content of the

16  conversation you had before could not be used against him in

17  court?

18  A.   No, ma'am, I did not.

19  Q.   Okay.  You didn't go into any discussion about how that

20  prior statement, I didn't realize, or I didn't intend to get

21  into it?  You didn't address it at all; correct?

22  A.   No, ma'am, I did not.

23  Q.   Other than to basically resume your conversation about

24  prior domestic violence; correct?

25  A.   I -- I did continue the conversation, I guess, yes, ma'am.

Roberts - Cross                                                          43

```
1    Q.   Okay, all right.  And you didn't tell him -- strike that.
2         You indicated on direct examination that Mr. Rooney was
3    basically in the same place as you had left him; correct?
4    A.   Correct.
5    Q.   All right.  But you can't remember as you sit here today
6    who unlocked the cruiser for you the second time you talked to
7    him?
8    A.   No, ma'am, I cannot.
9    Q.   Okay.  If the reports indicated that it was Officer
10   Trudell, do you think that that might be accurate?
11   A.   Yes, ma'am.
12   Q.   Okay.  And is it possible that Trudell stood maybe not
13   within earshot but in the vicinity while you talked to
14   Mr. Rooney the second time?
15   A.   So I -- I had focused myself inside the car but I -- I
16   don't know exactly where he was, but it's likely he would have
17   been in the parking lot, yes.
18   Q.   Okay.  If his report says, "I'm standing near Officer
19   Roberts, but because of wind I can't really hear what they're
20   talking about," is that fair?
21   A.   Yes, ma'am.
22   Q.   Okay.  And did you tell Trudell after you were done
23   talking to Mr. Rooney that he had invoked his right to have
24   counsel?
25   A.   Ma'am, I don't recall.
```

Roberts - Cross                                                        44

1    Q.   Okay.  Did you tell him that Mr. Rooney had elected to

2    remain silent?

3    A.   I do not recall if I said that.

4    Q.   Okay.  Is there some reason you can't remember this stuff?

5    A.   'Cause that -- when he said he -- the conversation ended,

6    I instantly transitioned to getting to the crime scene and

7    processing it.  It had been raining, and I was worried at the

8    time --

9    Q.   That's not what I'm asking you.  I'm asking you why you

10   can't remember some of these details.

11   A.   Because I wasn't focused on that, those type of

12   interactions.  I was focused on getting back to the crime

13   scene.

14   Q.   Okay.  So if Trudell says in his report that you advised

15   him that Rooney indicated his desire to remain silent, you

16   would not dispute that you may have mentioned that to Trudell

17   after you finished up with Rooney?

18   A.   No, ma'am, I would not.

19   Q.   All right.  And then you went into the -- to the station,

20   and maybe it would seem consistent with your policy to share

21   with Walker what Rooney told you and how the interview ended;

22   correct?

23   A.   Correct.

24   Q.   All right.  Have you ever done cases on a Native American

25   reservation before this case?

1    A.    Yes, ma'am, I had.

2    Q.    Okay.  How many cases had you done?

3    A.    I -- I really have no idea on a numerical figure.

4    Q.    Okay.  A lot of case -- I mean, you'd only been an officer

5    for maybe 18 months, all right, by the time this occurred;

6    correct?

7    A.    Yes, ma'am.

8    Q.    Okay.  So you're not terribly experienced with dealing

9    with Native Americans.  Would you say that's fair?

10   A.    Yes, ma'am, I would agree with that.

11   Q.    Okay.  'Cause one of the things you told Mr. Rooney is

12   that you normally work on cases where people blow shit up.  Is

13   that even true?

14   A.    No, ma'am, it's not.

15   Q.    All right.  You were trying to build some sort of rapport

16   with Mr. Rooney where he would understand the gravity of your

17   position; correct?

18   A.    Correct.

19   Q.    All right.  This -- this certainly is obvious to all of us

20   here, but I need you to say it.  When you were trained at

21   Quantico --

22   A.    Uh-huh.

23   Q.    -- you were trained on what Miranda requires of you, as an

24   officer?

25   A.    Yes, ma'am.

Roberts - Redirect                                              46

1    Q.   Okay.  And so you certainly know that if you question a

2    suspect when they're in custody that you need to advise them of

3    their rights per Miranda; correct?

4    A.   Yes, ma'am.

5    Q.   All right.  And you would agree, as you testified here

6    today, that for whatever your reason is that you failed to do

7    so in the first interrogation; correct?

8    A.   Correct.

9    Q.   All right.  And that you didn't take any measure to cure

10   that neglect when you talked to Mr. Rooney the second time;

11   correct?

12   A.   Correct.

13             MS. STEENBOCK:  Nothing further.

14             THE COURT:  Redirect.

15             MS. WRIGHT:  Your Honor, may I have just a moment,

16   please?

17             THE COURT:  Take as much time as you need.

18             MS. WRIGHT:  Thank you.

19                      REDIRECT EXAMINATION

20   BY MS. WRIGHT:

21   Q.   I'm going to start right where Ms. Steenbock just left off

22   as far as not taking any measures to cure your previous failure

23   to advise him of his rights.

24        In that second interview at 5:35, you rights advised him?

25   A.   Correct.

Roberts - Redirect                                                    47

1    Q.    Okay.  So that would have been your measure to inform him
2    of his rights; correct?
3    A.    Correct.
4    Q.    All right.  Now, in your training were you told that in a
5    subsequent interview with a defendant that you're required to
6    inform them that their previous statement could not be used?
7    A.    No, ma'am, I was not.
8    Q.    And a question came up in your cross-examination of
9    whether it's consistent with your -- your policy to tell
10   another officer, in this case it would be Officer Walker, what
11   you discussed with the defendant.  I want to ask if there's a
12   policy on that.
13   A.    No, ma'am, not -- not as far as like a --
14   Q.    Like an FBI policy?
15   A.    No.  Nothing in a three-ring binder, no.
16   Q.    Okay.
17   A.    That I'm aware of.
18   Q.    So is it more just kind of a practice among investigators
19   that you might discuss what a defendant said?
20   A.    Yes, ma'am.
21   Q.    But there is no policy?
22   A.    Not that I'm aware of, no.
23   Q.    Okay.  And then when you went to speak with the defendant,
24   did you in fact observe his physical demeanor?
25   A.    Yes, ma'am.

1    Q.    And did you observe any signs of intoxication?

2    A.    No, ma'am.

3    Q.    Did you observe whether he appeared to be under the

4    influence of a -- of a drug or any other kind of substance?

5    A.    No, ma'am.  He appeared sober.

6    Q.    Okay.  And you had not met him before; correct?

7    A.    Correct.

8    Q.    So what made you feel comfortable saying that he appeared

9    sober?

10   A.    There was no odor of anything going on.  He seemed very

11   articulate in his statements.  He was able to complete

12   narratives, and his body mannerisms were articulate.

13   Q.    Okay.  And as an FBI agent, what authority do you have to

14   issue orders over a tribal police officer?

15   A.    None.

16   Q.    What authority do you have to issue orders over a BIA

17   officer?

18   A.    I have no authority.

19   Q.    Now, although you don't necessarily have authority to

20   issue orders to them, I think Ms. Steenbock was getting at

21   whether or not you could secure a scene in some way.

22   A.    Yes, ma'am.

23   Q.    Is there a collaborative approach in a case like this

24   where tribal law enforcement are the -- are the initial

25   responders and you come in as the FBI?

Roberts - Redirect                                                    49

1    A.    Somewhat, yes, ma'am.

2    Q.    Okay.  But you don't have, once you come in as an FBI

3    agent, the ability to tell the tribal officers or the BIA

4    officers what they're going to do?

5    A.    No.

6    Q.    And then did you testify that the recording which you --

7    you did not locate until after the motion to suppress was filed

8    that it was labeled as a transport recording?

9    A.    Yes, ma'am.

10   Q.    And that you didn't know it was related to this case?

11   A.    Correct.

12              MS. WRIGHT:  I have nothing further, Your Honor.

13              THE COURT:  Ms. Wright, is there any reason that this

14   witness cannot be excused?

15              MS. WRIGHT:  Do you have anything?

16        I don't think so, Your Honor.

17              THE COURT:  Ms. Steenbock.

18              MS. STEENBOCK:  No.  I think he can be excused.

19              THE COURT:  Okay.  Thank you for your testimony, sir.

20   You may stand down.

21        Ms. Wright, do you have any additional evidence today?

22              MS. WRIGHT:  No, not today, Your Honor.  I think it

23   makes the most sense to -- to continue on Friday once we have

24   Officer Walker here.

25              THE COURT:  And that hearing's been scheduled for

1    10:30; correct?

2            MS. WRIGHT:  That is my understanding.

3            THE COURT:  Okay.  Well, we'll recess till Friday,

4    December 18th, at 10:30 in the morning here in Courtroom No. 6.

5            MS. WRIGHT:  Thank you, Judge.

6            THE COURT:  Thank you.

7            MS. STEENBOCK:  Thank you, Your Honor.

8            THE COURT:  Defendant is remanded back to the custody

9    of the U.S. Marshal.

10           (Recessed at 10:28 a.m.)

11           (At 10:38 a.m. on December 18, 2020; with counsel and the

12   defendant present:)

13           THE COURT:  20CR104.  We're scheduled for a

14   continuation of the motion to suppress that was filed on behalf

15   of the plaintiff *[sic]*.  We had testimony and exhibits earlier

16   in the week, and I understand now that the government has one

17   additional witness.

18           MS. WRIGHT:  Yes, Your Honor.

19           THE COURT:  Will you please enter your appearance for

20   today.

21           MS. WRIGHT:  Good morning, Your Honor.  Lecia Wright

22   and Sean Lynch for the United States.

