IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>vs.<br><br>JONTHAN DANIEL ROONEY,<br><br>              Defendant. | 8:20CR104<br><br>**FINDINGS AND<br>RECOMMENDATION** |

      This matter is before the Court on the Motion to Suppress Statements (Filing No. 41) filed by Defendant, Jonathan Daniel Rooney. Defendant filed a brief in support of the motion (Filing No. 42), the government filed a brief in opposition (Filing No. 48), and, pursuant to the Court's text order (Filing No. 47), Defendant filed a reply brief (Filing No. 48).

      Evidentiary hearings on the motion were held on December 15 and 18, 2020. Defendant was present with his attorney, Kelly Steenbock. The government was represented by Assistant United States Attorney, Lecia Wright. Samuel Roberts, a Federal Bureau of Investigation Special Agent, ("SA Roberts"), and Anthony Walker, a federal police officer with the Bureau of Indian Affairs-Office of Justice Services, ("Officer Walker"), testified on behalf of the government. The Court received without objection the government's Exhibits 1-4. A transcript (TR) of the hearings was prepared and filed on January 13, 2021. (Filing No. 66). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion to suppress be denied.

## BACKGROUND

      Just before 8:00 p.m. on May 16, 2020, the Winnebago Police Department ("WPD") received a call requesting assistance for a vehicle that had become stuck in mud on BIA Road 50, also known as Honey Creek Road, on the Winnebago Indian Reservation.[1] The call originated from Kozee Decorah,[2] who had become stranded with her infant child and her partner, Defendant.

---

[1] Although this information was not adduced at the evidentiary hearing on the motion to suppress, both parties' briefs provide similar timelines of events leading up to law enforcement's contact with Defendant and will be summarized here to provide background solely for purposes of this motion.

[2] It is unclear whether the WPD received the call for assistance from Decorah herself or whether Decorah called her aunt who then relayed the information to the WPD.

WPD Conservation Officer Peter Snowball ("CO Snowball") responded to the call and drove to assist the stranded couple. CO Snowball arrived in the area around 8:03 p.m. and saw an unoccupied vehicle that appeared to be stuck in a bank. CO Snowball radioed dispatch to see if the couple had been located on foot. They had not. When CO Snowball attempted to leave the area around 9:00 p.m., his own vehicle became stuck in the mud, so he walked to meet another CO, Benjamin St. Cyr ("CO St. Cyr").

At 9:50 p.m., CO Snowball and CO St. Cyr returned to the WPD station. WPD Second Assistant Fire Chief Jonathan Grant ("SAFC Grant") and WPD Fireman Kyle Urbanec advised the COs that Decorah lived in Walthill, Nebraska on the Omaha Nation Indian Reservation. CO Snowball and CO St. Cyr, with the assistance of police in Walthill, went to the apartment where Decorah and Defendant lived. No one was home and a neighbor stated the couple had not returned home. On their way back to Winnebago, the COs suggested they check the cabins on private property near Honey Creek Road and arranged to meet SAFC Grant and Urbanec there.

CO Snowball, CO St. Cyr, SAFC Grant, and Urbanec met at the driveway entrance of the private property where the cabins were located, and at about 11:50 p.m. proceeded on foot up a hill to the first cabin, which was empty. The officers decided to head east to check the second cabin on the other side of the valley. Through the timberline, CO Snowball observed a red glow on the hilltop across the valley and commented that it might be a fire. CO Snowball and Urbanec called out and received no response. CO Snowball and Urbanec walked to the second cabin and began to search around the area. They did not see anyone but observed a pair of black boots on the south side of the cabin.

CO Snowball knocked on the cabin door, and after waiting a moment, opened it and stepped inside. CO Snowball saw a male, later identified as Defendant, lying under a blanket on a mattress with a clothed infant, later identified as Decorah's child. Defendant sat up and CO Snowball observed Defendant was naked. Defendant asked CO Snowball, "Where is she? Where's my clothes? Are you the rescue party?" CO Snowball confirmed he was the rescue party and shined his flashlight around the cabin. CO Snowball did not see any pants, underwear, or a shirt, but did see an infant car seat, a cell phone, a billfold, a baby bag, and a can of baby formula on the floor. CO Snowball asked Defendant where Decorah was and Defendant replied, "She went outside to get cell service." CO Snowball radioed dispatch at 12:10 a.m. and advised he had located

Defendant and an infant and that he was going to continue looking for Decorah. CO Snowball reconvened with the other officers to come up with a plan to locate Decorah.

