IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 8:20CR104 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **BRIEF IN SUPPORT OF** |
| | ) | **OBJECTION TO FINDINGS AND** |
| | | **RECOMMENDATION** |
| | ) | |
| JONATHAN ROONEY, | ) | |
| | ) | |
| Defendant. | ) | |

The Defendant objects to the Magistrate Judge's Findings and Recommended (F&R) on his Motion to Suppress Statements. The Defendant requests this Court review his motion *de novo* pursuant to 28 U.S.C.A. § 636(b)(1), to sustain each of Defendant's objections, and modify the Magistrate's F&R accordingly. Please consider this brief, in addition to Defendant's prior briefings (docs 42 and 48), in support of his objections.

## Background

As fully explained in the prior briefs of both the Defendant and the government, there were four custodial statements obtained by law enforcement after questioning the Defendant on May 17, 2020. As outlined in the F&R, each of the interviews occurred while Rooney was naked with only a small blanket to cover his genitals and was at all times handcuffed in the back of a patrol unit. Indisputably, the first two statements are the result of custodial questioning without benefit of *Miranda*. The third statement was a successive interrogation designed to piggyback off the prior unwarned statements. The fourth statement was a successive interrogation by the BIA agent after Rooney had requested the assistance of a lawyer. The Magistrate address the statements as such:

To summarize, law enforcement initiated four encounters with Defendant while he was handcuffed and naked in the back of the patrol vehicle wherein Defendant made statements: (1) the first non-*Mirandized* conversation with Officer Walker at approximately 1:18 a.m., which was not recorded; (2) SA Robert's non-*Mirandized* six-and-a- half-minute questioning that commenced at approximately 3:23 a.m., which was recorded and disclosed after Defendant filed this motion to suppress (Ex. 1); (3) SA Robert's recorded thirty-three minute questioning that commenced at approximately 5:35 a.m. after Defendant signed a *Miranda* rights advisory form (Ex. 4) and was terminated after Defendant stated he wanted a lawyer (Ex. 2); and (4) Officer Walker's recorded questioning that commenced at 6:18 a.m. after he advised Defendant of *Miranda*, which Defendant waived. (Ex. 3).

Statement two was obtained by FBI Special Agent Roberts almost immediately after arriving on scene around 3:00 a.m. Roberts testified that he was aware there was suspected remains and a missing woman. (T 11:13-15) He testified that he approached Rooney to with the intention of seeing if he was under the influence or if there was physical evidence on his body that need to be documented (T 14:14-18, 19:12-14). Despite his stated intent, Roberts did not even observe any of the physical injuries other officers saw plainly. Roberts did not take a PBT or do any field-testing to determine if Rooney was under the influence. Roberts did not even ask any questions oriented toward physical health or injuries. (T 33-34). Even if Roberts wanted to verify, before he went into questioning Rooney, that there were actually human remains in the fire-pit - he was certainly aware that Rooney was detained from the scene of his missing partner. (T 20: 5-8) It is wholly dishonest to refer to Rooney as anything but the chief suspect in her disappearance. After questioning Rooney in a manner the government concedes, "crossed the line" to interrogation, he accompanied local law enforcement to the scene of the suspected human remains. (doc 45 at 10) Importantly, Roberts questioned Rooney about prior domestic violence within the relationship. The information collected from this interview informs Roberts's strategy during the subsequent interview. (exhibit 1 at 4:35)

During the follow up interrogation, which statement three, Roberts *partially* complied with the requirements of *Miranda*. As pointed out by the Magistrate Judge, Roberts failed to advise Rooney of the "right to remain silent" as part of the *Miranda* admonishment. (exhibit 2). The Magistrate found, "Defendant did not raise issues with the adequacy of SA Roberts' *Miranda* advisement at the outset of this interrogation…" (F&R p.12) To the extent necessary to raise the issue on this *de novo* review, Defendant DOES object to the adequacy of the *Miranda* advisement. Any failure to raise the issue earlier is exclusively the fault of undersigned counsel. Despite the Magistrate's view, Roberts's failure to recite accurately the full warnings speaks volumes to the issues raised herein. That in addition to all the sloppy, wrongheaded decisions made by Roberts that were fully briefed and argued, the fact Roberts intentionally ditched the "right to remain silent" underscores what is plain- given the police conduct in this case, Rooney would have no reason to think he had any genuine right to remain silent. The Magistrate is wrong to give Agent Roberts the benefit of the doubt that his mistakes and omissions were innocent when each of the decisions were geared toward reducing the chance of Rooney exercising his constitutional rights.

