IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 20CR104 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **BRIEF IN SUPPORT OF** |
| | ) | **DEFENDANT'S OBJECTION** |
| | ) | |
| JONATHAN ROONEY, | ) | |
| | ) | |
| Defendant. | ) | |

Federal Rule of Evidence 404(b) states "[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." "The Rule excludes evidence of specific bad acts used to circumstantially prove that a person has a propensity to commit acts of that sort." *United States v. Heidebur*, 122 F.3d 577, 579 (8th Cir. 1997). "To be admissible as Rule 404(b) evidence, the evidence must be (1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged. *United States v. Shoffner*, 71 F.3d 1429, 1432 (8th Cir. 1995).

The proposed other act evidence is simply propensity and bad character evidence which the Rule explicitly prohibits. The alleged other acts are reported by family and close friends only <u>after</u> Ms. Decorah's death. The alleged threats or acts of violence are undocumented. There are no corresponding pictures, 911 calls, investigations, recordings or convictions to substantiate these dramatic post-mortem allegations. For some of the evidence, since there is no corroboration, the evidence can only be presented by repeating hearsay. For other evidence, the government will not be able to establish the truth of the allegation by even a preponderance of the evidence. The government offered a list of the potential statutory basis for the admissibility

of the evidence, however, the only relevance of the evidence is to demonstrate conformity with prior allegations and a propensity for violence against Ms. Decorah.

## BACKGROUND

Prior to her death, Ms. Decorah had a long history of mental health and substance abuse struggles. The allegations from the government's proposed witnesses that Ms. Decorah was the victim of abuse surfaced only after her death. The allegations fall into two general categories: 1. Witnesses who will testify that Ms. Decorah confided in them of some abuse or threat and 2. Witnesses who claim to have seen abuse or injuries firsthand. The Defendant objects to the testimony regarding both categories of allegations for each of the reasons outlined in his objection. First, there is insufficient evidence to support the allegations since there is no direct or circumstantial corroboration of any of the allegations. The alleged threats reported by Ms. Decorah are hearsay and offered only for the truth of the matter asserted. Witnesses who say they saw an assault or saw marks on Ms. Decorah failed, to a person, to document the incident. There are no police reports, there are no private caseworker complaints, and there are no photographs. Second, even if the Court finds the government has met its burden of proof, the evidence is not relevant for a proper purpose. The cause of Ms. Decorah's death is unknown. Evidence of domestic turmoil will be introduced solely to establish Rooney's propensity for violence toward Ms. Decorah- a prohibited purpose for the introduction of evidence. Finally, allegations of domestic abuse in a domestic murder trial is so unfairly prejudicial as to outweigh any probative value it could offer the jury. The risk of the jury's misuse of the evidence toward propensity for violence cannot be curtailed by a limiting instruction.

**Ms. Decora's statements to third parties, who never personally witnessed any abuse, are uncorroborated, inconsistent hearsay allegations that should not be admitted at the time of trial.**

The government, in its notice, proffers that Kirah Cassidy will testify that Ms. Decorah disclosed to her that she was being abused mentally and physically by Mr. Rooney. Ms. Cassidy lived with Mr. Rooney and Ms. Decorah for a time period in 2018, however, her information about abuse stems exclusively from what Ms. Decorah told her rather than her own eye-witness observations. Based upon the FBI's interview, it appears Ms. Cassidy NEVER saw signs of abuse such as threatening language, unexplained bruises or marks on Ms. Decorah's body or face.

The government intends to rely upon Ms. Decorah's statements about abuse to Ms. Cassidy that occurred over the Facebook messenger application in the winter and spring of 2020. Ms. Decorah, in her messages to Ms. Cassidy, confided that she thought Mr. Rooney was being unfaithful to her and expressed her frustration that he kept bringing up her own (long since passed) infidelities. When she told Ms. Cassidy that Mr. Rooney was abusing her in front of their children, Ms. Cassidy did not react as any other person, much less friend, would be expected to react. She didn't offer Ms. Decorah refuge. She didn't call police or child protective services. She didn't do anything, other than send a crying face emoji, to help Ms. Decorah from what she described as a very violent situation.