23           THE COURT:  Good morning to each of you.

24       For the defendant.

25           MS. STEENBOCK:  Good morning, Judge.  Kelly

 1  Steenbock, Assistant Public Defender, on behalf of Mr. Rooney,

 2  who's seated at counsel table with me this morning.

 3          THE COURT:  Good morning to each of you.

 4      How are you feeling today, Mr. Rooney?

 5          THE DEFENDANT:  (Indiscernible.)

 6          THE COURT:  All right?

 7          THE DEFENDANT:  Yeah.

 8          THE COURT:  I apologize to counsel and the parties

 9  for our seven or eight-minute delay.  I had a civil hearing

10  that took a little bit longer than I had hoped it would.

11      With that said, if you want to go ahead and call your

12  first -- your witness, you may do so.

13          MS. WRIGHT:  Government calls Anthony Walker to the

14  stand, Your Honor.

15          THE COURT:  Mr. Walker, will you come up here to the

16  witness stand?

17      We'll have you sworn in.

18      You can go ahead and take a seat and -- and sit in front

19  of the microphone.

20      Sir, would you raise your right hand?

21          ANTHONY WALKER, PLAINTIFF'S WITNESS, SWORN

22          THE COURT:  Could you please state your full name?

23          THE WITNESS:  Anthony Walker.

24          THE COURT:  Okay.  Ms. Wright, you may proceed.

25          MS. WRIGHT:  Thank you.

1        DIRECT EXAMINATION

2    BY MS. WRIGHT:

3    Q.   Good morning, Officer Walker.  Will you please tell the

4    judge a little bit about what you do for a living?

5    A.   I am a federal police officer with the Bureau of Indian

6    Affairs-Office of Justice Services.  I've been employed there

7    since 2013.

8    Q.   Which off- -- oh, sorry.

9    A.   What's that?

10   Q.   Didn't mean to cut you off.  Which office do you work out

11   of?

12   A.   Currently stationed at the Winnebago agency, Winnebago

13   Police Department.

14   Q.   And how long have you been there?

15   A.   Since 2013.

16   Q.   What sort of training did you have to be an officer with

17   the BIA?

18   A.   I -- prior to me becoming an officer, I received my

19   associate's degree in criminal justice.  I also received my law

20   enforcement certification at the Federal Law Enforcement

21   Training Center in Artesia, New Mexico, under the Indian police

22   academy.

23   Q.   All right.  And do you have any other training

24   qualifications that you have to stay up to date with during the

25   year?

Walker - Direct                                                     53

1    A.    Yes.  We have a mandatory 40 hours of in-service training

2    every year.

3    Q.    Prior to working for the Winnebago agency, did you have

4    any other law enforcement experience?

5    A.    Just receiving my associate's degree and then also working

6    cas- -- casino security and then also having another federal

7    position as a firefighter.

8    Q.    All right.  At the Winnebago Police Department, what are

9    your current duties and responsibilities?

10   A.    I'm currently the field training officer as of 2019, also

11   certified evidence control technician.  I've been the evidence

12   control tech for the agency since 2014 and also a certified

13   teaching instructor.

14   Q.    All right.  And so all of those duties you've just

15   described, were those your duties in May of 2020?

16   A.    Yes.

17   Q.    In May of 2020, did you become involved in a call for

18   service involving Kozee Decorah asking for assistance at Honey

19   Creek Road?

20   A.    Yes.

21   Q.    And how did you become involved?

22   A.    I began my tour of duty at 11 p.m. that night, and I

23   received a call from swing shift officer -- Winnebago Tribal

24   Officer Ken LaPointe advising me of the pending traffic that

25   was going on at that time.

Walker - Direct                                               54

1    Q.   All right.  And was this on May 16th, 2020, at 11 p.m.
2    that you came on duty?
3    A.   Yes.
4    Q.   And what did Officer LaPointe advise you about a -- about
5    the pending call?
6    A.   That they were apparently looking for Kozee Decorah and
7    saying that she was stuck down there on that minimum
8    maintenance road.
9    Q.   All right.  And so when you came on duty at 11 o'clock,
10   what did -- what did you do with that information?
11   A.   I responded to that location and then listened to the
12   traffic over the radio that two conservation officers were
13   attempting to respond to the female's residence to see if they
14   made it home and then also that they'd contacted family members
15   to see too that -- if they made it home or not.
16   Q.   Okay.  And so just to back up a little bit, did you become
17   aware after coming on duty that conservation officers did in
18   fact go to Honey Creek Road?
19   A.   Yes.
20   Q.   And can you describe for the judge on the Winnebago
21   Reservation what is Honey Creek Road, and is there another name
22   for it?
23   A.   Yeah.  It's a nickname for the road, and it's actually BIA
24   Road 50.  It's a minimum maintenance road down towards the
25   Missouri River.  We call it Big Bear Park.  It's heavily

 1   wooded.  It's kind of out in the country from Winnebago, the

 2   actual town.

 3   Q.   Okay.  And the conditions that night, do you recall what

 4   they were, weather conditions?

 5   A.   Yeah.  It had been raining that day.  To my understanding

 6   the roads were -- were muddy and wet.

 7   Q.   All right.  And you said that you had started to respond

 8   to that location?

 9   A.   Yes.

10   Q.   When you say "that location," what were you referring to?

11   A.   To BIA Road 50, to where the officers were now searching.

12   Q.   You were going to join them?

13   A.   Yes.

14   Q.   Were you able to join them at that time?

15   A.   No.  I actually received another call for service at a

16   different location in town in Winnebago that I had to turn away

17   from.

18   Q.   All right.  And did you wrap up responding to that call

19   and then at some point return your attention to the

20   investigation of Kozee Decorah?

21   A.   Yes.  After responding to that call, I ended up going to

22   the Winnebago Police -- Police Station there and then was

23   trying to get information on what actually was going on to --

24   at that time what I had missed, you know, what was on that

25   call.

Walker - Direct                                                        56

1    Q.   All right.  And did you learn at approximately ten after

2    midnight on May 17th, 2020, that Officer Snowball advised they

3    had located a male and an infant?

4    A.   Yes.

5    Q.   All right.  And after Officer Snowball advised that, what

6    happened?

7    A.   After they advised that they located the male and female,

8    I was just listening to the radio traffic, and they were

9    talking amongst themselves but said that they were going to

10   continue looking for a female.

11   Q.   Okay.  And at some point did Officer Snowball let you know

12   that they would be transporting the male and the infant back to

13   the police department?

14   A.   Yes.  They advised that one of the voluntary firefighters

15   were going to transport the male and the infant.

16   Q.   Do you know what time that was?

17   A.   I have to refer to my report, if that's okay.

18   Q.   Do you have that in front of you?

19   A.   Yes.

20        MS. WRIGHT:  Your Honor, may he refer to his report?

21        THE COURT:  Yes.

22        MS. WRIGHT:  Thank you.

23   A.   According to my report the time was at 1:02 in the

24   morning.

25   BY MS. WRIGHT:

Walker - Direct                                                        57

1    Q.    Okay.  And then after being advised that they were

2    transporting a male, did you at some point find out who in fact

3    was being transported back?

4    A.    Yes.  I contacted Officer Snowball, and he relayed that

5    information to me.

6    Q.    Who was it that they were bringing back?

7    A.    Jonathan Rooney and his child.

8    Q.    Okay.  Was there anything else that you learned about

9    Mr. Rooney and the child at that time?

10   A.    Officer Snowball advised that Jonathan was nude, he had

11   only a blanket to cover himself, his private genital area, and

12   he also had some injuries.

13   Q.    Okay.  Did he say anything about the child, the condition

14   of the infant?

15   A.    Said the child appeared to be okay.

16   Q.    All right.  And did at some point you learn some -- let me

17   ask you this:  Where was it that Mr. Rooney was located?

18   A.    He advised me they located him inside the cabin on that

19   road there.

20   Q.    All right.  And can you -- have you yourself seen the

21   cabin?

22   A.    Not prior to that, no.

23   Q.    Okay.  But after -- during the course of this

24   investigation, you have observed it personally?

25   A.    Yes.

Walker - Direct                                                    58

1    Q.    And you had described the area of Honey Creek Road or BIA

2    Road 50 as being a wooded area --

3    A.    Yes.

4    Q.    -- and somewhat away from the -- the main town of

5    Winnebago.  Was the cabin likewise in this wooded remote area?

6    A.    Yes.  From the minimum maintenance road, you -- you would

7    not be able to see it.  It is kind of tucked away up on a hill

8    inside the trees.

9    Q.    Okay.  And I'll take a pause just a moment.

10         And so he was located.  Was it inside the cabin?

11   A.    Yes.

12   Q.    Along with the infant?

13   A.    Yes.

14   Q.    And did you learn anything else about what we're referring

15   to generally as the scene?  Was anything else found?

16   A.    Police Officer Snowball advised that there was -- it

17   appeared to be a fire outside the cabin and also appeared to be

18   human remains.

19   Q.    Okay.  Now, once you became aware that the conservation

20   officers and the firefighters had located what appeared to be

21   human remains and they said they were bringing Mr. Rooney down

22   to the Winnebago Police Department, did you do anything in

23   between learning that Mr. Rooney would be brought to the police

24   department and him actually arriving there?

25   A.    Yes.  I contacted the other officer that was on duty.  It

Walker - Direct                                                    59

1    was Winnebago Tribal Officer Marcus Trudell, advised him to

2    come to the police station there, and then also contacted a

3    ambulance to have them check out the child --

4    Q.   Okay.

5    A.   -- once they arrived.

6    Q.   All right.  And when they arrived, do you know what time

7    that was?

8    A.   I'd have to refer to my report 'cause I have to -- is that

9    okay?

10   Q.   Yes, it is.

11   A.   That time would be at 1:18 in the morning.

12   Q.   All right.  Now, when Mr. Rooney arrived at the police

13   department, was he taken into the police department?