CO Snowball had observed a fire about 5-7 yards from the cabin and saw that an outhouse and a large tree branch were on fire. When CO Snowball took a closer look in the fire pit, he saw a round, white object and a bone lying next to it. Both CO Snowball and Urbanec agreed that the round object looked like a skull, and both agreed the fire had an odd smell. CO Snowball brought SAFC Grant over to the fire and discussed what they were going to do; they determined they would not tell Defendant that they saw bones in the fire pit and would transport him to the WPD.

Defendant exited the cabin with a blanket wrapped around his waist and asked about his clothes. CO Snowball told Defendant they had not found any clothes and that SAFC Grant was going to take Defendant back to the WPD station while CO Snowball stayed to look for Decorah. Defendant picked up a wallet, cell phone, and can of baby formula, and CO Snowball handed Defendant the diaper bag. SAFC Grant transported Defendant and the infant to the WPD station.

Officer Walker, an officer with the BIA, began his shift at 11 p.m. on May 16, 2020, and had been informed of the search for Decorah, but did not join the search party because he had to respond to a different call. (TR. 53-55). When he completed his other call, Officer Walker returned to the WPD station and heard CO Snowball's update at 12:10 a.m. that Defendant and an infant had been located. (TR. 56). At 1:02 a.m., CO Snowball called Officer Walker to let him know Defendant and an infant were being transported back to the WPD station by fire personnel. Officer Walker was advised that Defendant was nude, only had a blanket to cover himself, and had some injuries, but the infant appeared unharmed. (TR. 57). CO Snowball also advised Officer Walker of the suspected human remains found in the fire near the cabin where Defendant had been found. (TR. 58). Officer Walker then contacted the other Winnebago Tribal Officer on duty, Marcus Trudell ("Officer Trudell"), and also called an ambulance for the infant. (TR. 59).

Defendant and the infant arrived at the WPD station at 1:18 a.m. Defendant's personal items were taken into the WPD station and Defendant was moved from the fire department vehicle into the back of a fully marked regular patrol vehicle in handcuffs. (TR. 59, 65). Officer Walker acknowledges that Defendant was detained at this time. (TR. 60). Officer Walker testified he personally knew Defendant and Defendant's family from religious functions in their small community over the years. (TR. 62, 87-88). Officer Walker observed that Defendant did not appear to be intoxicated or under the influence of drugs, and "appeared normal as if it was just any

other day." (TR. 62). Defendant was still naked with the small blanket wrapped around his groin and buttocks to his mid-thigh. (TR. 78-79). Officer Walker observed Defendant had physical injuries to his face, shoulder, and arm area, and noticed Defendant's hands were dirty and dark and he smelled of fire smoke. (TR. 64). Officer Walker wanted to ask Defendant where Decorah was and initiated a conversation with Defendant without advising Defendant of his *Miranda* rights. (TR. 60). Officer Walker, accompanied by Officer Trudell, stood outside the vehicle with the door open during their first conversation with Defendant. (TR. 64). Officer Walker was wearing his full uniform with his service weapon, but did not touch or otherwise brandish it. (TR. 62). Officer Walker asked Defendant if he knew where Decorah was and whether Defendant would be okay if the infant was checked out by medical personnel. (TR. 61). Defendant replied he did not know where Decorah was. (TR. 63). According to Officer Walker, he did not raise his voice and maintained a conversational tone. (TR. 62). Officer Walker did not record this conversation with Defendant, but summarized what Defendant said in a written report. (TR. 63). At 2:08 a.m., Officer Walker administered a preliminary breath test to Defendant and recorded a .000% result. (TR. 66).

After he finished talking with Defendant, Officer Walker asked the Nebraska State Patrol to do a helicopter flyover of the area to see if they could locate Decorah in the woods using infrared equipment. (TR. 67-68). Officer Walker also asked the Thurston County sheriff's department for assistance in triangulating Decorah's location using her cell phone. (TR. 68). Officer Walker also contacted the WPD Chief of Police, Jason Lawrence, who referred Officer Walker to the on-call FBI Special Agent, SA Roberts. (TR. 67). Once Officer Walker confirmed with CO Snowball that human remains were found in the fire by the cabin, he relayed that information to SA Roberts. (TR. 68-69).