As to statements one and two, the government conceded in its briefs that both Walker and Roberts knew the Defendant was in custody and that, at times, their inquiries crossed the line into interrogation. The government also conceded that Walker (during statement four) violated the Defendant's right to cease his interview until he had a lawyer and that he did so after knowing, for whatever reason, that Rooney had terminated his interview with the FBI. The government chose to avoid the obvious findings that the Magistrate would be obligated to enter in these circumstances. Instead, it choose to eliminate the issue by electing to not introduce those statements at the time of trial. The government, in its choice to protect the unlawful

conduct of its agents, avoids the legal findings that are obvious.  However, it cannot prevent this Court from considering the conduct when it considers the totality of the way Rooney was treated or the officer's lack of regard for the law as it relates to how it obtains its evidence.

## Argument

**1.  Robert's successive interrogation monopolized upon Rooney's first, unwarned, statement.  The two-part interrogation process failed to advise Rooney that he had any real choice about giving an additional statement and should be suppressed pursuant to *Missouri v. Seibert*, 542 U.S. 600, 613 (2004)**

The Magistrate Judge's F&R concludes, "the government has met its burden to prove that SA Roberts' failure to provide *Miranda* warnings to Defendant prior to the first six-and-a-half minute questioning was not a deliberate, calculated, or intentional use of a two-step interrogation process designed to circumvent *Miranda*." (F&R p.9)  Further finding that the Agent's efforts to interrogate without *Miranda* was not a "deliberate, calculated, intentional strategy to circumvent *Miranda* and provoke a confession." (F&R p.9)  The Magistrate's finding completely ignores the actual conduct of Agent Roberts who was told, by Rooney, "[I'm] being detained because they haven't found my wife." (exhibit 1).  Instead of telling the self-proclaimed detained Rooney he has any rights, while handcuffed over a missing person, Agent Roberts questioned him about his activities of the day and prior criminal history.  (exhibit 1).  Even as Rooney responded with incriminating statements about prior domestic situations with the victim, Roberts never stopped him or did anything at all to let Rooney know his statements will be used against him in a criminal proceeding.  Roberts took no effort at all to advise Rooney that he had any choice about answering his questions.

After going out to the scene and coming to the same conclusion of the Wildlife and Conservations Officers, that the remains located in the fire pit were likely human remains, Roberts returned to the still naked Rooney, and advised him of several of his rights per *Miranda*.

"The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Siebert* at 611-612.

Like in *Seibert*, Roberts did nothing to alleviate any conclusion that Rooney's earlier statement would not be used against him nor that he would be given an opportunity to remain silent or stop talking about matters already covered in the first interview. "The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Seibert* at 616–17. Certainly that also the case here where the first comment from Roberts (after *Miranda*) was a bridge from the earlier interrogation, "you told me your story earlier, we talked a couple hours ago, all that stuff and I went up to that cabin okay." (exhibit 2).

      This Court should not warp the circumstances of this case – Roberts intentionally failed to advise Rooney of his rights in his first interrogation- trying to keep the interaction casual, in a way as to not alert Rooney to appreciate the gravity of his own situation. His testimony that he wanted to find out if Rooney was drunk or had physical injuries is contradicted by common sense and Roberts's own conduct. Roberts did not ask about consumption or even take a flashlight to look at Rooney's body. He didn't even work through the first part of critical thinking necessary to the investigative process. Roberts failed to make an FBI 302 report of the interaction while it was still fresh in his memory. Roberts failed to log the audio of the interview, despite inquiries as to its existence, until AFTER the undersigned filed Rooney's Motion. Only "finding" the audio after it became clear that reports of other officers as well as the recording of his own interaction with Rooney made it clear that the prior custodial interview took place. The Agent testified, at the motion hearing, to have mislabeled the audio as a transport interview. Worse, he failed to acknowledge his obligation to pursuant to Court order to turn over statements of the Defendant even if they occur during transportation. (T:6-8). This conduct all speaks to Roberts's intentional efforts to circumvent *Miranda.*

      The third interrogation, where Roberts fails to give a proper admonishment, does not cure the improper earlier interrogations (both by BIA Walker and by Roberts). The Magistrate erred to find that inadequate *Miranda* warnings could have served their purpose. The Magistrate erred in finding that Rooney's signature on the FBI Rights Advisory Form (exhibit 4) remedied the insufficient oral recitation of *Miranda.* The audio of the interview reveals insufficient time for Rooney (or anyone) to read the form and the Agent specifically told Rooney to read only one of the statements aloud, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to [UI] to answer questions without a **lawyer** present. Okay."