It is the Defendant's position that Ms. Decorah was seeking support, not from abuse, but from her long-held depression. Once telling Ms. Cassidy that she was, "just wanting to die" because of being cheated on by Mr. Rooney. (February 24, 2020) And then later, telling her friend, "I was so happy before this happened now I just want to kill myself" after being disappointed in Mr. Rooney's reaction to being confronted about his infidelity. (April 30, 2020) In fact, almost all of Ms. Decorah's complaints to Ms. Cassidy were about cheating- not about abuse.

Like many people, Ms. Decorah presented herself and her relationships over social media as she wanted to be perceived by others. For example, on May 15, 2020, Ms. Decora posted a picture of herself onto Facebook with the caption, "3 months clean yesterday." Yet only days earlier, on May 7, 2020, in her private messages with Ms. Cassidy, Ms. Decorah was asking where to "get trees" and making a plan to "blaze." It is apparent that Ms. Decorah was quite comfortable with presenting herself however it best suited her needs at the time. There is no way to know what statements, if any, are true. Allowing another witness to repeat what she said does not cure or change the initial unreliability of the statement.

The government proffers that it expects Ms. Decorah's sister, Lil Stella, to testify that Ms. Decorah told her that Rooney threatened that he could kill her and that her body would never be found. The threat allegedly occurred sometime after the birth of Ms. Decorah's first baby, born July 9, 2016. Yet, despite the gravity of the threat, at no time did Lil Stella ever report the incident to police, child services or any other authority. There are no Facebook messages to corroborate ongoing concern for Ms. Decorah's safety. Lil Stella did not message her sister to ask about her safety- ever. Lil Stella never made effort to contact Ms. Decorah's juvenile caseworker to make a complaint that she was worried her sister was in danger.

The government proffers that on three separate occasions Sarah Dobbs travelled from Wisconsin to Winnebago, Nebraska with the intention of taking Ms. Decorah back to Wisconsin to escape domestic abuse by Mr. Rooney. There are no dates or context to the allegation of abuse. No pictures were taken to document abuse. Ms. Dobbs also alleges that Ms. Decorah told her that Mr. Rooney threatened to kill her on multiple occasions. There are, of course, no dates to any of the alleged threats. There are no reports to police, child protective services or to caseworkers. Ms. Decorah's children were taken by child protective services of the Winnebago

tribe due to her drug abuse- yet at no point during any of these professional interventions did Ms. Decorah report she was being threatened with her life by the father of the children (who was also under juvenile jurisdiction for drug abuse).

The government intends to call Mysehll Mike to testify that Ms. Decorah, her self-proclaimed "best friend," confided that Rooney threatened to kill her or set her car on fire. She also claimed that Ms. Decorah called her while being chased by Mr. Rooney and she observed, via video, a black eye that Ms. Decorah claimed was from Rooney pushing and hitting her. Ms. Mike alleges there are numerous Facebook messages about the allegations, however, none turned up on the government's Facebook subpoena. Again, despite the nature of the allegation and the fact that Ms. Mike claims she even drove to Nebraska to try and get Ms. Decorah to come with her back to Wisconsin, there is absolutely no corroboration of the alleged threats. There were no reports to law enforcement, child protective services or to the juvenile caseworkers. There are no photographs, recordings or screen shots from this alleged incident with the black eye or from a time where Ms. Decorah was running from Mr. Rooney.

The government alleges that Ms. Decorah stayed with Rhea Sanchez, her sister, for a week due to being in fear for her life after a threat about gang members coming to kill her. The allegation is undated and fantastical. There is no report of the alleged threats nor any indication that Mr. Rooney is associated with gang members. It is certainly possible that the couple bought drugs from gang members and made them mad in some way, however, there is no evidence to support the allegation and even less to connect Mr. Rooney.

The government proffers that Ms. Decorah told Maybeth Whitewing in January, 2017, that if anything ever happened to her that it was because of Mr. Rooney. Again, Ms. Whitewing, though she claims to also have witnessed an assault firsthand, never alerted any authorities.

Even with these two factors coupled, Ms. Whitewing did nothing to assist her friend. She didn't even make a simple phone call to the juvenile caseworker.