14   A.   No.

15   Q.   Where was he put?

16   A.   He was transported from the fire department vehicle into a

17   Winnebago Police vehicle at that time.

18   Q.   What kind of vehicle was he placed into?

19   A.   A regular patrol vehicle, fully marked.

20   Q.   Are those smaller sedans?  Is it an SUV?  What kind of car

21   is it?

22   A.   It was a Chevy Silverado pickup.

23   Q.   All right.  And does it have a cab in it so like the front

24   driver's seat, passenger seat, and then a cab behind it, like

25   back seats, or is it just a two-person truck?

Walker - Direct                                                          60

1    A.    No.   It's a crew cab, has a back seat --

2    Q.    Okay.

3    A.    -- and then a rear partition.

4    Q.    All right.  Now, did you make any decision with respect to

5    Mr. Rooney and whether you would want to interview him or speak

6    to him when he arrived at the police department?

7    A.    Yes.  I wanted to ask if he knew where Kozee was.

8    Q.    All right.  And so when he arrived, was he in -- placed in

9    handcuffs?

10   A.    Yes.  He was detained at that time.

11   Q.    All right.  And with him being detained, did you in fact

12   make contact with him at that time?

13   A.    Yes.

14   Q.    And did you advise him when you made contact with him

15   initially of his Miranda rights?

16   A.    No.

17   Q.    Why did you not do that at that initial conversation?

18   A.    I wasn't going to be interrogating him.  I was just asking

19   if he had any information on where she was located to where we

20   could start our search, 'cause we were still actively searching

21   for her.

22   Q.    All right.  And although you had knowledge that there were

23   remains that the conservation officers identified as human

24   remains, did you at the time you made contact with Mr. Rooney

25   initially believe those remains to be Ms. Decorah?

1    A.    No.  At that time Officer Snowball stated he believed them

2    to be human remains, but he did not confirm.

3    Q.    All right.  And so when you made contact with him, you

4    were still attempting to find Ms. Decorah?

5    A.    Yes.

6    Q.    And other than asking him if he knew where she was, did

7    you ask him any other questions?

8    A.    I asked him if it would be okay if the ambulance would

9    check out the child, if they would be able to look over the

10   child.

11   Q.    All right.  And when you made contact with him at this

12   initial occasion -- let me ask you this:  Did -- did you know

13   him?  Did you have a prior relationship with Mr. Rooney?

14   A.    Yes, I did.  Me and Jonathan are mutual -- yeah, I know

15   him.

16   Q.    Okay.  Have you ever spent any time with him socially?

17   A.    No.

18   Q.    Have you ever -- have you guys ever been to family

19   functions together or work functions, anything like that?

20   A.    No.  I would say just religious functions --

21   Q.    Okay.

22   A.    -- at church.

23   Q.    And at those religious functions did the two of you ever

24   engage with one another, become friendly, or anything like

25   that?

Walker - Direct                                                    62

1    A.    Like I said, it was just mutual.

2    Q.    Okay.  Did you have an occa- -- on this occasion when you

3    spoke with him first at the vehicle, did you observe his

4    demeanor?

5    A.    Yes.

6    Q.    How did he appear to you?

7    A.    He appeared to be normal as if it was just any other day.

8    Q.    Okay.  Did he show any signs of being intoxicated or under

9    the influence of any kind of drug?

10   A.    No.

11   Q.    All right.  And did he in fact speak to you

12   conversationally at the time when you made contact with him?

13   A.    He just said he didn't know where she was.

14   Q.    All right.  Did you ever raise your voice at him or use

15   any show of force when you approached him?

16   A.    No.

17   Q.    Can you describe for the judge, were you in uniform?

18   A.    Yes, I was in full duty uniform.

19   Q.    And does that include your service weapon?

20   A.    Yes.

21   Q.    Would that have been visible to Mr. Rooney?

22   A.    Yes.

23   Q.    Okay.  And do you know if you ever, you know, touched your

24   weapon or made any display with it?

25   A.    No.

1    Q.   All right.  When you made contact with him initially, did

2    you record that conversation?

3    A.   No.

4    Q.   Did you in some way, though, memorialize what he told you

5    about being out with -- with Ms. Decorah?  Did you write it

6    down in your report?

7    A.   I don't understand the question.

8    Q.   I'm sorry.  It was a bad question.  That first

9    conversation that you had with him, you did not record it;

10   correct?

11   A.   No.

12   Q.   There is no recording of it, but did you write down at

13   some point what you discussed with him or what he told you?

14   A.   No.

15   Q.   Did you put that information into your written report?

16   A.   Yes.

17   Q.   Okay.  So other than your written police report, though,

18   it wasn't captured anywhere else?

19   A.   Marcus Trudell was present.

20   Q.   Okay.  And so in your report did you summarize your

21   conversation with Mr. Rooney?

22   A.   Yes.

23   Q.   And when you made contact with him initially, what did he

24   tell you?

25   A.   He stated that he didn't know where she was.

1   Q.   All right.  Did he tell you about what they were doing at

2   that location or anything at that time?

3   A.   No.

4   Q.   All right.  And after you had contact with him at the

5   vehicle, was he left inside that vehicle?

6   A.   Yes.

7   Q.   And when you observed him, what was he wearing?

8   A.   He had a green-colored blanket covered around his waist

9   covering his private genital area.

10   Q.   And you -- did he have a shirt on?

11   A.   No.

12   Q.   Were you able to observe anything on his body?

13   A.   He did have some physical injuries on his face, his

14   shoulder, arm area.

15   Q.   Okay.  And was there anything else notable about him from

16   having contact with him?

17   A.   His hands appeared to be dirty, kind of dark colored a

18   little bit, and then he smelled of smoke from a fire.

19   Q.   When you spoke with him at this initial contact, did you

20   get inside of the vehicle and sit next to him, or where were

21   you positioned?

22   A.   I was face-to-face with him.  I did not get in the

23   vehicle.

24   Q.   So you were standing outside of it with the door open?

25   A.   Yes.

Walker - Direct                                                    65

```
1    Q.   And Officer Trudell was present as well?

2    A.   Yes.

3    Q.   Were any other officers present?

4    A.   No.

5    Q.   Did Mr. Rooney have anything with him other than the child

6    and the blanket?

7    A.   He had a pair of boots that were muddy.  He also had his

8    cell phone on him and a wallet.

9    Q.   What were done with -- what was done with those items?

10   A.   Those items were inside the firefighters' vehicle at that

11   time while he was being transported to the other vehicle, and

12   those items were brought inside the police department by the

13   firefighters.

14   Q.   All right.  And then did you have any further contact with

15   him after that initial discussion with him when he arrived?

16   A.   Yes.  I asked him what his child's name was when the

17   ambulance arrived.  They needed to know the information.

18   Q.   Okay.  At some point did you administer a preliminary

19   breath test to him?

20   A.   Yes, I did.

21   Q.   What time was that?

22   A.   I'd have to refer to my report, if that's okay.

23   Q.   Okay.

24   A.   That time was 2:08 in the morning.

25   Q.   And did you yourself administer that test?
```

1    A.    Yes.

2    Q.    What were the results of it?

3    A.    Results were .000 percent.

4    Q.    Did Mr. Rooney remain inside of that police vehicle for

5    the entire time he was at the Winnebago Police Department?

6    A.    Yes.  We -- we do not bring any -- any people from general

7    public inside the PD even if they're in custody.  We keep them

8    inside the vehicle.

9    Q.    Why is that?

10   A.    We've had several incidents where individuals would either

11   self-harm or destroy property inside the police station.  We

12   don't have anywhere we could put them.

13   Q.    You don't have a holding cell?

14   A.    No.

15   Q.    Okay.  And was he periodically checked on?  Was he given

16   an opportunity to use the restroom?  Do you know that?

17   A.    I do not know, but I do know that Officer Trudell remained

18   at the police station with him --

19   Q.    Okay.

20   A.    -- throughout the process.

21   Q.    So Officer Trudell was the one who was responsible for

22   that portion of overseeing Mr. Rooney while he was there?

23   A.    Yes.

24   Q.    Okay.  Do you happen to have Officer Trudell's report with

25   you?  Or have you ever reviewed his report, I guess I should

Walker - Direct                                                      67

1   ask.

2   A.   Yes, ma'am, I -- I believe I have it.

3   Q.   If Officer Trudell wrote a supplemental report for

4   purposes of this case, is that something you typically would

5   have access to?

6   A.   Yes.

7   Q.   And is that why you have in fact reviewed it as a part of

8   this case?

9   A.   Yes.

10  Q.   And so if his report indicates that he had periodically

11  checked on Mr. Rooney, would that be consistent with your

12  understanding as well?

13  A.   Yes.

14  Q.   While -- after you administered the breath test, did you

15  make any calls or notifications to anybody about where the case

16  was -- was at, at that point?

17  A.   Well, I contacted Chief of Police Jason Lawrence, let him

18  know what -- what the incident was going on, what was taking

19  place, and then he referred me to call the on-call FBI special

20  agent.

21  Q.   All right.  And who was the on-call special agent?

22  A.   Special Agent Sam Roberts.

23  Q.   And did you also request dispatch to ask for some

24  assistance in searching for Ms. Decorah?

25  A.   Yes.  I -- I actually contacted the Nebraska State Patrol

1    to see if they would be able to bring their helicopter out to

2    do a flyover of the area.  Their helicopter has infrared

3    cameras equipped to it where they would be able to pick up heat

4    signatures inside the wooded areas if she was in fact out there

5    in the woods.

6    Q.   All right.

7    A.   I also contacted the sheriff's department in Thurston

8    County.  They have -- they have the technology to locate a

9    person's cell phone to triangulate your location also.  All

10   they needed was her phone number.

11   Q.   And did you take these actions after Mr. Rooney was back

12   at the police department?