SA Roberts works major crimes and violent crimes on the Native American reservations in Nebraska. On May 17, 2020, at about 2:30 a.m., he received a call from WPD stating human remains had been found in a burn pit. SA Roberts was advised the remains were potentially female and the WPD had a potential suspect in custody. (TR. 11). SA Roberts arrived at the WPD around 3:08 a.m. and made contact with Officer Walker, who relayed to SA Roberts the nature of what had happened and what was found at the cabin. (TR. 12, 69). Officer Walker and SA Roberts both testified they did not discuss any strategy on how to approach or speak to Defendant. (TR. 12, 22, 69). SA Roberts testified he decided to interview Defendant immediately because SA

Roberts wanted to determine if Defendant was intoxicated and did not want any physical evidence to be cleaned or otherwise lost if Defendant was sent to corrections. (TR. 13-14, 22).

SA Roberts first spoke to Defendant at 3:23 a.m. without advising Defendant of his *Miranda* rights. SA Roberts was wearing khaki pants, a pullover or polo shirt, a blue jacket, and his tactical agent gear, including his firearm and badge on his belt. (TR. 17). Defendant was still handcuffed and naked in the back of the patrol vehicle in the parking lot of the WPD station. (TR. 21). SA Roberts acknowledges Defendant was in custody, and although SA Roberts testified he did not intend to interrogate Defendant at that time, SA Roberts recognizes he did, in fact, ask Defendant questions that elicited incriminating responses during the six and a half minutes they spoke. (TR. 15-16, 19, Ex. 1). SA Roberts recorded this interview but testified he did not produce this recording until October 8, 2020, because he had mislabeled it as a transportation recording. (TR. 18, 38-40). During this questioning, SA Roberts asked Defendant why he was there (in the patrol vehicle) and Defendant replied he was being detained because they had not found his wife. Defendant denied knowing where Decorah was. SA Roberts asked Defendant more questions about his day, where he worked, and then started probing details of Defendant and Decorah's relationship, asking whether they fight a lot and whether Defendant ever "puts his hands on [Decorah]," which Defendant admitted he does. SA Roberts concluded by asking Defendant again if he knew where Decorah was, and Defendant replied he did not and said she was going to see a friend in Sioux City. (Ex. 1).

Once SA Roberts finished speaking to Defendant, SA Roberts and Officer Walker headed to the cabin where Defendant had been found. There, Officer Walker and SA Roberts confirmed human remains were in the fire pit. (TR. 23, 71). The officers also observed blood on the floor of the cabin, in the doorway, and on the front porch area. (TR. 23, 72). SA Roberts called an evidence response team to the scene, and once the scene was secured, SA Roberts and Officer Walker headed back to the WPD station. They again did not discuss any strategy on how they were going to talk to Defendant. (TR. 72). Officer Walker and SA Roberts arrived back at the WPD station at 5:23 a.m. and debriefed the incident amongst themselves with Officer Trudell and the two fire department officers. (TR. 24, 73).

By this time, SA Roberts believed Defendant was a suspect and involved with the human remains and decided a more detailed interview was called for. (TR. 24). At 5:30 a.m., SA Roberts again made contact with Defendant to conduct another interview. (TR. 24-25; Ex. 2). SA Roberts

verbally provided a rights advisory under *Miranda* to Defendant; however, in listening to the audio recording of this interview, SA Roberts did not advise Defendant of his right to remain silent. (Ex. 2). SA Roberts did provide Defendant with an FBI FD-395, Advice of Rights Form, which Defendant signed at 5:35 a.m. (Ex. 4). SA Roberts then questioned Defendant for about thirty-three minutes. SA Roberts remained outside the patrol vehicle while questioning Defendant. (TR. 27-28). SA Roberts did not threaten Defendant and his tone was generally conversational. SA Roberts did reference Defendant's earlier admission that Defendant sometimes hit Decorah. After about thirty-one minutes, Defendant asked, "Do I need a lawyer then?" SA Roberts continued his questioning until Defendant stated, "I want a lawyer." (Ex. 2 at 33:04). SA Roberts then terminated the interview.[3]

After he was done questioning Defendant, SA Roberts went back inside the WPD station and spoke to Officer Walker. SA Roberts testified he does not recall the substance of their conversation and does not recall whether he relayed to Officer Walker that Defendant had asked for an attorney. (TR. 28-29).