(exhibit 2). This fact being of special relevance since this the right to a lawyer is right Rooney chose to invoke later in the interrogation (exhibit 2).

Omission of *Miranda* as "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will" is one circumstance but not the only scenario with "ask first warn later." See, *Oregon v Elstad*, 470 U.S. 298, 309 (1985). The Magistrate's F&R erroneously categories Agent Roberts's as not deliberate or calculated. The totality of Robert's conduct, however, says something entirely different. That his conduct and even his pathetic effort to remedy his conduct were designed to eliminate Rooney's choices.

**2. Agent Roberts administered an incomplete *Miranda* advisement and, as such, Rooney's waiver of his rights was not knowingly, intelligently, and voluntarily given.**

Custodial interrogations, by their nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona,* 384 U.S. 436, 464 (1966). To combat this natural pressure, *Miranda* demands that individuals subjected to custodial interrogation be advised of their right to remain silent and to have counsel present. *Id.* at 468-70.

While Defendant acknowledges there is no precise language or order the rights advisory must be given, it is impossible to understand why Agent Roberts refused to accurately read the list of rights on the form he held in his hand. The single strongest virtue of *Miranda* is the fact that the giving of the warnings obviates the need for a case-by-case inquiry into the actual voluntariness of the admissions of the accused. Agent Roberts's effort to obfuscate Rooney's choices by not advising him of his rights in the first instance and ineffectively advising him in the second case renders his statements not just involuntarily given but given without knowing and intelligent waivers of his rights.

**3.  In each of these instances, Rooney's statements were not voluntarily given and should be excluded from use at the time of trial even as impeachment evidence.**

Defendant acknowledges it rare; however, this Court can de-incentivize the all too common practice in cases investigated in Indian Country to skate the fine line of the law.  This Court has the authority to exclude statements for use as impeachment if the Court finds the Defendant's "will overborne and his capacity for self-determination critically impaired because of coercive police conduct."  See, *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

The voluntariness of a statement must look to the totality of what happened.   Rooney was taken from the scene, where he knew he was being detained while police tracked down his missing "wife."  He remained naked, handcuffed in the back of a patrol car for over 4 hours.  He was first interrogated twice without benefit of *Miranda*.  While he waited for the next interrogation he was never given food, clothes, water or an opportunity to use the restroom.  While the Magistrate asserts that officers "checked on Rooney" throughout the detention, there is no evidence he was provided humanitarian breaks. (F&R p. 12-13) This was not a short period of "discomfort," this treatment was humiliating and degrading.  Then, when the Agent returned to him, he administered incomplete *Miranda* warnings and did not give Rooney an opportunity to read the *Miranda* waiver form before signing the document.  Finally, even after invoking his right to have a lawyer, the BIA steps in to re-interrogate him.  As pointed out in the F&R, Walker has personal history with Rooney- the kind that he explicitly used to gain trust and extract yet another illegally obtained confession.  The Defendant asks this Court to consider all the evidence in its totality and find that any statements given were not voluntarily given.  This Court should suppress them from use against the Defendant in the event he elects to testify in his own defense.

**Conclusion**

The Defendant request this court to make a *de novo* determination as to each of the objections and modify the Magistrate's F&R accordingly. FBI Agent Roberts's conduct during the interrogation process was intentionally designed to circumvent *Miranda* warnings by deliberate delay in order to provoke a confession. Agents intentionally acted to subvert Rooney's right to remain silent both by interrogating him without *Miranda* in the first instance and then and by failing to advise him of his right to remain silent. Rooney's statements were not knowingly, intelligently and voluntarily given. Statements obtained in violation of Rooney's right to remain silent were not voluntarily given. As such, the Court should prohibit the government from using Rooney's statement to Agent Roberts from use against in their case-in-chief and prohibit the government from using any of the other statements against him even if he elects to testify at trial.

JONATHAN ROONEY, Defendant,

By:   s/ Kelly M. Steenbock
        **KELLY M. STEENBOCK**
        **Assistant Federal Public Defender**
        222 South 15th Street, Suite 300N
        Omaha, NE 68102
        (402) 221-7896
        Fax: (402) 221-7884
        email: kelly_steenbock@fd.org