Finally, Nevada Whitewing, who lived with Maybeth Whitewing, alleges that Ms. Decorah told her that if she ended up dead, it would be Mr. Rooney who did it. Presumably, Nevada Whitewing is referring to the same allegation as Maybeth Whitewing. What an amazing coincidence. Two people, possibly relatives, who live together both report the same allegation of threat. Yet, neither of them took any steps to help Ms. Decorah or alert any authorities. Neither of them can provide documentary corroboration. Only after Ms. Decorah died did either of them populate their Facebook pages with quotes and captions about their love and care for Ms. Decorah. They would do anything to have her back yet when allegedly presented an opportunity, they didn't do anything to help save her from supposed abuse. The Defendant respectfully submits it is because the witnesses, in an effort to make sense of the nonsensical, have manufactured allegations of threats in order to assist with a conviction.

**Unfounded allegations of domestic abuse should not be admitted at the time of trial.**

The government proffers that Ms. Dobbs will testify that she had seen incidents of Mr. Rooney physically assaulting Ms. Decorah. Once again, the alleged incidents were not documented in any way. Despite the fact that two of these alleged events occurred in public places, law enforcement was not called. There is no video evidence of its occurrence. There are no photographs or reports to caseworkers.

In addition to the hearsay statements Mr. Decorah allegedly made to Rhea Sanchez about Mr. Rooney, Ms. Sanchez also claims to have seen Ms. Decorah with black eyes after she claimed that Mr. Rooney had pushed her on the bed and hit her. No report was made and no

photographs corroborate the event.  The event allegedly occurred in 2017 while Mr. Rooney was living in Wisconsin with Ms. Decorah.  So years and years passed without this caring, attentive sister seeking any sort of help for Ms. Decorah who was allegedly in an abusive relationship with the father of her 3 children.  Never did Ms. Sanchez intervene with the Winnebago tribe to become a guardian of Ms. Decorah's children while she recovered from her addiction to substance abuse issues.  Never did Ms. Sanchez call the assigned juvenile caseworker to report concerns about abuse or to recommend domestic violence intervention on behalf of Ms. Decorah or her children.

    Ms. Sanchez has demonstrated she has no moral dilemma with calling the authorities even on matters of domestic disturbance.   She called police on Ms. Decorah on June 5, 2017, where she alleged Ms. Decorah assaulted her.  Ms. Sanchez didn't say anything about Mr. Rooney being physical with Ms. Decorah- only that she (Sanchez) had been assaulted by Ms. Decorah.  She alleged that Ms. Decorah punched her in the face after arguing about Ms. Decorah's mistreatment of her animals.   Reports from the incident reveal that Mr. Rooney was present when law enforcement were called regarding the fistfight between the sisters.  Any domestic concerns could have been reported right at that time if such existed.

    Ms. Mike claims to have had video calls with Ms. Decorah, allegedly seeing in the video call signs of a struggle or abuse.  None of those alleged interactions were captured with video or even a screen shot of the action.  Despite her concern for her for Ms. Decorah, she had not even seen her in-person for 3 years prior to her death.  Similarly, Maybeth Whitewing claims to have had an undated video call with Ms. Decorah where she observed a bruise. No recordings or screen shots were taken to document the incident.  The one video that was provided by Ms. Whitewing is a verbal argument between two people, allegedly Mr. Rooney and Ms. Decorah.

Someone decorated the video with sparkly writing- not something one would adorn a video with supposed domestic violence. The video itself proves nothing other than two people arguing. Finally, Nevada Whitewing, who claims to have seen Mr. Rooney to head-butt Ms. Decorah, similarly never documented the abuse.