13   A.   Yes.

14   Q.   Turning back to your notification of Agent Roberts, did

15   you speak to him on the phone directly?

16   A.   Yes.

17   Q.   And did Agent Roberts require any kinda -- did you notify

18   him of the human remains that were found?

19   A.   Yes.  I notified him of what Officer Snowball located, and

20   he stated that he needed a confirmation that those were in fact

21   human remains before he came out.

22   Q.   So what did you do at that point?

23   A.   I contacted Officer Snowball and relayed the information

24   to him that he needed confirmation.

25   Q.   And did Officer Snowball get back to you with that

1   confirmation?

2   A.   Yes.

3   Q.   And then did at some point Officer -- excuse me, Agent

4   Roberts arrive at the Winnebago Police Department?

5   A.   Yes.

6   Q.   Was that at approximately 3:08 a.m.?

7   A.   I'd have to refer to my report for the time --

8   Q.   Okay.

9   A.   -- if that's okay.

10  Q.   If you would.

11  A.   Yes, 3:08 in the morning.

12  Q.   When Offic- -- when Agent Roberts arrived, did he come

13  into the police department and speak with you?

14  A.   Yes.

15  Q.   And at that time what did the two of you discuss?

16  A.   I notified him of the -- the incident, of how I obtained

17  the call, and then where we were at, at that time.

18  Q.   Okay.  And did you inform him that Mr. Rooney was out in

19  the parking lot?

20  A.   Yes.

21  Q.   Did the two of you discuss a strategy or an approach on

22  how you would speak to the defendant?

23  A.   No.

24  Q.   Do you know if he ended up speaking with Mr. Rooney?

25  A.   Yes.

Walker - Direct                                                70

1    Q.    How do you know that?

2    A.    We were thinking of a strategy of how to get to the area.

3    The volunteer fire department vehicle was the only vehicle at

4    that time able to get out to that area because of the road

5    conditions.  They had some better tires on their vehicle.  And

6    Special Agent Roberts advised he wanted to make contact with

7    Rooney before we went out there --

8    Q.    Okay.

9    A.    -- and at that time that's when he went outside to make

10   contact with him.

11   Q.    Okay.  So was it as you guys were leaving to go to the

12   scene, to go to the cabin, that Agent Roberts stopped and spoke

13   with the defendant?

14   A.    Yes.

15   Q.    Were you present during that discussion?

16   A.    No.

17   Q.    Was Officer Trudell present during that discussion?

18   A.    No.

19   Q.    And after Agent Roberts finished talking with Mr. Rooney,

20   did he tell you what Mr. Rooney said?

21   A.    No.

22   Q.    What did you guys do after Agent Roberts finished talking

23   with the defendant?

24   A.    We drove down to the area on the pavement and then from

25   there we went onto the minimum maintenance road.  We all got

1    into the same vehicle.

2    Q.    Okay.  And did you at that time make your way up to the

3    cabin and to the fire?

4    A.    Yes.

5    Q.    And what did you observe when you got up to the cabin?

6    A.    About a mile from the minimum maintenance road, you pull

7    into a field, and it's at the bottom of a hill, and from that

8    point you can see where the cabin is.  After entering into the

9    field was able to see the cabin and also evidence of a fire

10   smoldering --

11   Q.    Did --

12   A.    -- next to the cabin.

13   Q.    Did you approach that fire and take a look at it?

14   A.    Yes.  After we arrived, we all exited our vehicles, and

15   then we approached the scene with FBI Agent Roberts.

16   Q.    And what did you see at the cabin and at the fire?

17   A.    Observed the cabin had an open front door, and then where

18   the fire was, Officer Snowball pointed out to where those

19   remains were, and then we actually observed them for ourselves,

20   and the FBI agent confirmed that those were human remains.

21   Q.    Okay.  And inside the cabin was there anything notable

22   that you saw?

23   A.    Yeah.  After FBI Roberts made his phone call, he wanted to

24   do a initial walk-through, and I went with him and observed a

25   mattress on the floor.  Also, there was several miscellaneous

Walker - Direct                                                    72

1    items and then also blood on the floor.

2    Q.   All right.  Did you notice blood anywhere else at the

3    cabin?

4    A.   There was blood in the doorway and then also outside on

5    the front porch area.

6    Q.   All right.  Did you take pictures of any of those things?

7    A.   Yes, I took photos of the scene.

8    Q.   Including the -- the area that had the fire?

9    A.   Yes.

10   Q.   And after you were done at the scene, what did you do?

11   A.   After we got done with the scene, FBI Roberts advised that

12   he was going to call the evidence response team to the scene

13   and that once they arrived that Officer Snowball and Officer

14   St. Cyr would be relieved from securing the scene.  We got back

15   into our patrol vehicles and went back to the police station.

16   Q.   As you were heading back to the police station, did you

17   and Agent Roberts discuss at that point a strategy on how to

18   approach Mr. Rooney or to interview him?

19   A.   No.

20   Q.   Did you independently form a strategy of your own without

21   talking to Agent Roberts?  Did you have a strategy for how you

22   wanted to talk to him?

23   A.   No.

24   Q.   And do you know what time you returned to the Winnebago

25   Police Department?

1    A.    I'd have to refer to my report, if that's okay.

2    Q.    If you would, please.

3    A.    It was at 5:23 in the morning.

4    Q.    And then at 5:23 what happened when you all arrived back

5    at the police department?

6    A.    We arrived.  It was myself, Officer Trudell, and then the

7    volunteer fire department.  There was two -- two of their

8    employees that were there also that were helping with the

9    search.  Kind of conducted a debrief of the incident amongst

10   ourselves.

11   Q.    All right.  And did Agent Roberts make contact with

12   Mr. Rooney again?

13   A.    Yes.

14   Q.    And to your knowledge did he interview him at that time?

15   A.    Yes.

16   Q.    And do you know -- were you present for Agent Roberts'

17   second interview with Mr. Rooney?

18   A.    No.

19   Q.    After Agent Roberts completed his interview with the

20   defendant, did Agent Roberts come and talk to you?

21   A.    He came inside and stated that he was done with his

22   interview.

23   Q.    Did he advise you or tell you that Mr. Rooney had asked

24   for a lawyer?

25   A.    No.

Walker - Direct                                               74

1    Q.   And when you had this conversation with Agent Roberts, did
2    you then make a decision as to whether or not you would speak
3    with the defendant?
4    A.   Yes.
5    Q.   And did you in fact go speak to him?
6    A.   Yes.
7    Q.   When you went to speak with him, did you advise him of his
8    rights?
9    A.   Yes.  For the Bureau of Indian Affairs, we do have a form
10   that we have to fill out when we do advise somebody of their
11   rights asking them questions.  Throughout the whole process we
12   add our initials when we ask them the questions if they
13   understand.  They actually do sign that form.
14   Q.   Did you also record that interview?
15   A.   Yes.
16   Q.   And have you had an opportunity to listen to that
17   recording since you -- since that day that you recorded it?
18   A.   Yes.
19   Q.   And was the recording that you listened to a true and
20   accurate copy of your conversation with the defendant?
21   A.   Yes.
22   Q.   And he did in fact waive his rights with you and spoke to
23   you, but you were not aware that he had previously told Agent
24   Roberts that he wanted to speak with a lawyer?
25   A.   There's two questions there.

Walker - Direct                                              75

1    Q.    It might have been.

2    A.    The first one, yes, and the second one, no.

3    Q.    Okay.  When you started speaking with Mr. Rooney, do you

4    recall him saying that he had already talked to the FBI guy?

5    A.    Yes.

6    Q.    And you said, "Well, I'm BIA"?

7    A.    Yes.

8    Q.    What did you mean by that?

9    A.    For us, we enforce tribal law, and at that time he was

10   going to be charged under tribal law.

11   Q.    Okay.  So were you operating as a BIA officer for purposes

12   of a tribal court at that time?

13   A.    Yes.

14   Q.    Now, to your knowledge, if the defendant had asked for a

15   lawyer and invoked his rights and you're contacting him after

16   he did that, would any statements that he gave to you be

17   admitted in tribal court?

18   A.    I don't know the -- the answer there.

19   Q.    You're not sure?

20   A.    No.

21   Q.    Okay.

22   A.    I'm not sure.

23   Q.    And when you approached Mr. Rooney, did you -- did you

24   ever app- -- excuse me, appeal to the fact that the two of you

25   were Native American?

Walker - Direct                                                76

1   A.   No.

2   Q.   Did you ever use any tactics to manipulate him or force

3   him to talk to you?

4   A.   No.

5   Q.   And then other than speaking to the defendant on this

6   occasion, other than interviewing him, did you also take photos

7   of him?

8   A.   Yes.  I asked him if he'd be -- consent to take photos,

9   and he said yes.

10  Q.   And the conversation that you had with the defendant at

11  that time, was it a heated conversation?  Can you describe how

12  you saw that conversation go?

13  A.   That was a -- I believe it was a normal conversation as if

14  we're talking amongst ourselves, you and me.

15           MS. WRIGHT:  Your Honor, may I have just a moment?

16           THE COURT:  Yes.  Take all the time you need.

17  BY MS. WRIGHT:

18  Q.   Okay.  Officer Walker, you did say that you were familiar

19  with Mr. Rooney.  You know who he is.  Is -- do you see

20  Mr. Rooney here in the courtroom today?

21  A.   Yes.

22  Q.   Okay.  And is that the individual sitting next to

23  Ms. Steenbock at defense -- defense table?

24  A.   Yes.

25           MS. WRIGHT:  Okay.  I have nothing further at this

1    time, Your Honor.

2              THE COURT:  Cross-examination.

3              MS. STEENBOCK:  Thank you, Judge.

4                        CROSS-EXAMINATION

5    BY MS. STEENBOCK:

6    Q.   Officer Walker, you just indicated that you took

7    photographs of Mr. Rooney when -- after you did your interview

8    with him; is that correct?