Officer Walker then decided to speak to Defendant and commenced another round of questioning at 6:18 a.m. (TR. 74, Ex. 3). Officer Walker testified he was not aware that Defendant had asked for a lawyer. (TR. 73). Officer Walker advised Defendant of his *Miranda* rights. Defendant said he already talked to "that FBI guy" and Officer Walker responded, "Well, I'm BIA." Officer Walker testified that he meant that, at that time, he believed Defendant was going to be charged under tribal law and that Officer Walker was taking a statement for the tribal prosecution. Defendant agreed to talk to Officer Walker and made incriminating statements. (TR. 75, 89-91). Officer Walker maintained a conversational tone throughout this interrogation. (TR. 76).

Officer Walker testified that the WPD station does not have a holding cell, so Defendant was kept naked covered by the blanket in the patrol vehicle the entire night, which was close to five hours. (TR. 66, 80). Officer Trudell's report, which Officer Walker reviewed, notes that Officer Trudell periodically checked in on Defendant. (TR. 66-67).

A forensic dental consultant later identified the remains in the fire pit as Decorah, and on May 20, 2020, the undersigned magistrate judge signed a criminal complaint for Defendant.

---

[3]   Officer Trudell's report states that Defendant decided to remain silent during this round of questioning. (TR. 44, 86).

(Filing No. 1). Defendant is now charged in a Second Superseding Indictment with murder in the second degree of Decorah under 18 U.S.C. §§ 1111 and 1153 (Count I) and destruction of evidence in violation of 18 U.S.C. § 1512(c)(1) (Count II). (Filing No. 49).

Defendant filed the instant motion to suppress any statements he made to law enforcement on the night of May 16 to the early morning hours of May 17, 2020, both in the government's case-in-chief and for impeachment purposes. To summarize, law enforcement initiated four encounters with Defendant while he was handcuffed and naked in the back of the patrol vehicle wherein Defendant made statements: (1) the first non-*Mirandized* conversation with Officer Walker at approximately 1:18 a.m., which was not recorded; (2) SA Robert's non-*Mirandized* six-and-a- half-minute questioning that commenced at approximately 3:23 a.m., which was recorded and disclosed after Defendant filed this motion to suppress (Ex. 1); (3) SA Robert's recorded thirty-three minute questioning that commenced at approximately 5:35 a.m. after Defendant signed a *Miranda* rights advisory form (Ex. 4) and was terminated after Defendant stated he wanted a lawyer (Ex. 2); and (4) Officer Walker's recorded questioning that commenced at 6:18 a.m. after he advised Defendant of *Miranda*, which Defendant waived. (Ex. 3).

At the suppression hearing, the government clarified its position on each of the above encounters. The government does not intend to offer Defendant's unrecorded statements to Officer Walker (1) for any purpose. The government also does not intend to use Defendant's first statements to SA Roberts (2) or Defendant's last statements to Officer Walker (4) in its case-in-chief but would seek to use those statements as impeachment should Defendant testify. The government asserts that Defendant's post-*Miranda* statements to SA Roberts (3) during the 5:35 a.m. questioning are admissible in its case-in-chief under *Oregon v. Elstad*, 470 U.S. 298 (1985). (TR. 7-8; Filing No. 45 at pp. 1-2). Defendant argues that his statements to SA Roberts during the 5:35 a.m. questioning must be suppressed pursuant to *Missouri v. Seibert*, 542 U.S. 600 (2004), as it was an impermissible two-step interrogation. Defendant further asserts that no statements he made are admissible as impeachment because his statements were not made voluntarily.