## ARGUMENT

It is worth noting that the Federal Rules of Evidence have recently been amended to include a stricter rule requiring the government to identify a proper, non-propensity purpose for the proposed evidence. The government has failed to comply with the Notice requirement outlined at Federal Rule of Evidence 404(b)(3)(B) to "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Mere allegations of domestic abuse coupled with a list of the statutory possible permissible purposes does not satisfy the notice requirement. Committee notes upon the 2020 Amendment of the Notice requirement make it clear that the reason for the amendment was to eliminate the government's mistaken belief that there carried no obligation to describe the specific act that the proposed evidence would tend to prove. "The prosecution must not only identify the evidence that it intends to offer pursuant to the rule but also articulate a non-propensity purpose for which the evidence is offered and the basis for concluding that the evidence is relevant in light of this purpose." See, Unites States Supreme Court, Orders, April 27, 2020 (effective December 1, 2020) Committee Note, https://www.rulesofevidence.org/latest-updates/.

Counsel is familiar with the government's theory of the case, so inartfully described to most all witnesses by FBI Special Agent Roberts, who told them that prior instances of domestic abuse would assist the prosecution in the case against Mr. Rooney. However, contrary to

Robert's speculation, such uncorroborated instances have no room at trial. As described above, the witnesses' descriptions are of events remote in time to the issues at trial and are wholly uncorroborated. Quite frankly, the witnesses descriptions of what Ms. Decorah told them demonstrates nothing more than their shared disbelief of her word. How else can the these stories never spur even one person to contact law enforcement, the caseworker who makes decisions about her three children, or the men and women involved in the Native American Church services that the couple attended regularly?

There are no charges or convictions to sort. These allegations were never investigated at the time they allegedly occurred. Now that they have surfaced, the law requires this Court to make a gatekeeping decision to evaluate the allegations to determine what is true to a standard of preponderance of the evidence. This test must be applied to each individual allegation- a finding that a jury would likely find Mr. Rooney guilty of the crimes had they been charged. The evidence is lacking and this Court should enter an order prohibiting the government from introduction of any of these unfounded allegations at the time of trial.

Should the Court find the government has met its burden, only then should the evidence be evaluated to determine what proper purpose the evidence should be admitted. It is the government's obligation to demonstrate the chain of inferences that would lead the Court to conclude that the evidence is being offered for a proper purpose and not just to establish conformity with a bad reputation.

Prior domestic abuse does not provide motive for murder. Especially when there doesn't appear to be any evidence of such, no impending arrest or doom to come to Mr. Rooney that would motivate him toward action. Like any domestic partner, Mr. Rooney had opportunity to harm Ms. Decorah any time. Prior allegations of abuse do not give him greater opportunity to

harm her in the future. Likewise, prior instances of domestic violence does not establish a plan. The remaining two purposes include intent and absence of mistake or accident and this Court cannot determine admissibility under those theories until Defendant has made his defense known.

If the Court finds there is a proper purpose for some of the proposed evidence, the introduction of other acts of domestic violence are so unfairly prejudicial to outweigh any probative value provided by inclusion of the evidence. There are two intertwined Rule 403 dangers in this case. First, evidence that Mr. Rooney committed crimes other than and in addition to the one for which he is on trial has obvious prejudicial effect. It will arouse the emotions of the jury and endear unwarranted sympathy for the deceased. Second, it may tend to confuse the issues, especially since Mr. Rooney must now defend himself against more than one allegation and it may appear that Mr. Rooney must defend himself against all allegations to secure a favorable jury verdict. The Court must weigh the allegations against the generally low probative value of allegations stemming back to 2017 being evidence of anything recent.

## CONCLUSION

The Defendant, Mr. Rooney, respectfully requests this Court to enter an order prohibiting the government from introduction of supposed "prior bad acts" evidence at the time of trial. The evidence of other acts of domestic violence are not relevant to a contested matter other than the defendant's criminal propensity. There is insufficient proof that Mr. Rooney even committed the other alleged acts and there is no direct or circumstantial proof sufficient to overcome the burden of proof. The proposed evidence does not have a place within the statutory outlined proper purposes. Finally, a balancing of the evidence demonstrates that any probative value is substantially outweighed by its prejudicial effect upon the jury.

JONATHAN ROONEY, Defendant,

By:   s/ Kelly M. Steenbock
      **KELLY M. STEENBOCK**
      **Assistant Federal Public Defender**
      222 South 15th Street, Suite 300N
      Omaha, NE 68102
      (402) 221-7896
      Fax: (402) 221-7884
      email: kelly_steenbock@fd.org