9    A.   Yes.

10   Q.   Okay.  The photographs you took of him, though, they

11   represent how he appeared to you when you first had -- had

12   contact with him at one o'clock in the morning; correct?

13   A.   Yes.

14   Q.   All right.  And it appears that the photographs are of him

15   sitting in the back seat of the Chevy Silverado truck.  Is that

16   where you took the pictures?

17   A.   Yes.

18   Q.   All right.  But when he first arrived, he was brought

19   there in Offic- -- or firefighter Grant's vehicle; correct?

20   A.   Yes.

21   Q.   And what kind of car is that?

22   A.   I believe it's a pickup also.

23   Q.   Okay.  All right.  And Mr. Rooney had just a blanket on

24   him to cover his genital area?

25   A.   Yes.

1    Q.    Other than that he was naked?

2    A.    Yes.

3    Q.    Okay.  And just to paint a picture for the court, this

4    blanket is not a large blanket; correct?

5    A.    I would believe so, yeah.

6    Q.    Okay.  Have you had a chance to look at the photos that

7    you took since you first took them?

8    A.    Yes.

9    Q.    Okay.  Did you refresh your memory of what they look like

10   to prepare for today's hearing?

11   A.    Yes.

12   Q.    Okay.  So you would agree with me that the blanket does

13   not even come to his kneecaps when it comes to covering his

14   body; correct?

15   A.    Yes.

16   Q.    Okay.  So does it go all the way around his body?

17   A.    Yes.

18   Q.    Did it cover his buttocks?

19   A.    Yes.

20   Q.    Okay.  So it wrapped the entirety of his buttocks and his

21   genitals when he transferred himself from the firefighter's

22   vehicle to the cruiser; correct?

23   A.    Yes.

24   Q.    All right.  But you would agree with me that comes about

25   halfway down his thigh; correct?

Walker - Cross                                                    79

1    A.    Yes, or up to the knees.

2    Q.    Pardon?

3    A.    To the knees, yes.

4    Q.    Your testimony is it comes to the knees?

5    A.    Yes.

6    Q.    Okay.  Would looking at the photographs refresh your

7    memory of how far the blanket comes down?

8    A.    Yeah.  I believe in a seated position it kind of comes up

9    a little bit higher, but yes, it was to the knees.

10   Q.    Okay.  So when he was standing, you thought it came down

11   to his knees, but you would agree with me as he's handcuffed

12   and seated in the cruiser, it does not come to his knees?

13   A.    Yes.

14   Q.    Okay.  And you were obviously very respectful when you

15   took the photographs, but would you agree to me that -- with me

16   that, you know, in certain positions that he would not be able

17   to cover his genitals entirely?

18   A.    Through that entire time he was covering his genitals.

19   Q.    Okay.  Why didn't you give him a jumpsuit to put on?

20   A.    We don't have any.

21   Q.    You don't have any?

22   A.    No.

23   Q.    Thurston County has them?

24   A.    I believe so.

25   Q.    Okay.  And you didn't make any efforts to get a jumpsuit

Walker - Cross                                                        80

1    from Thurston County?

2    A.   Thurston County is probably about 25 minutes away, and

3    they would probably only provide that if that's where he was

4    taken to.  We do not have a jail for Winnebago.

5    Q.   Okay.  So it's your testimony that Thurston County would

6    not have probably provided you a jumpsuit for Mr. Rooney?

7    A.   No.

8    Q.   Okay.  And you would agree with me that he was in that

9    cruiser naked for over four hours, almost five hours; correct?

10   A.   Yes.

11   Q.   All right.  And what other efforts were taken so that he

12   could cover his body?

13   A.   I believe just the blanket that he had on.

14   Q.   That's all?

15   A.   Yes.

16   Q.   All right.  And are you equipped with a body camera on

17   your uniform?

18   A.   No.

19   Q.   Okay.  Is -- other officers are?

20   A.   I believe the county is but not -- not BIA.

21   Q.   Okay.

22   A.   We do not have a policy for that.

23   Q.   Okay, all right.  Did you come onto your shift any earlier

24   because of this situation with looking for Kozee Decorah?

25   A.   No.

1    Q.   Okay.  So that was your normal shift?

2    A.   Yes.

3    Q.   You indicated that you were momentarily diverted from the

4    investigation because there was a service call in town; right?

5    A.   Yes.

6    Q.   Okay.  Did you arrest anyone as a result of that?

7    A.   No.  That man was not located on that call.

8    Q.   Okay.  Were there any other parties arrested in the area

9    around this evening and into the morning hours?

10   A.   No.

11   Q.   Okay.  So if I told you that there was an individual that

12   was arrested in the wooded area, you're not familiar with that;

13   correct?

14   A.   Yeah.  I'm not familiar with that.

15   Q.   All right.  When Officer Robert- -- or Agent Roberts came

16   to the Winnebago Police Department, you indicated on direct

17   examination that you gave him a short briefing on where the

18   situation was; correct?

19   A.   Yes, 'cause he did not know where this location was.

20   Q.   Okay.  Did you also tell him about the physical injuries

21   you observed on Mr. Rooney?

22   A.   Yes.

23   Q.   All right.  And did you tell him that you smelled an odor

24   of fire about his person?

25   A.   Yes.

1    Q.   And did you tell him that you had administered a

2    preliminary breath test for alcohol?

3    A.   Yes.

4    Q.   Okay.  And you told him your observations of -- of all of

5    those things; correct?

6    A.   Yes.

7    Q.   All right.  And at that point you had not been out to the

8    scene of the cabin; correct?

9    A.   Yes, that's correct.

10   Q.   Okay.  So if offer -- Officer Roberts testified that he

11   thought you had been to the cabin, he would be mistaken?

12   A.   Yes.

13   Q.   All right.  The first time you went up there is with

14   Roberts?

15   A.   Yes.

16   Q.   All right.  And that's after Roberts had talked to

17   Mr. Rooney; correct?

18   A.   Yes.

19   Q.   When you took these pictures that are depicted in the BIA

20   photo log, did you use a camera or your cell phone?

21   A.   It was a department-issued camera that we have.

22   Q.   Did Roberts ask you to take any pictures before you went

23   to the scene?

24   A.   What do you mean by that question?

25   Q.   You told -- you just had a conversation with him in the

Walker - Cross                                                        83

1    station --

2    A.    Yes.

3    Q.    -- saying, you know, he's got a shiner on his face and

4    he's got a bruise on his shoulder.  You told him what you saw;

5    right?

6    A.    Yeah.

7    Q.    Did Roberts say to you, "Let's go take pictures of him

8    right now"?

9    A.    No.

10   Q.    All right.

11   A.    The initial photos are from when we first seen him right

12   there, 4:01.

13   Q.    And these are from when you come back; right?

14   A.    Yes.

15   Q.    Okay.  Did Roberts ask you to do another PBT with him

16   watching you do it?

17   A.    No.

18   Q.    Did you tell or did you discuss with Roberts whether or

19   not you observed any other signs of intoxication or impairment?

20   A.    No.

21   Q.    Did you tell him you didn't think that Rooney was under

22   the influence?

23   A.    What -- I don't understand the question.

24   Q.    Well, you testified that when you had contact with him,

25   you did not think he was under the influence of alcohol or

1    drugs; correct?

2    A.    That's correct.

3    Q.    Okay.  Did you tell that to Roberts also?

4    A.    Yes.

5    Q.    Whose custody was Mr. Rooney in at that time?  Winnebago?

6    A.    Yes.

7    Q.    Okay.  So when you call Roberts, it's because the nature

8    of the crime suspected would involve federal jurisdiction;

9    correct?

10   A.    Yes.

11   Q.    Okay.  And you, as a BIA officer, are accustomed to

12   working with the FBI; correct?

13   A.    Yes.

14   Q.    All right.  And so you don't have any squabbles or

15   jurisdictional issues with who does what in an investigation.

16   You work collaboratively with the FBI?

17   A.    Yes.

18   Q.    All right.  You've had a chance to review Officer

19   Trudell's report?

20   A.    Yes.

21   Q.    And the government attorney asked you on direct

22   examination if you saw in that report where Officer Trudell

23   indicated that he periodically checked on Mr. Rooney; right?

24   A.    No.  I believe I said I was not sure.

25   Q.    Okay.  Have you had a chance to review Trudell's report?

Walker - Cross                                                    85

 1    A.    Yes.

 2    Q.    Okay.  So if -- if I tell you that the report indicates

 3    that he periodically went out to check on Jonathan, would you

 4    say that Officer Trudell put the truth in his report?

 5    A.    Yes.

 6    Q.    Okay.  There is no log of activity to do with checking on

 7    Mr. Rooney; correct?

 8    A.    No.

 9    Q.    Okay.  So in other words, no officer wrote, "2:15, I

10    offered him a restroom break; 3:05, I offered him water"?

11    There's nothing like that that exists.

12    A.    No.

13    Q.    And when are these reports made?

14    A.    The initial reports are made at the time of the incident

15    that he's after -- afterwards.

16    Q.    Okay.  So they're not made exactly when you're talking to

17    the person?