## ANALYSIS

As an initial matter, the undersigned magistrate judge will first address whether the government's concessions not to use Defendant's statements in encounters (1), (2), and (4) in its case-in-chief renders Defendant's motion to suppress moot as to those statements, or whether, as

Defendant urges, the undersigned magistrate judge should instead recommend suppression. (TR. 8-9; 92-94). It has generally been the practice of courts within this district, and the practice of other district courts within this circuit, to deny as moot motions to suppress when the government agrees not to offer the contested evidence in its case-in-chief. See, e.g., *United States v. Mitchell*, No. 08-CR-46-LRR, 2009 WL 36605, at *2 (N.D. Iowa Jan. 5, 2009)("[A]s a practical matter, there does not appear to be a significant difference between granting the Motion or denying it as moot based on the government's representation that it will not offer the evidence during its case in chief . . . It appears that rather, when the government agrees not to offer evidence which is the subject of the motion to suppress, the common practice is to deny the motion as moot"); *United States v. Lindsey*, No. CRIM. 10-15 JNE JJK, 2010 WL 4822925, at *1 (D. Minn. Nov. 22, 2010), *aff'd in part*, 702 F.3d 1092 (8th Cir. 2013)("Because the government had agreed not to use in its case in chief [the defendant's] statements whose suppression the magistrate judge recommended, the Court denies as moot [the defendant's] motion to suppress those statements"). The undersigned magistrate judge declines to depart from this general practice. Accordingly, based upon the government's representations that it will not use Defendant's statements during encounters (1), (2), and (4), in its case-in-chief, the undersigned will recommend that Defendant's motion to suppress be denied as moot to that extent.

The issues remaining before the court are whether Defendant's statements to SA Roberts during the 5:35 a.m. questioning (3) are admissible in the government's case-in-chief under *Elstad* or inadmissible under *Seibert*, and whether any or all of Defendant's statements were involuntary such that they should be excluded for all purposes, including impeachment.

    **I.**    **Whether *Elstad* or *Seibert* applies**

The government does not dispute that Defendant was in custody on both occasions when SA Roberts spoke to Defendant. The government also does not dispute that the questions SA Roberts asked Rooney constitute interrogation. But, the government contends that, despite SA Roberts' initial failure to advise Defendant of his *Miranda* rights, SA Roberts's post-*Miranda* interview is admissible under *Elstad*.

Under *Elstad*, "absent deliberate coercion in obtaining an unwarned statement, a careful and thorough administration of *Miranda* warnings cures the condition that rendered the prior unwarned statement inadmissible." *United States v. Magallon*, 984 F.3d 1263, 1283 (8th Cir.

2021)(citing *Elstad*, 470 U.S. at 298). *Seibert* limited *Elstad* "by holding that a warned statement will be inadmissible when law enforcement uses a two-step interrogation tactic," which is "an intentional tactic by law enforcement to 'circumvent *Miranda* requirements' by 'deliberately' delaying the warnings 'in order to provoke a confession.'" *Magallon*, 984 F.3d at 1283 (citing *Seibert*, 542 U.S. at 600 and quoting *United States v. Wise*, 588 F.3d 531, 536 (8th Cir. 2009)). The Eighth Circuit applies *Seibert* "only to the intentional use of a two[-]step interrogation process in an effort to circumvent *Miranda* requirements." *Id.* (quoting *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007). "[T]he police officer's technique [must be] 'designed,' 'deliberate,' 'intentional,' or 'calculated' circumvention of *Miranda*" in order for *Siebert* to apply. *United States v. Black Bear*, 422 F.3d 658, 664 (8th Cir. 2005)(citing *Seibert*, 542 U.S. at 619-22)(Kennedy, J., concurring in the judgment). "When a defendant alleges his post-*Miranda* statement was obtained by a two-part interrogation, the prosecution must establish by a preponderance of the evidence that the failure to give *Miranda* warnings at the outset was not deliberate." *Magallon*, 984 F.3d at 1283 (citing *Torres-Lona*, 491 F.3d at 758). "Where there has been no such calculated effort, the admissibility of a post warning statement should continue to be governed by *Oregon v. Elstad*." *Id.*

In this case, the undersigned magistrate judge finds that the government has met its burden to prove that SA Roberts' failure to provide *Miranda* warnings to Defendant prior to the first six-and-a-half minute questioning was not a deliberate, calculated, or intentional use of a two-step interrogation process designed to circumvent *Miranda*. SA Roberts first became involved in this case at 2:30 a.m. after he received confirmation from CO Snowball that human remains were found in the fire pit near a cabin where Defendant was found. SA Roberts first spoke to Defendant shortly after SA Roberts arrived at the WPD station—at 3:23 a.m.—before SA Roberts had been to the crime scene and during the time officers were still actively searching for Decorah. SA Roberts testified he did not have his own independent strategy in approaching Defendant and both Officer Walker and SA Roberts consistently testified no interrogation strategy was ever discussed between them. SA Roberts testified he "ran out" to speak to Defendant immediately after arriving at the WPD station to assess Defendant and see if Defendant was intoxicated. (TR. 22). True, Officer Walker had already administered a preliminary breath test to Defendant and received a result of .000%, but it is unclear if this was communicated to SA Roberts when he arrived. Regardless, it is clear that SA Roberts' initial conversation with Defendant was more of a