18    A.    No.

19    Q.    Okay.  They're made at some point after things settle

20    down --

21    A.    After the incident, yeah.

22    Q.    Okay.  And so your report was made when?

23    A.    After the incident.

24    Q.    In the morning after Mr. Rooney was taken to Thurston

25    County?

Walker - Cross                                                    86

```
 1    A.    Yes.

 2    Q.    You sat in your office and typed it?

 3    A.    Yes.

 4    Q.    Okay.  Is it done by typing or by dictation?

 5    A.    Typing.

 6    Q.    Okay.  And why do you do it right after?

 7    A.    Department policy.

 8    Q.    Okay.  And what other reasons would there be for that?

 9    A.    Be for -- like I said, department policy.  It's habit.  We

10    do that --

11    Q.    Yeah.

12    A.    -- every day.

13    Q.    I'm not trying to trick you or anything.

14    A.    Yeah.  We do it every day so --

15    Q.    Well, I mean, but it's also freshest in your mind at that

16    point; right?

17    A.    Yeah.

18    Q.    All right.  You're going to remember everything as much as

19    possible, as accurately as possible, when you write that report

20    right afterwards; right?

21    A.    Yes.

22    Q.    Officer Trudell wrote in his report that when you and

23    Agent Roberts came back that Agent Roberts went to question

24    Jonathan and during that round of questioning, Jonathan did

25    decide to remain silent.
```

Walker - Cross                                                    87

1    A.    Okay.

2    Q.    Okay?  So that's something that Officer Trudell was aware

3    of at the time.  Is that something that you were aware of at

4    the time?

5    A.    No.

6    Q.    Okay.  And why would Officer Trudell know that and not

7    you?

8    A.    I believe it was because it was Officer Trudell's vehicle.

9    I don't know.  That's the only reason why, I would think.

10   Q.    Okay.  Was Trudell out with Roberts when Roberts did the

11   interview?

12   A.    I don't think so.  I don't know.

13   Q.    Okay.  Did Roberts come in and brief Trudell separately

14   from briefing you?

15   A.    I don't know.

16   Q.    How long prior to May of 2020 have you known Jonathan

17   Rooney?

18   A.    I can't give you an accurate date.

19   Q.    Years, years and years?

20   A.    Yes, it's been years.

21   Q.    Okay.  And you know his family?

22   A.    Yes.

23   Q.    And you know his mother?

24   A.    Yes.

25   Q.    Okay.  Do you know his father as well?

Walker - Cross                                                    88

```
1    A.    No.

2    Q.    Okay.  You know his siblings, his sister?

3    A.    Yes.

4    Q.    Okay.  And you know them from going to the Native American

5    Church; correct?

6    A.    I know them.  It's a small community.

7    Q.    Sure.

8    A.    His -- I believe his aunt is married to my uncle, and

9    they've been married for quite some time so we knew each other

10   from -- from that too.

11   Q.    Okay.  And so you're Native American?

12   A.    Yes.

13   Q.    You're Winnebago?

14   A.    Yes.

15   Q.    Okay.  And as you said earlier, you -- it's a small

16   community so --

17   A.    Yes.

18   Q.    And you also knew Jonathan to work for the city at that

19   time; correct?

20   A.    No.  I did not know where he worked.

21   Q.    Okay.  When you talked to him after you gave him his

22   rights and he agreed to speak with you, he referenced to you

23   people and occasions of seeing them at church; correct?

24   A.    Yes.

25   Q.    Okay.  And that basically is a history that the two of you
```

1    have about common people in the community; correct?

2    A.   Yes.

3    Q.   All right.  So when you said to him -- when he told you,

4    "I already talked to that guy," and you said he's FBI, I'm BIA,

5    so what does that statement mean?

6    A.   As a BIA officer, we conduct our own primary investigation

7    for tribal court.

8    Q.   Okay.

9    A.   So it's separate from FBI Agent Roberts' investigation.

10   Q.   Well, you certainly know if there is a body, whether it be

11   a homicide or whether it be an unlawful disposal of a body,

12   that that's a FBI matter; correct?

13   A.   Yes.  It would -- also would be my jurisdiction under

14   tribal law.

15   Q.   Did you prosecute this under jurisdiction of tribal law?

16   A.   Yes.  I submitted everything to tribal court.

17   Q.   And it's been dismissed?

18   A.   I wasn't -- I didn't know that.

19   Q.   Okay.  Did you honestly think it was going to be

20   prosecuted by Winnebago Tribal Court --

21   A.   I don't --

22   Q.   -- when you have a body on your hands?

23   A.   I don't know that.

24   Q.   You have no idea?

25   A.   No.

Walker - Cross                                                          90

1    Q.    Have you ever seen it happen?

2    A.    No, not in -- not in Winnebago.

3    Q.    Where at have you seen it happen?

4    A.    I've been detailed to 12 other different reservations, a

5    total of five different states in Indian country, and I've seen

6    that happen before.

7    Q.    Okay.  Which case is that?

8    A.    We had a -- a similar case, a homicide in Standing Rock

9    Indian Reservation where a female murdered her spouse, and

10   that's where it happened.

11   Q.    It happened under tribal jurisdiction?

12   A.    Yes.

13   Q.    And it was prosecuted by the tribe instead of by the FBI?

14   A.    It was both.

15   Q.    It was prosecuted in both jurisdictions?

16   A.    Yes.

17   Q.    Okay.  So in your -- in your mind you thought, you know,

18   that this statement that you were taking from him would be used

19   against him in tribal court; correct?

20   A.    Yes.

21   Q.    And that that was independent and regardless of whatever

22   he decided to do to end the conversation with the FBI?

23   A.    Yes.

24   Q.    All right.  So even if you knew that he wanted a lawyer

25   for his federal statement, that to you didn't necessarily mean

Walker - Cross                                                                91

1   he wanted a lawyer for his tribal statement; correct?

2   A.   I don't understand your question.

3   Q.   Okay.  Let me just rephrase it a little bit.  So in your

4   mind they're separate statements to be used by separate

5   prosecuting entities; correct?

6   A.   I believe so, yeah.

7   Q.   Okay.  So you said that your statement is for the -- the

8   tribal prosecution; right?

9   A.   Yes.

10  Q.   Okay.  So in your opinion the statement that you took from

11  Mr. Rooney was independent of whatever statement he made to the

12  FBI; right?

13  A.   Yes.

14  Q.   Okay.  So also, regardless of however that statement went,

15  whatever reason he had that he was done talking to Roberts, you

16  were going to take a statement if he was willing to talk to you

17  to be used in tribal court?

18  A.   Yes.

19           MS. STEENBOCK:  Nothing further.

20           THE COURT:  Redirect.

21           MS. WRIGHT:  I have nothing further, Your Honor.

22           THE COURT:  Ms. Wright, is there any reason that this

23  witness cannot be excused?

24           MS. WRIGHT:  No, Your Honor.

25           MS. STEENBOCK:  No, Your Honor.

1          THE COURT:  Okay.  Thank you, Ms. Steenbock.

2      Sir, thank you for your testimony.  You may stand down.

3          THE WITNESS:  Thank you.

4          THE COURT:  Ms. Wright, do you have additional

5  evidence?

6          MS. WRIGHT:  I do not, Your Honor.

7          THE COURT:  Do you rest?

8          MS. WRIGHT:  I do.

9          THE COURT:  Evidence on behalf of the defendant.

10          MS. STEENBOCK:  No, Your Honor.  We rest.

11          THE COURT:  Thank you.  When we had started --

12          MS. WRIGHT:  Thank you.

13          THE COURT:  -- on Tuesday, I had indicated that I

14  would give the parties an opportunity to make closing

15  arguments.  I think I -- so this is your opportunity to do so.

16      I think I'll let Ms. Steenbock go first with your argument

17  and give Ms. Wright an opportunity to respond.

18          MS. STEENBOCK:  Thank you, Judge.

19      I first want to address this mootness dispute that we're

20  having.  I will tell the Court that I did some research on

21  that.  From my research there are no appellate decisions

22  requiring the court to accept the government's request that you

23  find it to be moot because they're not going to use the

24  statement.

25      What I did find is two district court orders from Iowa

1   upholding a magistrate's concession that the government -- or a

2   finding of mootness because the government displayed a manifest

3   intent to not use the statement.

4       I would ask the Court to consider that although that

5   district court judge may have found that that is fine in that

6   circumstance that that is certainly not something you are

7   required to accept.  There is no rule, no law precedent that

8   says that the government gets to dictate what this court

9   decides based on the defendant's motion.

10      And I would submit to you that the reason and the

11  motivation for that is to avoid a finding of unconstitutional

12  behavior by this FBI agent and by this BIA agent.  The whole

13  purpose of *Wong Sun*'s exclusionary rule is to deter future

14  police misconduct by not allowing them to use statements

15  obtained in violation of Miranda or in other situations that

16  are unconstitutional.

17      So what they're asking you to do is skirt a finding that

18  what they did was wrong in this case, which it is wrong, and

19  it -- it may present itself as relevant in the future.  Even if

20  the government doesn't intend to use it in their case in chief,

21  it may be relevant.

22      I will tell the Court in candor there are going to be

23  other issues that may touch on these statements, including but

24  not limited to, you know, 404(b) bad acts evidence.  The

25  government will likely seek to introduce prior bad acts, and

1       some of the statements that the defendant gave that are

2       incriminatory that were taken in violation of his rights may

3       touch on the believability or credibility of those statements.

4       And if there is a court ruling that they were taken in

5       violation of his rights, then that's a different ground that we

6       can deal with when we go to the motion in limine hearings.

7           There's also things that I can't necessarily foresee right

8       now.  For instance, there are guideline enhancements.  There

9       are clemency issues in the event that Mr. Rooney is convicted.

10      There's a number of reasons, and I would ask the Court to make

11      findings independent of the government's intent at this point

12      to use those statements.

13          I don't think that there -- there's any need for me to

14      spend a lot of time on statement one.  It is indisputably taken

15      without Miranda.

16          Statement number two, which is the statement Roberts

17      achieved when he first arrived at the scene, he testified on

18      Tuesday that his intent was to ascertain Mr. Rooney's level of

19      intoxication and to determine whether or not his body had

20      physical evidence that needed to be preserved.  He may say that

21      that's his intent, but there is not one thing in the record or

22      really in anyone else's testimony to support that.  He's saying

23      that now as a way to fit within the confines of the *Siebert*

24      ruling.