spontaneous, off-the-cuff questioning of Defendant, rather than an intentional tactic implemented to "provoke a confession." SA Roberts acknowledges he asked Defendant questions that prompted incriminating responses, and in particular, SA Roberts inquired about domestic violence between Defendant and Decorah, which information SA Roberts used in his post-warning interrogation. But, had SA Roberts truly been implementing a deliberate "question-first, warn later" strategy, his questioning would have lasted longer than six and a half minutes and delved into more specific and complete questions, such as inquiries related to the suspected human remains in the fire pit. See *Seibert*, 542 U.S. 600, 615 (taking into consideration "the completeness and detail of the questions and answers in the first round of interrogation"); *Torres-Lona*, 491 F.3d 750, 758 (distinguishing *Seibert* as involving a post warning confession rather than a post warning false statement). SA Roberts is an experienced agent and should have known to administer *Miranda* warnings the first time he spoke to Defendant in custody; nevertheless, under the circumstances, the undersigned finds that SA Roberts' initial failure to warn Defendant was not a deliberate, calculated, intentional strategy to circumvent *Miranda* and provoke a confession. Accordingly, the undersigned finds that *Seibert* does not apply, the admissibility of Defendant's post-warned statements depends on whether they were knowingly and voluntarily made. See *Elstad*, 470 U.S. at 309.

## II. Whether Defendant's Statements were Knowing and Voluntary

Absent evidence of actual coercion or improper police tactics in obtaining an unwarned statement, "the admissibility of any subsequent statement" turns "solely on whether it is knowingly and voluntarily made." *Elstad*, 470 U.S. at 309, 318. Defendant does not dispute he made his statements knowingly but instead argues any statements he made were involuntary. To determine whether a subsequent statement is voluntary the court examines "the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Magallon*, 984 F.3d 1263, 1284 (quoting *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004)). Other factors include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education,

physical condition, and mental condition." *Id.* (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)(quotation omitted). "[T]actics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices,' do not 'render a confession involuntary . . . unless 'the overall impact of the interrogation caused the defendant's will to be overborne.'" *Id.* (quoting *Brave Heart*, 397 F.3d at 1041). "[O]ne of the key concerns in judging whether confessions were involuntary, or the product of coercion, [is] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne." *LeBrun*, 363 F.3d at 726. And, if the first "statement is actually coerced," the Court must also decide "whether that coercion has carried over into the confession" by examining factors such as "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *Elstad*, 470 U.S. at 310. "The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id.* at 318.

In this case, after SA Roberts concluded his brief, initial non-*Mirandized* interview of Defendant around 3:30 a.m., SA Roberts drove out to the crime scene where he saw blood in the cabin where Defendant was found and confirmed human remains were in the fire pit nearby. Thus, when SA Roberts returned to the WPD station two hours later at 5:30 a.m., he believed a detailed interview of Defendant was warranted and provided Defendant with a written FD-395 Advice of Rights Form that sets forth each of Defendant's rights under *Miranda*. SA Roberts also verbally recited the majority of these rights to Defendant. What is extremely troubling to the undersigned, however, is that the audio recording of this interview demonstrates that SA Roberts neglected to verbally recite the customary opening line of *Miranda* warnings, that is, "You have a right to remain silent." Instead, SA Roberts began with warning number two that, "Anything you say can be used against you in court." SA Roberts also did not clearly communicate to Defendant what he was signing and there is no indication in the record that Defendant actually read the rights advisory form before signing it. See Ex. 2. SA Roberts' baffling omission of the most very basic right under *Miranda*—the right to remain silent—hardly constitutes "a careful and thorough administration of *Miranda* warnings" that "cures the condition that rendered the prior unwarned statement inadmissible." *Magallon*, 984 F.3d at 1283.