25          In other words, he wants this Court to think his

1    intents -- intention was not malfeasance but his -- his

2    mind-set was innocent.  The Court has a copy of the audio

3    recording, and right from the jump he doesn't ask him, "Are you

4    drunk?  Have you been using drugs?  Are you high?"  He says,

5    "Why are you in here?"  And after a few moments after that, he

6    says, "Do you guys fight a lot?  I mean, what's going on?"

7         Even after Mr. Rooney tells him at 3:56, "I didn't think I

8    was in any trouble," he -- he tries to minimize that, saying,

9    "No, I'm not saying you are in trouble," even though he clearly

10   is handcuffed naked in the back of a cruiser, and then acr- --

11   tries again to get into this situation with prior domestic

12   acts.

13        The second conversation uses that tenor, uses that

14   information for Roberts to develop a fake persona where he's

15   the victim of a domestic relationship, and he gets it, man.

16   That's how bitches be.  They corner you, they trap you, they

17   make you feel like you have to do something back to them.

18   That's all ridiculousness, and it is based entirely on what he

19   achieved from the first statement.

20        When he went in the second time, he did not make any

21   effort to say, "Look, I talked to you before.  None of that is

22   going to be used against you.  I want to start fresh."  He did

23   not try and do that.  He did not -- even if his intent, which I

24   don't believe, was intent to find out the level of intoxication

25   and find out injuries, he did not, once he got into the weeds,

1    so to speak, stop and say, "Hey, I think we're going too far.

2    I need to tell you what your rights are."  He did not do that.

3          *Siebert* talks about a five -- five factors for this Court

4    to consider when determining whether or not this was a

5    conscious decision to withhold Miranda.  Number one, the

6    completeness and detail of questions and answers to the first

7    round of questioning.  I just talked about how the domestic is

8    a common theme with both.

9          Number two, whether or not the two statements have

10   overlapping cont- -- content.

11         Number three, the timing.  The entire time Mr. Rooney was

12   naked and handcuffed in the back of a cruiser.  There is no

13   intervening circumstance.  There is no event that -- that broke

14   the causal chain between this conduct.

15         Number four, the continuity of police personnel.

16         And number five, the degree to which the interrogation

17   treated the second round of questioning as continuous with the

18   first round of questioning.  He made no attempt to advise that

19   the prior statement, couldn't use.  He took no effort to take

20   curative measures.

21         He may not have known that he needed to provide Miranda.

22   It seems as though this officer is not experienced at all.  His

23   testimony was that he didn't realize he had audio recorded the

24   first statement because he thought it was an interrogation that

25   he had done during a transportation.  I -- I asked him with

1   kind of incredulity, you know, you know that that's also a

2   custodial interrogation, and he said no, he didn't know that.

3       So it may be that he didn't realize that was his

4   obligation, but that doesn't mean that he didn't have that

5   obligation under the law.  He testified that he was taught at

6   Quantico that anytime somebody's in custody that you're

7   supposed to give them their rights per Miranda, and he failed

8   to do so.  So he was either trained to do it this way or he

9   decided to do it this way for other strategic reasons that he's

10  not being honest about.

11      So after I filed the motion to suppress and I called him

12  out for not only not recording it, which seems silly, but then

13  not even writing a 302 -- there's no report even with a

14  mention.  The only reason I knew that this first report existed

15  or this first conversation existed is because Walker and

16  Trudell put it in their reports that it happened.  Otherwise,

17  if you look at the totality of the FBI investigation and the

18  reports, there is no mention of it at all.

19      *Siebert* asks the court whether a reasonable person in

20  Mr. Rooney's shoes would have understood the second Miranda to

21  have given him any real choice, and I would submit to you

22  because of all that had occurred beforehand, there is no belief

23  that Mr. Rooney had at that point that he had a real choice

24  about continuing the conversation that they had already had

25  about his relationship with Ms. -- Ms. Decorah and their prior

1   domestic incidents that were brought up in the first incident.

2       I would urge the Court to not only suppress statement

3   number two, but to suppress statement number three as a

4   unlawful continuation of the conduct in statement number two.

5       As to statement number four, the last series of questions

6   illustrate I think the whole point is that whether or not the

7   BIA agent knew whatever reason Mr. Rooney had to terminate his

8   conversation with the FBI, that they thought they had the right

9   to go in, give him a new Miranda, and to see if he wanted to

10   speak.  And that, of course, is completely contrary to *Edwards*

11   and *Minnick*.  It does- -- and I would submit it doesn't even

12   matter if he knew or not, but he at least had some indication

13   that Mr. Rooney had terminated the conversation.

14       He knew that it had been a 30-minute conversation.  He

15   made no inquiries why.  He says he made no inquiries of Roberts

16   why.  I mean, that -- there's -- the case law is pretty --

17   pretty straightforward that it's a bright-line rule unless

18   Mr. Rooney initiates further conversations after having invoked

19   his right to have counsel that those statements should not be

20   taken.

21       The -- the second prong is we are also arguing that it

22   should not be used against Mr. Rooney as impeachment evidence

23   should he elect to testify.  The Court has heard numerous times

24   that Mr. Rooney was naked.  He was in the back of a police car.

25   The ambulance was taken -- or brought to evaluate the child

1    because the child had been exposed to weather and it was cold.

2    Mr. Rooney was not evaluated.  He was not offered clothes.  He

3    was not offered anything more to conceal his privacy, you know.

4         The fact that I mentioned that Officer Walker knows

5    Mr. Rooney from the community, offered a little bit of us

6    versus them as far as we're BIA, we're Native Americans, you

7    know, this is the FBI, this is completely different, don't

8    worry about that, is a little bit of coercive.  It is a little

9    bit of relying upon a common community, and we would argue that

10   all of this combined should render the statement given not only

11   in violation of *Minnick* and *Edwards* but also involuntarily

12   given.

13        And with that I'll submit the matter.

14        THE COURT:  Thank you.

15        Ms. Wright, in your argument why don't you start with

16   identifying for the Court what statements the government

17   intends to offer and for what purpose, whether it be for trial

18   or for under 404(b) or potential other uses and also whether it

19   might be offered for impeachment or not in the event the

20   defendant testifies.  There are four statements essentially,

21   "statements" meaning periods in which the defendant was

22   questioned.  One and four were done by Officer Walker.  Two and

23   three were done by Special Agent Roberts.

24        So again, I know we went over this a little bit when we

25   started the -- the hearing on -- on Tuesday, but on those four

 1    sets of statements, how does the government intend to use those

 2    in this case?

 3            MS. WRIGHT:  So the first interview with Officer

 4    Walker, the government would not be using that in its case in

 5    chief.  That -- that interview, quite frankly, I don't know

 6    that we have any interrogation that took place.  The defense

 7    does not seem to be arguing that that is an improper statement.

 8    I think our focus here is -- is on that -- is from when Agent

 9    Roberts made contact with Mr. Rooney.  So that first interview,

10    if we're going to call it an interview, between Officer Walker

11    and Mr. Rooney, the government -- I don't plan on using any of

12    those statements, but I also don't think that there's been any

13    presentation or argument here that there was a -- a violation.

14            THE COURT:  Well, the testimony was, as I understand

15    it, that Mr. Rooney denied knowing where the victim was.

16            MS. WRIGHT:  Correct.  That is correct.  And so that

17    would be potential impeachment evidence only, Your Honor.

18        For the second statement, which is the one when Agent

19    Roberts made contact with Mr. Rooney at approximately 3:23, the

20    government already indicated we are not going to use those

21    statements in our case in chief, but we do believe they are

22    available for impeachment purposes.

23        The third statement, it's the government's position that

24    that comes in and is admissible using the framework of *Oregon*

25    *vs. Elstad.*

1          The fourth statement, which is the one with Officer

2     Walker, the government does not plan to use that in its case in

3     chief, but it's our position it is available for impeachment

4     purposes.

5          THE COURT:  What about Ms. Steenbock's argument

6     that -- that while you may not be intending to use the

7     statements in the questioning one, two and four in your case in

8     chief, she's concerned it might be used for other purposes?

9          MS. WRIGHT:  Well, unfortunately we haven't really

10    dis- -- had an opportunity to flesh out those issues, but if it

11    was for 404(b), for example, I think that we would have to have

12    motions in limine to determine whether or not at the time that

13    evidence may come forward if it is admissible or not.  I think

14    it's too soon, without us having an evidentiary hearing, to

15    make a determination about any 404(b) evidence, which in this

16    case it would only be from that first interview where Agent

17    Roberts -- sorry.  I should say the second interview where

18    Agent Roberts briefly spoke to the defendant for the six

19    minutes.

20         As far as the 404(b) analysis, I would ask the -- the

21    Court not make a ruling on that, 'cause we really haven't had

22    an opportunity to address that issue.  I think that's properly

23    addressed with a motion in limine and that it would still be

24    potentially admissible for those purposes and of course with a

25    limiting instruction.  So I'm not willing at this point to say

1    that we're not potentially going to use that.

2         THE COURT:  Do you want to address the issue of

3    whether, if statements are not going to be admissible,

4    nonetheless they can be used for impeachment purposes?

5         MS. WRIGHT:  Yes, I do.  So the violations have to be

6    of a nature that essentially you're going to punish the -- the

7    government for these violations, and I just don't think you

8    have that here.  The law is pretty straightforward at -- my

9    brief addresses this -- that's still available for impeachment

10   purposes even under more egregious circumstances than what we

11   have here, which is -- quite frankly, there's no egregiousness.

12   They are still admissible for impeachment purposes.

13        I don't think Your Honor has seen anything during the

14   course of this hearing, any of the testimony, any of the

15   recordings, that would suggest that those items should be

16   suppressed and not used for impeachment; so the government's

17   position is that they are available for that purpose.