However, Defendant did not raise issues with the adequacy of SA Roberts' *Miranda* advisement at the outset of this interrogation and does not argue his waiver was made unknowingly—only that his statements were involuntary. And, "in the absence of a proper verbal *Miranda* warning, receipt of the proper warning in writing might itself be sufficient to inform a suspect of his Miranda rights[.]" *United States v. Clayton*, 937 F.3d 630, 637 (6th Cir.), *cert. denied*, 140 S. Ct. 669 (2019). Here, the written form provided to Defendant, which he signed, clearly advises him of each of the required *Miranda* warnings, and considering the totality of the circumstances, the undersigned finds Defendant's statements after being provided with these warnings were made knowingly and voluntarily. Defendant is an adult with some prior experience with law enforcement and no recorded vulnerabilities or mental impairments. Defendant was not intoxicated and did not otherwise appear to be under the influence of any substances. Defendant speaks English and there were no apparent issues with him understanding what he was being asked or with what he was saying. SA Roberts' interrogation tactics were not abusive, extreme, coercive, or otherwise of the nature such that Defendant's will was overborne. SA Roberts did not yell at or threaten Defendant, did not brandish his weapon, and generally spoke in a conversational tone. SA Roberts interrogated Defendant alone and Defendant was not outnumbered or otherwise intimidated by use of force. The fact that SA Roberts did not tell Defendant his earlier statements could not be used against him also does not require a finding of involuntariness. See *United States v. Ollie*, 442 F.3d 1135, 1141 (8th Cir. 2006)("The later statement was admissible so long as it was made voluntarily, and its voluntariness was not undercut by the suspect's ignorance that his initial statement could not be used against him"); *Elstad*, 470 U.S. at 316 ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness."). Defendant also demonstrated an understanding of his rights, as he unequivocally asked for a lawyer after thirty-three minutes of questioning. Defendant's statements during SA Roberts' first round of questioning were not "actually coerced," but in any event, two hours passed between the two sets of questioning, and the second round of questioning was preceded by some *Miranda* advisement.

Defendant contends his statements were involuntary because he was handcuffed and naked in the back of a police cruiser for almost five hours with only a small blanket to cover him, was not given clothes or evaluated for cold exposure, and there is no indication he was provided anything to eat or drink. But, Officer Trudell was standing outside the patrol vehicle and

"periodically" checked in with Defendant. Defendant's relatively short period of physical discomfort does not render his statements involuntary when considering the other circumstances set forth above. Accordingly, the undersigned magistrate judge finds that Defendant knowingly and voluntarily provided statements to SA Roberts during the 5:35 a.m. interrogation, and therefore those statements are admissible pursuant to *Elstad*.

Finally, the government would also seek to use Defendant's first statements to SA Roberts (2) and Defendant's last statements to Officer Walker (4) as impeachment should Defendant testify. See *Harris v. New York*, 401 U.S. 222, 224 (1971); *New Jersey v. Portash*, 440 U.S. 450, 458 (1979). "Voluntary statements taken in violation of Fifth Amendment prophylactic rules, while inadmissible in the prosecution's case in chief, may nevertheless be used to impeach the defendant's conflicting testimony." *Michigan v. Harvey*, 494 U.S. 344, 344 (1990). Defendant recognizes that "cases in which a defendant can make a colorable argument that self-incriminating statements were compelled—despite warnings and a waiver of them—are rare." (Filing No. 48 at p. 6). For the same reasons discussed above, the undersigned magistrate judge finds that Defendant's initial statements to SA Roberts, and subsequent statements to Officer Walker, were voluntarily made. Neither officer threatened or intimidated Defendant, raised their voice, brandished their weapon, or otherwise acted in a way such that Defendant's will was overborne. With respect to Officer Walker's questioning, Defendant argues the additional implication of their common Native American heritage and church membership rendered his statements involuntary. But, "playing on a suspect's emotions, using his respect for his family against him, . . .[or], conveying sympathy" does not render a confession involuntary "unless 'the overall impact . . . caused the defendant's will to be overborne.'" *Magallon*, 984 F.3d 1263. Under the circumstances, the undersigned magistrate judge finds that was not the case here. Therefore, because Defendant's statements were made voluntarily, they may be used as impeachment should Defendant choose to testify in this case. Upon consideration,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert F. Rossiter, Jr. that Defendant's Motion to Suppress Statements (Filing No. 41) be denied.

Dated this 12th day of February, 2021.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.