18        THE COURT:  And then there's the issue raised with

19   regard to the third interview/interrogation session with --

20   which took place after the government asserts and Special Agent

21   Roberts testified that Miranda warnings were given to the

22   defendant.

23        MS. WRIGHT:  So that particular interview, Your

24   Honor, is admissible, and that's why I -- I would like to -- I

25   guess I'll just make a closing argument, if I --

1          THE COURT:  Sure.

2          MS. WRIGHT:  -- if I may.  So first I'll address the

3     moot issue.  In this court historically in practice the issue

4     is moot because the government is not presenting any evidence

5     for which we're -- we're planning on needing a ruling.  We

6     don't need a ruling on it because we're not going to be using

7     it.  That is what renders the issue moot, and so it's not

8     skirting a constitutional issue and avoiding a finding being

9     made that's adverse.

10         We're -- there is no evidence that we're asking to use,

11    and, therefore, there's no ruling that needs to be made on it.

12    So it's the government's position that the historical nature

13    and practice in these courts should remain and that it just be

14    denied as being a moot issue.

15         Now, I have indicated that *Oregon vs. Elstad* is the proper

16    framework here, and that is because in order for this to be

17    analyzed under *Missouri vs. Siebert*, there has to be some sort

18    of intentional designed plan to violate Miranda, and you just

19    don't have evidence of that here.  Without being offensive to

20    Agent Roberts or Officer Walker, it does not seem that their

21    understanding of how Miranda works is sophisticated enough that

22    they formed a plan to say, "I'm going to go in here and make

23    some headway with Mr. Rooney as much as possible, not advise

24    him of his rights, get him to confess, and then we'll clean it

25    up later and get him to confess again."

1        Instead what happened is when Officer Walker made his

2    initial contact with Mr. Rooney, he let him know he was being

3    detained as Ms. Decorah had not been located yet, and he's

4    still very actively searching for Ms. Decorah.  Although there

5    was some suspicion with regard to the remains, the fact that

6    Officer Walker was asking the Nebraska State Patrol helicopter

7    to go up and look for her, that they made contact with Thurston

8    County to attempt to locate her via her cell phone supports

9    that they're all still looking for her actively.

10       You'll see that when Mr. Rooney is found, it's at

11   midnight, and then the conservation officers say we're -- we

12   found the male, we found the infant, we're still looking for

13   Ms. Decorah.  They continue searching for her, and it's over

14   an -- it's about an hour before they say, "We're going to bring

15   Mr. Rooney back to the police station.  We're still up here.

16   There appears to be a skull in -- in this fire."  But there was

17   no confirmation at that point.  And so you have a situation

18   where, once Mr. Rooney's brought down, things are looking a

19   little suspicious, but they had no confirmation and were still

20   very much actively looking and hoping to find Ms. Decorah.

21       And their brief conversation where Officer Walker lets the

22   defendant know, "You're going to be held," and then that's over

23   and done with, Agent Roberts arrives and has some knowledge.

24   He's still suspicious himself as to whether or not this is

25   truly a human skull, and he even asked on the phone when he was

1    notified you've got to get some confirmation.  Once he had a

2    telephonic confirmation, he still wanted to see for himself to

3    know whether or not these remains were human remains.

4         Now, the conversation that he had with Mr. Rooney

5    initially, he said that he wanted to observe him and make sure

6    he wasn't going to be taken to Thurston County and any

7    potential evidence destroyed.  There's no obligation for Agent

8    Roberts to approach Mr. Rooney and tell him, "This is why I'm

9    talking to you.  I'm trying to make sure I preserve this

10   evidence."  And so the nature of the conversation that he had

11   with Mr. Rooney is fine.  It could be his true intent to make

12   an observation of him, but he also can ask questions that don't

13   reveal what his intent was, whether it be to see if he were --

14   he was under the influence or -- of something.

15        Now, although Agent Roberts testified it wasn't his intent

16   to interrogate him, we've already acknowledged and conceded

17   that the questions certainly cross into interrogation and he

18   should have been advised of his rights, and so there -- but you

19   can tell from the way this progressed that there was not a

20   purposeful, planned intent to go in there and try to get him to

21   say as much as possible, to confess to something.  He was kind

22   of sussing out and feeling out what -- what was going on with

23   the defendant.

24        Once he gets up to the scene and is satisfied that there

25   is a human skull and Ms. Decorah has still not been located, he

1    decides that this truly is a suspect and he's going to

2    interrogate him, and so he was advised of his rights.  His

3    failure to advise the rights at the first interview at 3:23,

4    though, does not forever bar a subsequent interview, and that's

5    where *Oregon vs. Elstad*'s framework is so important, because

6    you're looking at the voluntariness, and you look to the first

7    interview to look at the voluntariness.  There were no coercive

8    tactics used.

9        These conversations which you have listened to are calm.

10    They're respectful.  There's no -- there's no level of coercion

11    used whatsoever.  Everything was voluntary.  All the

12    discussions were voluntary.  This notion that the first

13    interview in which they talk about domestic violence is now so

14    linked to the second one.  I just don't think Your Honor should

15    buy that.  The way the second interview went down could have

16    gone that way regardless of whether or not Agent Roberts asked

17    in the first interview if there was any domestic violence

18    between the two.

19        There was one reference to it in that first interview, and

20    in the second interview after Agent Roberts had observed the

21    scene, there's -- at that point he's just interrogating him,

22    and he had advised him of his rights, which the defendant

23    waived.  And further he felt comfortable enough at some point

24    to know, okay, I'm done talking.  I want a lawyer.

25        So this idea that Mr. Rooney the -- thought he had no --

1    no choice but to just roll with it, he had already let the cat

2    out of the bag, that's just not true, because what Mr. Rooney

3    in fact did was say he didn't know where Ms. Decorah was, that

4    she had walked off.  He hadn't let any cat out of any bag.

5        Then with respect to the last interview, I've already

6    addressed that.  I think that Your Honor understands my

7    position on that one.  That's the one with Mr. -- Officer

8    Walker.

9        Based on everything, looking at the totality of the

10   circumstances, which is what you have to do to make a

11   determination of whether this is a *Missouri vs. Siebert* issue

12   or an *Oregon vs. Elstad* issue, it becomes apparent that it is

13   an *Oregon vs. Elstad* issue, and I note in my brief that there

14   are cases where the violations are much more egregious,

15   involving physical coercion.  Here you just don't have those

16   facts.

17       Even the suggestion of a shared culture, that they're both

18   Native American and that's the reason that we should now not be

19   able to use the interview for impeachment purposes with Officer

20   Walker, it's just human nature to try to make some sort of bond

21   with a person in speaking with them.  That is not coercion.

22       So for the reasons stated in our brief, for the reasons

23   brought during the course of this hearing, we would ask that

24   the motion be denied.

25            THE COURT:  Thank you.  I appreciate the parties'

1    arguments.

2        Ms. Steenbock, did you have any additional comments,

3    briefly?

4        MS. STEENBOCK:  Just briefly, Judge.  I think when

5    you're looking to whether or not Officer Roberts is just

6    inexperienced and -- and mistakenly did this by not Mirandizing

7    the first time, I think that's my whole point with looking at

8    all the other things he did.  He hid a recording.  He didn't

9    make a report.  He lied about his intention when he observed

10   the defendant.

11       And then even if you would give him the benefit initially,

12   it is very clear that he crossed the line and made absolutely

13   no effort to cure his mistake, either in the first instance or

14   when he went back and he said -- you know, when he gave him his

15   rights, he made no effort, as is required by *Siebert*, to try

16   and make sure the defendant had an actual choice.  It's an easy

17   thing to say, "I know you talked to me before, but I'm going to

18   talk to you again, and this time I need to make sure you

19   understand your rights."

20       That would have been a completely different scenario, and

21   that's not what happened, because maybe he thought that he

22   wouldn't ever have to reveal the first statement.  He wouldn't

23   have gotten caught concealing a recording or -- I find it

24   unbelievable that over the course of May, when this occurred,

25   and October, when I filed my motion, that he didn't have time

1    to write a 302 even to document it.  It was because of him

2    knowing that he messed up and that it affects the entirety of

3    the investigation.

4          I don't have anything else to add.

5             THE COURT:  Thank you.  I'll deem the matter

6    submitted after the transcript, which I'm ordering, is prepared

7    and is filed and available to the parties on CM/ECF.  After

8    it's submitted, it is my practice to try to get findings and a

9    recommendation out within 30 days, and I intend to do so in

10   this case.

11         Defendant has been in custody under an order of detention

12   and will be remanded back to the custody of the U.S. Marshal.

13         Are there further matters that can be addressed on behalf

14   of the defendant today?

15            MS. STEENBOCK:  No, thank you.

16            THE COURT:  On behalf of the government.

17            MS. WRIGHT:  No, Your Honor.  Thank you.

18            THE COURT:  We're in recess.  Parties are excused.

19         (Adjourned at 11:56 a.m.)

20                        * * * * * * * *

21         I, Lisa G. Grimminger, certify that the foregoing is a

22   correct transcription to the best of my ability from the

23   digital recording of the proceedings held in the above-entitled

24   matter.

25            */s/Lisa G. Grimminger*              January 13, 2021
              Lisa G. Grimminger, RDR, CRR, CRC   Date

1                          I-N-D-E-X

| | | Direct | Cross | Redirect |
|---|---|---|---|---|
| **WITNESSES:** | | | | |
| **FOR THE PLAINTIFF:** | | | | |
| Samuel Roberts | | 10 | 32 | 46 |
| Anthony Walker | | 52 | 77 | -- |

| EXHIBITS: | Offered | Ruled On |
|---|---|---|
| 1. CD of officer interviews | 5 | 5 |
| 2. Exhibit 1 | 5 | 5 |
| 3. Exhibit 1 | 5 | 5 |
| 4. Advice of rights | 5 | 5 |